IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION


UNITED STATES OF AMERICA          :      CASE NO.
                                  :
         v.                       :
                                  :
DEREK EUGENE SPRIGGS              :      1:12-CR-00300-1


TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
DAY I OF II


BEFORE:          HON. SYLVIA H. RAMBO

DATE:            April 24, 2013
                 9:10 a.m.

PLACE:           Courtroom No. 3, 8th Floor
                 Federal Building
                 Harrisburg, Pennsylvania


APPEARANCES:

MEREDITH A. TAYLOR, ESQUIRE
Assistant United States Attorney
     For the United States

HEIDI R. FREESE, ESQUIRE
     For the Defendant

_____

WENDY C. YINGER, RMR, CRR
Federal Official Court Reporter
P.O. Box 983
Harrisburg, PA  17108

I N D E X   T O   W I T N E S S E S

| FOR THE GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| Scott Wolfe | 51 | 60 | -- | -- |
| Josh Arvelo | 66 | 84 | 101 | 104 |
| Corey Dickerson | 106 | 112 | -- | -- |
| Jon Markle | 119 | 138 | 151 | -- |

| FOR THE DEFENDANT | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| Lawrence Muza | 156 | 164 | 164 | -- |

(Prospective jurors sworn.)

THE COURT: Good morning, everyone. Please be seated. Ladies and gentlemen, you've been called as prospective jurors in the case of the United States of America versus Derek Eugene Spriggs. This case should conclude today. And if not, it will not go any longer than tomorrow morning. We're going to call a certain number of you, and I would ask that you first fill in the jury box beginning in the front row and then the back row.

And then we will have to seat some of you that are called in the row behind the Government's counsel table. That would be the rows to your right, to my left. We'll have you indicate it at the appropriate time. Go ahead, Mark.

COURTROOM DEPUTY: Susan Rice.

THE COURT: Ms. Rice, go through the exit door all the way up to this seat.

COURTROOM DEPUTY: Reba Reachard. Barbara Kyler. Heather Francis. Kristen Fickes. Steven Adamy. Michael Dowling. Van Shatzer.

THE COURT: Mr. Shatzer, you'll have to enter the gate to the second row.

COURTROOM DEPUTY: Gary Rappoldt. Annette Hockenberry. Deborah Zenefski. Connie Moore. Joseph Szewczak. Gary Florence. Richard English.

THE COURT: Now, Mr. English, as you come through the

gate, take the bench behind Government's counsel table all the way over to the wall.

COURTROOM DEPUTY: Lenelle Roberts. Randi Malinowski. Ryan Tobias. Kurt Scafe. Kelly Marks.

THE COURT: Folks, vacate the row behind the bar. Move over to this side. Now proceed on that bench all the way over to the wall.

COURTROOM DEPUTY: Gary Hess. Jessica Kraft. James Rackson. Jerry Sunderland. Marcia Hickey. Laurie Malave.

THE COURT: All right. Now we need to vacate the next row. Ms. Malave, take the last seat in that next row.

COURTROOM DEPUTY: Alan Hepburn. Michael Ziemke. Cody Shomper. Keith Masser. Darlene Bakner. Joshua Zink.

THE COURT: Now, ladies and gentlemen, you should have been given a sheet with some questions on. I'm going to have each of you, when I recognize you, stand and only give the response. You do not need the questionnaire. We have the questions. Do you need the questionnaire? You're Ms. Rice? The answers to the questionnaire?

A JUROR: I'm 66. I am the only person in the household. I was a former English teacher and I'm retired. I have a B.S. degree and 24 graduate hours. I have served on a civil jury.

THE COURT: Where?

A JUROR: Perry County.

THE COURT: Approximately when?

A JUROR: Probably in the '80's. A long time ago.

THE COURT: Do you recall the nature of the case?

A JUROR: It was concerning work that one man had done. The people who owned land lived in Pittsburgh. The man was local who had done work for them on a piece of land they had purchased.

THE COURT: Okay. Was the verdict for the Plaintiff or the Defendant? Do you recall?

A JUROR: It was for the Defendant.

THE COURT: Were you the foreperson on that jury?

A JUROR: No, I was not.

THE COURT: Is there anything about that experience that would affect your ability to sit as a juror in this case?

A JUROR: No.

THE COURT: What school district did you teach?

A JUROR: West Shore, Central Penn, Susquenita. Greenwood was where I retired from.

THE COURT: Thank you. Is it Reachard?

A JUROR: I'm 50, and there is three people living in my household; my daughter and her partner. And I am a medical secretary. And I am widowed. And I have a high school education. And I've never served on a jury.

THE COURT: Your daughter and her companion, are they employed outside the home?

A JUROR: Yes.

THE COURT: Where are they employed?

A JUROR: One is a teacher at Lincoln Charter School, and the other one is a manager at a Credit Union.

THE COURT: Thank you. Ms. Kyler.

A JUROR: I'm 52. There's four people living in my house. I'm the mother. I'm not retired. I'm married. Occupation of my spouse is prison guard, but he's retired. I'm employed. I have an Associate's degree in nursing. And I've never served before.

THE COURT: In addition to your husband, are there any other people that are employed outside the home?

A JUROR: Yes. My 24-year-old son, he's a diesel mechanic at Fed Ex in Hagerstown.

THE COURT: This involves -- this is a criminal case. Would the fact that your husband was a prison guard in any way cloud your ability to render a fair and impartial decision in this case?

A JUROR: No problem.

THE COURT: And where was he employed? What prison?

A JUROR: Maryland prison.

THE COURT: Thank you. Ms. Francis.

A JUROR: I am 26 years old. Two people live in my household, and I live with my partner. I am not retired. I'm an executive assistant. I'm not married. And I have a

Master's degree. And I've never served on a jury.

THE COURT: Thank you. Ms. Fickes.

A JUROR: I'm 44. There's three people in my household. I am a mom and a wife. I'm not retired. I'm married. My husband works at a financial bank. I am employed. I work in energy sales. I have a Bachelor's in business management. And I've never served on a jury.

THE COURT: Thank you. Mr. Adamy.

A JUROR: I'm 53. Two people. I'm not retired. My wife is an administrative assistant at York College. I am employed. I graduated from high school. And I've never served.

THE COURT: Thank you. Mr. Dowling.

A JUROR: I'm 56. There's four people in the household. I'm not retired. I'm married. My wife is a cashier. High school education. And I never served.

THE COURT: Thank you. Mr. Shatzer.

A JUROR: I'm 59. There are two people living in my household. I'm the husband. It's just me and my wife. I'm presently working. My wife is a federal employee. I'm presently employed. My education, basically just high school diploma and vo-tech training. Never really served -- never been selected for any jury service.

THE COURT: You've been called but never selected?

A JUROR: Yeah, locally.

THE COURT: What agency is your wife employed by?

A JUROR: The IRS. She's a manager for IRS, the federal government.

THE COURT: All right. Thank you. Mr. Rappoldt.

A JUROR: I'm 48. There's five people that live in my household. It's my wife and three children. My wife is a homemaker. I'm a banker. I have an MBA. And I never served.

THE COURT: Thank you. Ms. Hockenberry.

A JUROR: I am 56. No other people in the household.

THE COURT: How many?

A JUROR: None. I'm not married. I am presently employed by Millers Capital Mutual Insurance here in Harrisburg. And high school diploma. And I was called for civil jury about eight years ago in Cumberland County.

THE COURT: Did you serve?

A JUROR: I was elected, but right before, they settled out of court then.

THE COURT: Okay. Is there anything about that experience that would affect your ability to sit as a fair and impartial juror?

A JUROR: No.

THE COURT: Thank you. Ms. Zenefski. Pronounce that again for me.

A JUROR: Zenefski. I'm 58. Two in the household; me and my spouse. Not retired. Yes, married. My husband is a

chief financial officer. I have a Master's in information systems. And I've never served on a jury.

THE COURT: Thank you. Ms. Moore.

A JUROR: I'm 65. Two people in my household. He's my husband. I'm retired. The last thing I did was custodian. And how long? I've been retired three years. My husband is a pastor. And I went to business school.

THE COURT: Pardon?

A JUROR: Went to business school.

THE COURT: Thank you. Have you ever served on a jury?

A JUROR: No, no.

THE COURT: Okay. Mr. Szewczak.

A JUROR: I'm 55. Two people in my household; my wife and I. I'm currently employed as a program manager. She's a nurse in a psychiatric facility. I have a Bachelor's degree. And I've never served.

THE COURT: Thank you. Mr. Florence.

A JUROR: I'm 51. Two in our household. I am the husband. My wife is a patient access clerk at a hospital.

THE COURT: Which hospital?

A JUROR: Waynesboro. High school graduate. I was called to be on, to serve, but they did not call me.

THE COURT: Is there anything about that experience that would affect your ability to sit as a fair and impartial

juror in this case?

A JUROR: No, ma'am.

THE COURT: Thank you. Mr. English.

A JUROR: I'm 68. Two in the household; my wife and I. I'm retired. I was a locomotive engineer. My wife has retired. She's a school teacher. And one year of college. And I never served.

THE COURT: What school is your wife --

A JUROR: Worndorff Elementary in Manchester.

THE COURT: Thank you. Ms. Roberts.

A JUROR: I'm 52 years old. I live alone. I work for Penn State Extension. I have a Master's degree. And in the early '80's, perhaps 1984, I served on a criminal jury in York County.

THE COURT: Are you married?

A JUROR: I'm divorced.

THE COURT: Okay. How long ago was that?

A JUROR: I believe it was 1984.

THE COURT: Where?

A JUROR: York County.

THE COURT: Do you remember what the case was about?

A JUROR: Yes.

THE COURT: What?

A JUROR: A gentleman was accused of involuntary manslaughter. He shook his girlfriend's baby and killed her.

THE COURT:  What was the verdict?

A JUROR:  Guilty.

THE COURT:  Were you the foreperson on that panel?

A JUROR:  I was --

THE COURT:  Were you the foreperson, the jury foreman?

A JUROR:  No, I was not.

THE COURT:  Is there anything about that experience that would affect your ability to sit as a fair and impartial juror in this case?

A JUROR:  No.

THE COURT:  Thank you.  Pass the microphone.  Ms. Malinowski.

A JUROR:  I'm 44.  Four people in my household.  I'm a wife and mother.  I'm not retired.  My husband is self-employed with an advertising business.  And I have two Bachelor's degrees.  And I've never served on a jury.

THE COURT:  You're a nurse?

A JUROR:  I'm a nurse.

THE COURT:  Thank you.  Mr. Tobias.

A JUROR:  I'm 36.  Four people live in my household; my wife and two children.  I'm not retired.  My wife is a computer programmer.  I have a Master's degree.  And I've never served.

THE COURT:  Thank you.  Mr. Scafe.

A JUROR: Good morning, Judge. I'm 48. Four people in the household; my girlfriend and my two stepchildren. I am a product manager for a local company here. I do have several years of college. And I've never served.

THE COURT: Who else besides you is employed outside the home?

A JUROR: My girlfriend.

THE COURT: Where is she employed?

A JUROR: Pennsylvania Higher Education Assistance Authority.

THE COURT: Thank you. Pass it all the way over to the end. Ms. Marks.

A JUROR: I'm 53. I live alone. I am not retired. I'm divorced. I'm presently employed for JFC Staffing as a temporary worker with AHOLD USA, in Carlisle, Pennsylvania. I have a high school education. I did serve in Cumberland County on a civil jury approximately eight years ago.

THE COURT: What was the nature of the case?

A JUROR: To be honest with you, Judge, I don't remember.

THE COURT: Do you remember -- were you the foreperson?

A JUROR: No, ma'am, I was not.

THE COURT: Anything about that experience that would affect your ability to sit as a juror in this case?

A JUROR: No.

THE COURT: Thank you. Mr. Hess.

A JUROR: 43 years old. There's two people live in my house; it's myself and my girlfriend. I am not retired. I am employed. And I have a high school education. I've never served on a jury before.

THE COURT: Is your girlfriend not working?

A JUROR: She does work, yes.

THE COURT: Where?

A JUROR: Snyders of Hanover, snack food.

THE COURT: Thank you. Ms. Kraft.

A JUROR: I am 30. I have four people in my household; my husband and two children. My husband works for Penn National Gaming. I have a Bachelor's degree in marketing and management. And I have never served.

THE COURT: Thank you. Mr. Rackson.

A JUROR: I am 24 years old. There's two people that live many my household; me and my fiancee. She works for BEP International as a secretary. I have a Bachelor's degree in accounting. And I served as an alternate juror on a criminal jury.

THE COURT: Did you ever get to deliberate in that case?

A JUROR: I did not.

THE COURT: Where was this?

A JUROR:  York County.

THE COURT:  Nature of the case?

A JUROR:  It was a guns violation.

THE COURT:  And were you the foreperson?

A JUROR:  No, I was not.

THE COURT:  Oh, you did not serve for deliberation. Anything about that experience that would affect your ability to sit as a juror in this case?

A JUROR:  No.

THE COURT:  Thank you.  Mr. Sunderland.

A JUROR:  I'm 43.  Four in the household; my wife and two children.  Wife is a stay-at-home mom.  I'm a senior maintenance technician.  Technical school.  And never served.

THE COURT:  Thank you.  Ms. Hickey.

A JUROR:  I'm 43.  Four people in my household.  I am the mother.  Currently not working.  Was a clerk typist with the Commonwealth of Pennsylvania.  High school graduate plus two years college.  And never served.

THE COURT:  Did you -- are you married?

A JUROR:  No.

THE COURT:  You're not.  Thank you.  Ms. Malave.

A JUROR:  I'm 51.  There's two people in my household; myself and my roommate.  I'm divorced.  I'm presently employed.  I have some college and certificate programs background.  I was called once for county court.  I

was dismissed for that, excluded for county court. And then I was called once for federal court, but before I even went, I never went through this process, apparently the case that I was supposed to be selected for never went through.

THE COURT: That happens a lot. Mr. Hepburn.

A JUROR: 43 years old. Three people; my wife and daughter. My wife is a stay-at-home mom. I have a Bachelor's degree. And I never served.

THE COURT: Thank you. Mr. Ziemke.

A JUROR: I'm 59. I live alone. I'm retired from the Department of Labor and Industry of the Commonwealth of Pennsylvania. I'm married, but my wife does not currently live in the house. She's going back to college. I have three years of college. And I've never served on a jury.

THE COURT: Mr. Shomper.

A JUROR: I'm 22. There's four of us living in my household; my mother and my stepfather and my brother. I work at Alvord-Polk Tool Company. And I have two years of education for the Pennsylvania College of Technology for Building Construction. And I've never served.

THE COURT: The other people in your household, where are they employed, if they are? My mother works for PMA Insurance Group, and my stepfather works for PHEAA.

THE COURT: Where?

A JUROR: PHEAA.

THE COURT: Thank you. Mr. Masser.

A JUROR: I'm 52. Four people in my household; my wife and my two sons. I drive truck. My wife is occupied -- yeah, she works for a realty company.

THE COURT: Do you know the name of the company?

A JUROR: No, I don't.

THE COURT: Okay.

A JUROR: I have some college education. And I have served before on a civil panel.

THE COURT: Where?

A JUROR: Harrisburg.

THE COURT: And how long ago?

A JUROR: Roughly 15 years ago.

THE COURT: Do you recall anything about the case?

A JUROR: Yes, I do.

THE COURT: What was it?

A JUROR: Harrisburg policeman was accused of -- I don't know what he was accused of. It was a Harrisburg policeman that was accused. And he was found not guilty.

THE COURT: So it was a criminal case not a civil case?

A JUROR: Sorry.

THE COURT: Were you the foreperson?

A JUROR: No, I was not.

THE COURT: Anything about that experience that would

affect your ability to sit as a juror in this case?

A JUROR: No.

THE COURT: Thank you, sir. Ms. Bakner.

A JUROR: I'm 54 years old. There are three people in my household; my fiancee and my future stepson. I am employed with Giant Foods. I am a high school graduate. And I have never served on a jury.

THE COURT: And your boyfriend works where?

A JUROR: He works for Timbar Packaging in New Oxford.

THE COURT: Does your stepson work?

A JUROR: No, he's in school.

THE COURT: Thank you. Mr. Zink.

A JUROR: I'm 26. My wife and daughter live with me. I work at Fresh Express, Harrisburg, as a mechanic. And my wife also works there. And I have a high school diploma.

THE COURT: Have you ever served on a jury before?

A JUROR: No.

THE COURT: Thank you. Ladies and gentlemen, I must now ask certain questions of you. And I'm asking that if you need to respond, raise your hand, and when I call on you, give me your last name as to any question to which you must respond. We have to keep a record of that. Now this case, as I said, is the United States of America versus Derek Spriggs. The United States is represented in this case by Meredith Taylor. She is

from the U.S. Attorney's office in the Middle District of Pennsylvania. Is there anyone here that is related to or acquainted with Ms. Taylor?

The Defendant is Derek Spriggs. Mr. Spriggs, would you stand, please? I would ask whether anyone is related to or acquainted with Mr. Spriggs? He is represented by Heidi Freese. I would ask whether anyone is acquainted with or related to Ms. Freese?

Thank you. Now this is a criminal case. Defendant has been charged with four offenses. He is charged as a felon in possession of a firearm, possession of a firearm during and in furtherance of a drug trafficking crime, criminal conspiracy to distribute and possess with intent to distribute a controlled substance, and an actual charge of possession with intent to distribute a controlled substance.

These events occurred on or about April 18, 2012, in the City of Harrisburg, which is in the Middle District of Pennsylvania. I would ask whether anyone here has any knowledge of the facts of this case directly or through any media. Now as I've indicated, the Defendant has been charged by way of an indictment. An indictment is not evidence in the case. It is merely a written charge of what the Government is accusing this Defendant of having been charged with. It is not to be considered as proof of anything in this case.

Now is there anyone here who has been a member, past

or present, of any organization involving firearms?  That's like the NRA.  Your name again, sir?

A JUROR:  My name is Joe Szewczak.

THE COURT:  Anyone else in the jury box?

A JUROR:  Reachard.

THE COURT:  What organization?

A JUROR:  A hunting club.

THE COURT:  Is there a name for it?

A JUROR:  West Manchester Fish and Game.

THE COURT:  Okay.  Anyone else?  Second row.  Yes, sir.

A JUROR:  I'm a member of the NRA, and I belong to -- well, I'm a former member of Mercersburg Sportsman Club.

THE COURT:  Okay.  Yes, sir.

A JUROR:  Rappoldt.  S&M Hunting Lodge.

THE COURT:  Anyone else?  First row back here.  Yes.

A JUROR:  English.  NRA.

THE COURT:  Anyone else in that row?  Second row?  Yes, sir.  Your name.  Take your hat off, sir.

A JUROR:  Hess.  McSherrystown Fish and Game.

THE COURT:  Take your hat off, sir.  Let me have your response again.

A JUROR:  McSherrystown Fish and Game.

THE COURT:  Okay.  Anyone else?

A JUROR:  Michael Ziemke.  Present member -- I was a

member of the NRA and a member of the Mechanicsburg Sportsmen's Club.

THE COURT: Now I would ask whether any of you believe that federal firearms statutes which limits the possession of certain types of firearms by certain people should not be enforced? Do you understand the question? I can repeat it if someone wishes me to repeat it.

A JUROR: Can you repeat it?

THE COURT: Okay. There are certain federal statutes that prohibit certain types of people from possessing firearms. Is there any one of you who believe that such statute should not be enforced? Do you understand the question? It appears to be negative. How many of you own firearms? Okay. I don't need to know the nature of the firearm. I just want to know if you possess it.

A JUROR: Rice.

A JUROR: Reachard.

A JUROR: There's guns in the house.

THE COURT: Fine. Okay.

A JUROR: Shatzer.

A JUROR: Rappoldt.

A JUROR: Joe Szewczak.

A JUROR: English. I own a shotgun and rifle.

THE COURT: Second row. Put your hands up. I can't see. Okay. Yes, sir.

A JUROR:  Hess.

A JUROR:  Kraft.

A JUROR:  Shomper.

A JUROR:  Masser.

A JUROR:  Bakner.

A JUROR:  Ziemke.

THE COURT:  Okay.  Now there will be certain people that may testify, and I'm going to name them.  And my question after I name them is whether or not any of you are related to or acquainted with these potential witnesses.  Special Agent Brian Gargiola.  Is that correct?

MS. TAYLOR:  That is, Your Honor.  He is not in the courtroom.

THE COURT:  Trooper John Markle.  Will he be testifying?  Thank you, sir.  Detective Gary Flythe.  Will he be testifying?

MS. TAYLOR:  He won't, Your Honor.

THE COURT:  David McKahan.  Will he be testifying?

MS. TAYLOR:  No, he won't, Your Honor.

THE COURT:  Corey Dickerson.

MS. TAYLOR:  Detective Dickerson will be.  And he's not in the courtroom right now.

THE COURT:  And he is with the Dauphin County Criminal Investigation Division, if that helps any.  What about Todd Johnson?  Will he be testifying?

MS. TAYLOR: He may, Your Honor.

THE COURT: Todd Johnson, Dauphin County Criminal Investigation Division. And Joshua Arvelo. Now are there any of you who believe that because a witness is a law enforcement officer, that his or her testimony should be given more credibility than any other witness?

Now are any of you employed by any agency of the federal government? I think there was one that worked for IRS or had a spouse that worked for IRS.

A JUROR: My wife works for IRS.

THE COURT: Okay. Would that factor in any way influence you in favor of the Government in this matter because she is so employed by the Government?

A JUROR: No, I do not believe so.

THE COURT: Anyone else? Yes, sir.

A JUROR: I work for the --

THE COURT: Name again, please.

A JUROR: Tobias. Tobias. I work for the Naval Supply Systems Command, the Department of Defense.

THE COURT: Over in Mechanicsburg?

A JUROR: Yes.

THE COURT: How long have you been so employed?

A JUROR: 14 years.

THE COURT: And would that factor cause you to favor the Government because you are employed by the Government?

A JUROR: No.

THE COURT: Would it affect -- would you be adverse to the Government because you're so employed?

A JUROR: No.

THE COURT: Okay. Does anyone here have any relative that had any case involving the federal government? Have any of you or any member of your family been the victim of a crime? Your name?

A JUROR: Hockenberry.

THE COURT: And what was the nature of that?

A JUROR: My sister was, where she worked it was robbed, and she was the clerk on duty at that time.

THE COURT: Would your knowledge of that incident in any way affect your ability to render a fair and impartial decision in this case?

A JUROR: No, ma'am.

THE COURT: Yes, sir.

A JUROR: Dowling. I had a son murdered back in 2007.

THE COURT: Where was that?

A JUROR: In York, Pennsylvania.

THE COURT: Would that have an effect on your ability to sit -- let me finish the question. Would that in any way affect your ability to sit as a fair and impartial juror in this matter? And I would have you come up here, and we'll put

it on the record outside the hearing of the rest of the panel.

A JUROR:  It probably would.

THE COURT:  Approach.

(Discussion was held at sidebar:)

THE COURT:  You say you think it would affect your ability?

A JUROR:  Yes, he was murdered with an AK 47, shot 18 times.  That's why I do not own guns.  I do not like guns.

THE COURT:  You feel you could not be --

A JUROR:  I do feel I couldn't.

THE COURT:  Because there are guns involved?

A JUROR:  Yes.

THE COURT:  You may step back in the back of the courtroom.  You're excused.  Remain in the courtroom though.

(Discussion at sidebar concluded.)

THE COURT:  I would ask the next person called to take Mr. Dowling's seat.

COURTROOM DEPUTY:  Victor Berglund.

THE COURT:  May we have your response to the questionnaire, sir?

A JUROR:  I'm 66.  I live alone.  I'm a widower.  I'm retired for the last nine years.

THE COURT:  From where, sir?

A JUROR:  I was a field service engineer.

THE COURT:  For whom?

A JUROR: For Honeywell. I repaired electronic equipment for the NASA. I had two years of electronics training. And I've never served on a panel before.

THE COURT: Okay. Do you belong to any organization involving firearms?

A JUROR: No.

THE COURT: Do you own a firearm?

A JUROR: Yes.

THE COURT: I've named some of the people who will be testifying. Do you recall those names?

A JUROR: None of those names were familiar to me.

THE COURT: And do you have any -- there are certain rules and laws that prohibit certain types of firearms being owned by certain types of people. Do you feel that those laws should not be enforced?

A JUROR: No.

THE COURT: In other words, this Defendant is charged with having previously been a felon of possessing a firearm, which is illegal. Do you feel that that type of law should not be enforced?

A JUROR: Should not be enforced? I believe it should be enforced.

THE COURT: Thank you. That's all we wanted to know. Do you recall any of the other questions I asked of the panel that you feel you need to respond to?

A JUROR:  No.  Most of my answers would have been negative.

THE COURT:  Okay.  Thank you.  Are any of you or any members of your family employed in any capacity in any law enforcement agency, local, state, federal?  Were you raising your hand?

A JUROR:  My husband is retired.

THE COURT:  Well, from where?

A JUROR:  State of Maryland.

THE COURT:  In what capacity was he employed by, law enforcement agency?

A JUROR:  Correctional officer.

THE COURT:  That's right.  Yes, sir.

A JUROR:  I have a nephew that's a deputy sheriff down in Georgia.

THE COURT:  In Georgia.  Would the fact that you have that relationship cause you to be favorable to the prosecution?

A JUROR:  No.  I mean, it wouldn't Affect me.

THE COURT:  Anyone else?  Yes.  Second row.

A JUROR:  Marks.  My father was employed by the Commonwealth of Pennsylvania, Department of Justice, for 30 years.

THE COURT:  In what capacity?

A JUROR:  He was the commissioner of corrections.

THE COURT:  Would that relationship in his position

in any way cause you to be prejudiced for or against any of the parties in this case?

A JUROR: No, Judge.

THE COURT: Okay. Yes, ma'am.

A JUROR: Malave. I was a 9-1-1 dispatcher for 21 years. At the time of the conviction that you were talking about, I was a Dauphin County 9-1-1 dispatcher. I'm not sure I remember the case you're talking about. I previously did work for Harrisburg City Police as a police dispatcher for 15 years.

THE COURT: First of all, would that position in any way cause you to favor or be prejudiced in one way or another for the prosecution?

A JUROR: No. I mean, the name does sound familiar. I couldn't tell you exactly.

THE COURT: That's very important whether or not you know anything about this case that would in any way --

A JUROR: This particular case with what you told me so far, it's not ringing a bell. I mean, without knowing more details, I couldn't say for sure if I was working at the time.

THE COURT: Well, hold on a minute. I think maybe I can give you a little bit more. It's alleged that Mr. Spriggs, in conjunction with another person, a Mr. Arvelo, is alleged to have had a drug transaction on April 18, 2012. Does that in any way raise any question in your mind as to whether you know anything about this?

A JUROR:  No.  I mean, it's not ringing a bell at this particular time.

THE COURT:  In the event you should be chosen, and as the case goes on you begin to have some familiarity with this, you must notify me.

A JUROR:  Oh, I definitely would, yeah.  That's why I wanted to let you know.

THE COURT:  I appreciate it.  Thank you very much. Counsel, if you wish to pick up and pursue any questions, you may do so.

MS. TAYLOR:  No, none from the Government, Your Honor.

THE COURT:  Ms. Freese.

MS. FREESE:  Your Honor, just for clarification, I believe when Mr. Dowling raised his hand and we approached sidebar, there may have been other individuals in the back of the courtroom --

THE COURT:  I'm sorry.  We didn't pick up on that.

MS. FREESE:  -- that we did not pick up on.

THE COURT:  I guess it would be whether anyone has been a victim or any member of your family has been a victim of a crime?

MS. FREESE:  I believe that's correct, Your Honor.

THE COURT:  Yes, ma'am.

A JUROR:  Kraft.  My niece was sexually abused.

THE COURT: I'm sorry, I can't hear you.

A JUROR: My last name is Kraft.

THE COURT: Yes.

A JUROR: And my niece was sexually abused.

THE COURT: How old was she?

A JUROR: 13.

THE COURT: Would that in any way affect your ability to sit as a fair and impartial juror in this case?

A JUROR: No.

THE COURT: Pardon?

A JUROR: No.

THE COURT: Thank you. Anyone else?

A JUROR: Malave. My parents' home was burglarized. It was actually a home invasion because my brother walked in during the burglary and was hit over the head and knocked unconscious.

THE COURT: How long ago was that?

A JUROR: I think it was like five or six years ago. I was actually working up in New York with NYPD at the time.

THE COURT: Would that episode in any way affect your ability to be a fair and impartial juror in this case?

A JUROR: No.

THE COURT: Okay. Thank you. Anyone else that we missed? Ms. Freese, do you have any questions you wished to pursue?

MS. FREESE: I don't believe so, Your Honor.

THE COURT: Okay. Now, ladies and gentlemen, what will happen now, and I ask your patience and indulgence, we must reduce your number to 14. That means that counsel have an opportunity to strike a certain number of you. And you're not to be upset if you are stricken, and you're not to be upset if you still remain as a juror.

(Strikes were exercised.)

COURTROOM DEPUTY: When I call your name, you can take your seat in the back of the courtroom. Reba Reachard. Barbara Kyler. Steven Adamy. Victor Berglund. Van Shatzer. Annette Hockenberry. And Connie Moore. Okay.

Juror number 1 is Susan Rice. Juror number 2, Heather Francis. Juror number 3, Kristen Fickes. Juror number 4, Gary Rappoldt. Juror number 5, Deborah Zenefski. Juror number 6, Joseph Szewczak. Juror number 7, Gary Florence. Juror number 8, Randy Malinowski. Juror number 9, Ryan Tobias. Juror number 10, Kurt Scafe. Juror number 11, Gary Hess. Juror number 12, Jerry Sunderland. Juror number 13, Darlene Bakner. And juror number 14, Joshua Zink.

THE COURT: The Government satisfied with the jury?

MS. TAYLOR: Yes, Your Honor.

THE COURT: Defendant satisfied with the jury?

MS. FREESE: Yes, Your Honor.

THE COURT: Those of you who have not been called in

the back of the courtroom are now excused with the thanks of the Court. If any of you need a jury attendance certificate or have any belongings down in the jury assembly room, you may pick them up. Otherwise, you're excused. Those of you who have been called, do you have anything down in the jury assembly room that you need to pick up? Okay. Mark will take you to the jury room and show you the rest rooms, and we'll take a recess, and then we'll begin the trial. Court's in recess.

(Recess was taken at 10:36 a.m. and proceedings reconvened at 10:55 a.m. with all parties present.)

(Jury was sworn.)

THE COURT: Ladies and gentlemen, now that you have been sworn, I have the following preliminary instructions for your guidance as jurors in this case: At the conclusion of the presentation of the evidence and closing arguments of counsel, I will again instruct you in rather detail a manner concerning the law that is applicable to this case.

You will hear the evidence and decide what the facts are. Then you will apply those facts to the law that I will later give you. You and only you are the judges of the facts. You will have to decide what happened. I play no part in judging the facts. You should not take anything that I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.

My role is to be the judge of law. I make whatever legal decisions have to be made during the course of the trial. And I will explain to you the legal principles that must guide you in your decisions. You must follow the law whether you agree with it or not.

Now during the trial, it may be necessary for me to talk with the lawyers out of your hearing here at the bench. If that happens, please be patient. We are not trying to keep important information from you. These conferences are necessary for me to fulfill my responsibility, which is to be sure that the evidence is presented to you correctly under the law.

We will, of course, do what we can to keep the number and length of these conferences to a minimum. I may not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

Now the evidence from which you find the facts consist of the following: The testimony of witnesses, documents and other things that is received into evidence, any facts that are stipulated, that is formally agreed to by the parties, and any facts that I have judicially noticed.

The following things are not evidence: Statements, arguments, and questions of the lawyers for the parties in the

case, objections by the lawyers, any testimony that I tell you to disregard, and anything you may see or hear about this case outside the courtroom.

You must make your decision based only on the evidence that you see and hear in court. Do not let any rumors, suspicion, or anything else that you may see or hear outside of the Court influence your decision in any way. You should use your common sense in weighing the evidence. Consider it in the light of your everyday experience with people and events and give it whatever weight you believe it deserves.

If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion. Now there are rules that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, the lawyer may object.

This simply means that the lawyer is requesting that I make a decision on a particular rule of evidence. You should not be influenced by the fact that an objection is made. Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe that evidence that is being offered is improper under the rules of evidence. You should not be influenced by the

objection or by the Court's ruling on it.

If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction. Also, certain testimony or other evidence may be ordered stricken from the record, and you will be instructed to disregard this evidence. Do not consider any testimony or other evidence that gets stricken or excluded.

Now there are two types of evidence that may be used in reaching your verdict. One type of evidence is called direct evidence. An example of direct evidence is when a witness testifies about something that the witness knows through his or her own senses; something the witness has seen, felt, touched, or heard, or did. If a witness testified that it was raining outside, and you believed him, that would be direct evidence that it was raining.

The other type of evidence is circumstantial evidence. Circumstantial evidence is proof of one or more facts from which you could find another fact. If someone walked into the courtroom wearing a wet raincoat and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining. You should consider both kinds of evidence that are presented to you.

And keep in mind, the law makes no distinction in the

weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any evidence. Now in deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses.

Credibility means whether a witness is worthy of belief. You may believe everything a witness says or only a part of it or none of it. In deciding what to believe, you may consider a number of factors, including the following: The opportunity and ability of the witness to see or hear or know the things the witness testifies to; the quality of the witness's understanding and memory; the witness's manner while testifying; whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice; whether the witness is contradicted by anything the witness has said or wrote before trial or by other evidence; how reasonable the witness's testimony is when considered in light of the other evidence that you believe; and any other factors that bear on credibility.

Keep in mind that the weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What is more important is how believable the witnesses were and how much weight you think their testimony deserves. Now keep an open mind during this trial. Do not make up your mind about the verdict until you have heard all of

the evidence and I have given you the final instructions about the law at the end of the trial and you have discussed this case with your fellow jurors during your deliberations.

Do not discuss this case among yourselves until the end of the trial when you retire to the jury room to deliberate. You need to allow each juror the opportunity to keep an open mind throughout the entire trial. During the trial, you may talk with your fellow jurors about anything else of personal nature or of common interest. During the trial, you should not speak to any of the parties, the lawyers, or the witnesses involved in this case, not even to pass the time of day.

If any lawyer or party or witness does not speak to you when you pass in the hall or ride the elevator or the like, remember it is because they are not supposed to talk or visit with you either. Do not talk with anyone else or listen to others talk about the case until the trial is ended and you have been discharged as a juror. It is important not only that you do justice in this case, but that you give the appearance of justice.

If anyone should try to talk to you about the case during the trial, please report that to me. Do not discuss this situation, if that happens, with any other juror. Do not discuss the case with anyone outside the courtroom or at home, including your family and friends. You may tell your family

and friends that you have been selected as a juror in a case and you may tell them how long the trial is expected to last.

However, you should also tell them that the judge has instructed you not to talk anymore about the case, and they should not talk to you about it. The reason for this is that sometimes someone else's thoughts can influence you. Your thinking should be influenced only by what you learn in this courtroom.

Now until the trial is over and your verdict is announced, do not watch or listen to any television or radio news programs or reports about the case or read anything on the Internet or with anyone else that might be involved with it. Now this is very important because there have been mistrials caused by the failure to abide by this rule.

Do not use a computer, cellular phone, other electronic devices or tools of technology while in the courtroom or during your deliberations. These devices may be used during breaks or recesses for personal uses, but may not be used to obtain or disclose information about this case. You may not communicate with anyone about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, through any blog or website through any Internet chat room or by any other social networking websites, including Google, Facebook, Myspace, etc.

You may not use any similar technology of social

media even if I have not specifically mentioned it. Do not do any research or make any investigation on your own about any matters relating to this case or this type of case. This means that you must not visit the scene, conduct experiments, consult reference works, or dictionaries, or search the Internet, websites, or blogs for additional information.

Please do not try to find out information from any source outside the confines of this courtroom. You must decide this case based only on the evidence presented in this courtroom and my instructions on the law. You should not concern yourself with or consider the possible punishment that might be imposed if you return a verdict of guilty.

Now the trial will proceed in this manner. The Government will have an opportunity to present witnesses in proof of their case. After each witness has testified on direct, they may be cross-examined by the Defendant. If necessary, the Government may redirect depending on the type of questions asked by the Defendant. After the Government has presented its case, it is the choice of the Defendant as to whether or not they choose to present any defense.

Keep in mind, in a criminal case, a Defendant is not required to produce any testimony or evidence on their behalf. The Government has the sole responsibility of proving each and every element of the crime charged against the Defendant beyond a reasonable doubt. After the evidence has been presented,

then each side will have an opportunity to present a closing argument to you.

I should indicate that before the testimony is presented, each attorney may make an opening statement to you. An opening statement cannot be an argument. It is only an outline of the case they intend to present. Ms. Taylor, are you ready to proceed?

MS. TAYLOR: I am, Your Honor.

THE COURT: Go ahead.

MS. TAYLOR: Good morning, ladies and gentlemen. On April 18th, 2012, a drug transaction occurred in the parking lot of the Harrisburg East Mall here in Harrisburg, Pennsylvania. The Defendant, Derek Spriggs, was an integral part of that drug transaction, and that's why you're here today. And that's why Mr. Spriggs is charged with the four counts in the indictment.

He's charged with two gun offenses, possession of a firearm by a convicted felon, possession of a firearm in furtherance of a drug trafficking crime, and two narcotics offenses; possession with intent to deliver a controlled substance, that being marijuana in this case, and criminal conspiracy to possess with the intent to distribute marijuana.

Now what you are going to come to hear throughout this case is that drug dealing is a business, an illegal one, but it is a business that operates like other businesses.

There are customers. There are middlemen. And there are bosses.

So let me take you back to April 18th, 2012. This case starts when the Dauphin County Drug Task Force becomes aware there is a confidential informant, or a CI, as they're sometimes referred to, who can purchase marijuana from an individual named Joshua Arvelo. You're going to hear from Mr. Arvelo today.

The Task Force sets up for the CI to contact Mr. Arvelo and order a quarter pound of marijuana, to purchase a quarter pound of marijuana from Mr. Arvelo. The confidential informant in this situation is the customer essentially. He contacts Mr. Arvelo, who is in this instance the middleman. And what you are going to hear is that Mr. Arvelo, in his capacity as a middleman, he contacts his supplier, who in this case is Derek Spriggs, his boss of sorts.

What happens on April 18th is, eventually they decide to conduct this drug deal at the -- in the parking lot of the Harrisburg East Mall. Mr. Arvelo drives Mr. Spriggs to the parking lot to participate in this drug deal. The police drive the confidential informant to the mall parking lot. Now, of course, the police are in plain clothes, they're driving unmarked vehicles. They all arrive at the parking lot in the afternoon of the 18th.

And what happens is, Mr. Arvelo gets out of his

car -- Mr. Spriggs has delivered the quarter pound of marijuana to Mr. Arvelo. Mr. Arvelo gets out of his car and he goes over to the car where the confidential informant is. At that time, Mr. Arvelo delivers the quarter pound of marijuana to the confidential informant, and the confidential informant pays him $460.00.

Now you're going to hear that $460.00 came from the police officers. They provide the confidential informants with money. It's referred to as buy money. What they've done with that money is, they've photographed it and they've recorded the serial numbers so that they can track it later and see who actually ends up with the money once the drug deal is complete. So Mr. Arvelo has gotten the marijuana from Mr. Spriggs, and he delivers it to the confidential informant.

Once he leaves the car and Mr. Arvelo is walking back to his car, officers from the Dauphin County Drug Task Force move in and arrest Mr. Arvelo. They, of course, find on him the $460.00 of buy money that he's just been given and the cell phone that is used to set up this transaction. Simultaneously, other officers from the Dauphin County Drug Task Force approach the car that the Defendant is sitting in to secure the car and also to ascertain Mr. Spriggs' role in this drug deal.

As they are attempting to get Mr. Springs out of the car, what you will hear from one of the detectives that he sees in his right-hand jacket pocket a gun in Mr. Spriggs' coat. He

alerts the other officers to the presence of that gun. And, of course, Mr. Spriggs is removed from the car, the officers remove the gun, and it's given -- eventually it's given to Trooper Markle and logged into evidence.

They realize at that point, of course, that it's loaded with six rounds of ammunition in it. Once the gun is taken off Mr. Spriggs, he, of course, is placed under arrest and he is searched. When he is searched, another quantity of marijuana is found in Mr. Spriggs' pants as well as the cell phone that was used in the setting up the deal with Mr. Arvelo and $89.00 in cash.

Now the Government is going to prove its case to you beyond a reasonable doubt each of the elements for each of the four charges. And we're going to do that by calling a number of the officers who were present that day who were involved in this transaction. You're also going to hear, as I mentioned, from Mr. Arvelo.

Now Mr. Arvelo was charged with narcotics trafficking offenses in connection with his activities that he did on April 18th. He was not federally indicted by my office and he is not facing any federal charges. He was charged by the state with felony narcotics trafficking offenses and he pled to those felonies. He pled to those felonies and he received a sentence of probation.

You're going to hear that this is not Mr. Arvelo's

first drug trafficking conviction. In fact, it's actually his third conviction for drug trafficking. But when you are listening to Mr. Arvelo testify and you are evaluating his credibility, I would ask you to keep this in mind. The Government did not select Mr. Arvelo as a witness to bring him here and have testify before you.

Mr. Spriggs selected Mr. Arvelo. Mr. Spriggs chose to associate with Mr. Arvelo. He chose to sell marijuana to him. And he chose to participate in this drug deal with him on April 18th. What you are also going to hear from Mr. Arvelo is that this is not the first time that Mr. Spriggs sold marijuana to him. Mr. Arvelo will explain to you that he was buying marijuana from Mr. Spriggs several times a week for several months leading up to what happens on April 18th.

Now I'd like to review the charges with you just briefly. At the end of all the testimony, Judge Rambo is going to give you detailed instructions on each of the elements and the law for each of the charges. But I would like to go over them just briefly so that you have a better idea of what's actually contested in this case, because the defense and the Government have actually come to some agreements on some of the elements.

We've agreed or stipulated to some of the facts that you can accept as true. In this case, the Defendant is charged, as I mentioned, with the two gun offenses; the first

one being that he was in possession of a firearm as a convicted felon. Now that requires that the Government present to you beyond a reasonable doubt that the Defendant knowingly possessed a firearm, that he was previously convicted of a felony, and that that firearm at some point traveled in interstate commerce.

Most of those elements are actually agreed upon by the parties. The item that was taken off of the Defendant on that day, there's an agreement that it was, in fact, a firearm. And you'll see that in court here today. There's also an agreement that Mr. Spriggs, prior to April 18th, that Mr. Spriggs was previously convicted of a felony offense. And there's an agreement that the firearm at some point had traveled in interstate commerce. So really, the only contested issue as to that charge is whether the Defendant possessed that gun.

The second gun offense that Mr. Spriggs is facing is possession of a firearm during or in furtherance of a drug trafficking crime. For that charge, the Government must prove that the Defendant engaged in drug trafficking; in this case, either possession with the intent to deliver marijuana or conspiracy to possess with the intent to deliver marijuana; and that Mr. Spriggs knowingly possessed that firearm in furtherance of those crimes.

In terms of the two narcotics offenses that Mr.

Spriggs is charged with, he's charged with possession with intent to deliver marijuana, which requires that he possessed the marijuana, that he knowingly possessed it, in other words, he knew what it was, and that he intended to deliver it. And there is an agreement between the parties that the substance that was recovered on that day by the police was tested by the laboratory and is, in fact, marijuana. So the real issue as to that charge is whether he possessed it with the intent to deliver it.

The final charge that Mr. Spriggs is facing is criminal conspiracy to possess with the intent to distribute marijuana. The elements of that offense are that there are two or more people who agreed to do something, in this case, agreed to distribute marijuana; that the Defendant, Mr. Spriggs, was a party to that agreement; and that the Defendant joined that conspiracy or made that agreement knowing that the plan was to distribute marijuana.

Now, ladies and gentlemen, at the end of all the evidence, I'll stand before you again and I'll ask you to convict Mr. Spriggs of each of the offenses that he's charged with. Thank you.

THE COURT: Ms. Freese, do you wish to address the jury at this point?

MS. FREESE: I do, Your Honor, thank you. May it please the Court, Mr. Spriggs, Ms. Taylor, ladies and gentlemen

of the jury, good morning.  This case rises and falls on the testimony of one person, Josh Arvelo.  As the Government just indicated, many of the facts in this case are not in dispute. But we're here because we disagree on one very critical aspect of this case that at the conclusion of the trial will be placed in your collective hands.

And that's the credibility of the Government's main witness, Josh Arvelo.  I'm going to be completely up front with you, ladies and gentlemen.  As you know, there are four charges that Mr. Spriggs faces, four separate counts of the indictment. And at the end of the trial, it will be your job to consider each of them separately.

Count 1, unlawful possession of a firearm.  Find him guilty of that, ladies and gentlemen, because he's guilty of it.  Mr. Spriggs did indeed have a gun.  Mr. Spriggs should not have had that gun.  Not just because it was a bad idea, but because it was illegal.

And you're going to hear through the course of this trial that the Government and the defense have agreed and entered into what is called a stipulation that the Government will read in that Mr. Spriggs, on April 18th, 2012, was not legally able to possess that weapon by virtue of a prior conviction; that is, a conviction for a crime that's punishable by at least one year.  So that's an easy one.  And at the end of the trial, when we get an opportunity to speak to you again,

I'll join in Ms. Taylor's plea to you to find him guilty of Count 1.

But we're here because of that critical disagreement on Counts 2, 3, and 4 of the indictment. And for purposes of our discussion this morning, ladies and gentlemen, I'm going to lump them together, these additional charges that are being piled on Mr. Spriggs.

Josh Arvelo is not just a Government witness, he is the corner stone of the Government's case. The Government just stood up here and told you that Josh Arvelo is a middleman. One person throughout the course of this trial is going to be able to tell you that Josh Arvelo is a middleman. And that's Josh Arvelo. He is the sole piece of evidence on that portion of this case.

On April 18th, 2012, undisputed, Mr. Arvelo sets up a sale with a confidential informant. He drives his own vehicle in which Mr. Spriggs is a passenger to the Harrisburg East Mall, and he parks it in front of the Bass Pro Shop. During the course of this trial, if you are not familiar with the Harrisburg Mall, you will be shown actually an aerial or an overview map of that area to get the lay of the land and to see how things occurred on that day and the vantage point that certain officers had.

So Mr. Arvelo pulls in the parking lot and he parks in front of the Bass Pro Shop. If you are familiar with the

mall, facing Macy's. Short time later, Mr. Arvelo gets out of the car. He walks over. Beyond there is like a row of boats of the Bass Pro Shop. Beyond those boats alongside of the Bass Pro Shop, gets into a confidential informant's vehicle, delivers a quantity of, a quarter pound of marijuana, which you will also have the opportunity to see today.

How do we know this? For the reasons the Government just told you. En route on the way back to his own vehicle, Mr. Arvelo was stopped by police. He had $460.00 worth of buy money or marked money on his person. And as no purpose, the confidential informant also went back to the police and turned over a quantity of marijuana which fit the order. Okay.

When Mr. Arvelo was selling his quarter pound of marijuana alongside of the Bass Pro Shop, Mr. Spriggs was seated in the car facing the opposite direction. Mr. Spriggs was not out of the car, was not with Mr. Arvelo, was not carrying a gun to back-up Arvelo or to be the muscle of that deal or to be the enforcer. Mr. Spriggs was in a place where his view was obstructed and anything could have gone down over there with Mr. Arvelo during Mr. Arvelo's drug sale.

Now the Government is arguing to you that the evidence will support a theory that Mr. Spriggs is the supplier, and because he is the big fish and he is the person at the top of this chain, he's guilty of the remaining charges. And as I just told you, they only get there through one person.

They only get there through Josh Arvelo.

And you're going to hear from him. And it will be your collective job at the end of this trial to determine whether he is being truthful, whether he is believable, or is he motivated by some bias? Is he motivated by some other reason to be less than truthful? To shift blame? To point the finger? To say, well, you got me, but I can help you, so you go easy on me?

Mr. Arvelo will tell you, because he's going to be sitting here in this box, not at that table as a Defendant in federal court, about what happened that day, about the fact that he is on probation. And you're going to hear more about Mr. Arvelo than April 18, 2012, because you're going to hear that Mr. Arvelo has made a career of selling drugs.

In 2009, you'll hear that Mr. Arvelo was convicted a first time in Philadelphia County of possession with the intent to distribute marijuana and carrying a firearm without a license, a felony. And you're going to hear that Mr. Arvelo went to jail and got sentenced to a period of three years probation for that crime.

And when he was on probation and ordered by the Court to follow a long list of rules, as a probationer would need to, he came to Cumberland County. And he got arrested and was convicted of drug delivery number two, delivering marijuana. And that was, of course, when he was on probation for drug

offense number one. And he got probation in Cumberland County for the second drug delivery.

So on April 18, 2012, Mr. Arvelo was on probation in a number of jurisdictions, in Philadelphia County, in Cumberland County, and that supervision was transferred here to Dauphin, when he committed drug delivery number three. While he was on probation, he also was convicted of other crimes which you'll hear about.

And Mr. Arvelo, in exchange for his cooperation, for his testimony, is not being charged in federal court. And you're going to hear about that as well, about the potential penalties he could face had he been charged in federal court. You're going to hear about how Mr. Arvelo, although he was on probation in multiple jurisdictions, and he's still out there selling drugs, about just how lucky he is to not be in jail. And the evidence will show that Mr. Arvelo is motivated, that he's biased, and that he has every motivation to rise to the occasion to get the job done for the Government, the job of convicting Mr. Spriggs.

I would ask you, ladies and gentlemen, to pay very close attention to the evidence in this case and to determine whether Josh Arvelo's testimony is the ticket to his own freedom or whether it's the truth. Thank you.

THE COURT: Call your first witness. First of all, is the gentleman in the back of the courtroom going to be a

witness?

MS. FREESE: No, Your Honor. We would request that all witnesses be sequestered at this time.

THE COURT: I don't think there's anyone else here except for the police officer prosecuting.

MS. FREESE: I believe there will be multiple police officers testifying.

THE COURT: Okay. Who's the first witness?

MS. TAYLOR: Detective Wolfe.

THE COURT: Okay.

**SCOTT WOLFE, GOVERNMENT'S WITNESS, SWORN**

COURTROOM DEPUTY: Would you state your name, please?

THE WITNESS: Scott Wolfe.

COURTROOM DEPUTY: Would you spell your last name?

THE WITNESS: W-O-L-F-E.

COURTROOM DEPUTY: Thank you.

THE COURT: You may proceed.

**DIRECT EXAMINATION**

BY MS. TAYLOR:

Q. Sir, how are you employed?

A. I am a corporal with the Shippensburg Police Department.

Q. And Corporal Wolfe, what are your current duties?

A. I'm assigned as a full-time member of the Cumberland County Drug Task Force.

Q. How long have you been a police officer?

A.   16 years.

Q.   Now, Corporal Wolfe, were you involved in the case that we are here about today that occurred on April 18th, 2012?

A.   Yes, I was.

Q.   How did you initially become involved?

A.   I had developed a confidential informant in Cumberland County who had provided me with information that they could purchase marijuana from Joshua Arvelo in Harrisburg.

Q.   Just tell the ladies and gentlemen of the jury just generally, what is a confidential informant?

A.   A confidential informant is someone that we develop; i.e., they may have pending charges or they just decide they want to cooperate on someone else's behalf or various amount of reasons that they'll want to cooperate with the police department.  And they come and provide information about drug activity.

And depending on how far they want to get involved with the investigation, some will introduce undercover police officers to suppliers of controlled substances or they their self go and purchase controlled substances from suppliers of the controlled substances under a controlled environment, which we determine the controlled environment.  We provide them funds to make the purchase.  We monitor and sometimes record phone calls to setting up the drug transactions and we are with them during the entire transaction and sales of the controlled substance.

Q. Is that what happened in this case?

A. Yes.

Q. You used a CI to set up a transaction with a gentleman by the name of Joshua Arvelo?

A. Yes.

Q. Now were you involved when those first phone calls were made?

A. No, I was not.

Q. Did you make contact -- because Mr. Arvelo was located in Harrisburg in Dauphin County, not in Cumberland County, did you make contact with someone from the Dauphin County Drug Task Force?

A. Yes, I -- upon receiving this information, I contacted Trooper Markle of the state police, who was with the vice or narcotics unit at the time, and relayed the information to him.

Q. Then Trooper Markle was actually the one who was involved in having the first series of phone calls to set up the deal?

A. Yes, he was.

Q. After you had initially given the information to Trooper Markle, did you actually participate in monitoring the drug deal that occurred that afternoon?

A. Yes, I did.

Q. Just tell us how, where you were located and how it got started?

A. Basically, I had driven the confidential informant down

and introduced him to Trooper Markle. And Trooper Markle at that time had the confidential informant place a phone call to Josh Arvelo. It was determined that the transaction was going to take place at the Bass Pro Shop in the parking lot.

The confidential informant was driven to that area by a member of the Dauphin County Drug Task Force, and I was positioned in the parking lot -- I was positioned in the parking lot by the Bass Pro Shop near the confidential informant and the undercover Dauphin County Drug Task Force vehicle.

Q. Now were you in a vehicle or were you out of a vehicle?

A. I was in a vehicle.

Q. Were you by yourself or with another officer?

A. I was with another officer.

Q. Who was that?

A. That was Detective Gary Flythe.

THE COURT: I'm sorry. Gary who?

THE WITNESS: Flythe.

BY MS. TAYLOR:

Q. Were you in a marked car or an unmarked car?

A. An unmarked car.

Q. How about uniform? Were you in any type of uniform or in plain clothes?

A. No, I was in plain clothes.

Q. From where you were seated in your vehicle, could you see

-- you could see the vehicle that the confidential informant was in?

A. We could just barely see the vehicle. At the time we originally had parked there, we could see the vehicle very well. But then being it was a parking lot, and Murphy's law, there were vehicles that parked by that vehicle and prohibited us from actually seeing the vehicle.

Q. So at some point, do you see someone start to cross the parking lot and approach the vehicle with a confidential informant in it?

A. Yes, I did.

Q. And did you recognize that person?

A. Yes, I recognized that person as Josh Arvelo.

Q. Did you actually see Mr. Arvelo get in the car? Could you see that from your vantage point?

A. No, I could not.

Q. Eventually, did you see Mr. Arvelo begin to come back across the parking lot?

A. Yes. Let me back up. I actually received radio transmission that the deal had been completed and we had the takedown sign, which meant that we were moving in to arrest Mr. Arvelo. As myself and Detective Flythe moved our vehicle to where Mr. Arvelo was being taken down, he was already subdued and was taken into custody.

Q. So there were other officers who had already arrested Mr.

Arvelo?

A.   Yes.

Q.   Once you realized that your assistance wasn't needed with Mr. Arvelo, what did you do?

A.   We proceeded to where Mr. Spriggs was, where Mr. Arvelo had parked his vehicle in the parking lot by Macy's.

Q.   Let me just back up to that.  From your vantage point, could you see the car that Mr. Arvelo came from, the car where Mr. Spriggs was in the passenger seat?

A.   No, I could not.

Q.   Okay.  So once you realized Mr. Arvelo is under arrest, you proceed to the car where Mr. Spriggs is located?

A.   Yes.

Q.   And what's happening when you get there?

A.   When I get there, we pull up by the, in the vicinity of the vehicle.  I see officers at the passenger side of the vehicle.  I see that they are struggling with an occupant inside the vehicle.

Q.   So there were already other police officers already there?

A.   Yes.

Q.   Already at the car?

A.   Yes.

Q.   At the time that you get there, had they gotten the person out of the vehicle?

A.   No, the person was still inside the vehicle.

Q.   What did you do when you got there?

A.   I approached the driver's side of the vehicle.  I can't remember if the door was open or not.  But I went in from the driver's side of the vehicle to assist with subduing Mr. Spriggs.

Q.   And just so we're clear for the record, the person that was in the car, do you see him in the courtroom today?

A.   Yes, I do.

Q.   And could you just identify him?

A.   He is seated in the white shirt to the rear of the courtroom beside defense counsel.

            MS. TAYLOR:  Your Honor --

            THE COURT:  So identified.

BY MS. TAYLOR:

Q.   Were you successful in getting Mr. Spriggs out of the vehicle through the driver's side?

A.   Eventually.  As I approached the -- as I approached the vehicle through the driver's side, I saw that they were struggling with Mr. Spriggs in the driver's side -- through the passenger's side window.  As I approached, I saw his -- he was facing the passenger side door.  And in his right jacket pocket, I saw a gun in his pocket.  I immediately identified and yelled, gun, so the other officers would be aware that there was, in fact, a gun.  And I reached into his jacket pocket and removed the gun and handed it back to another

officer.

Q. At that time, did you take the time to see whether the gun was loaded or secure it or did you just immediately pass it back to someone else?

A. I just immediately passed it back to another officer. Basically there's a rule that it's always plus one. You're always looking for a gun. If you find a gun, there's always a possibility of having another gun. So our main concern was to get Mr. Spriggs under control and out of the vehicle and get him handcuffed.

Q. At this point, are commands being given to Mr. Spriggs as to what you would like him to do?

A. Yes.

Q. And what was he being asked to do?

A. Keep his hands where we can see them.

Q. Was he asked to get out of the car?

A. Yes, I believe. Like I said, it happens so quick when you are in a vehicle trying to get someone out, especially after you see a gun. I'm not sure what all commands were being said.

Q. Once you take the gun out of Mr. Spriggs' pocket and hand it off to another officer, are you and the other officers eventually able to get Mr. Spriggs out of the car?

A. Yes, we bring him out the driver's side of the car, I believe.

Q. And what do you do with him at that point?

A.   He's taken to the ground and handcuffed.

Q.   After he's handcuffed, was he searched?

A.   Yes.

Q.   Now you didn't participate in the search of Mr. Spriggs, did you?

A.   No, I did not.

Q.   After you assisted with getting Mr. Spriggs out of the car and he's handcuffed and on the ground, did you have any further involvement either with Mr. Spriggs or any of the evidence in this case?

A.   I did not have any further involvement with Mr. Spriggs. But, however, I did see the gun while it was being bagged.

         MS. TAYLOR:  Your Honor, if I could approach the witness?

         THE COURT:  Yes.

BY MS. TAYLOR:

Q.   Sir, I'm going to show you what's been marked as Government's Exhibits 1 and 2.  Could you take a look in that box and see what it is?  Do you recognize the items that are in the box marked as Government's 1 and 2?

A.   Yes, I do.

Q.   What is it?

A.   It's a semiautomatic 380 handgun.

Q.   And do you recognize -- I mean, have you seen that one before?

A.   Yes.

Q.   And when was that?

A.   When I removed it from Mr. Spriggs' pocket.

Q.   All right.  And just so it's clear, Government's Exhibit 1 is the actual handgun, which is in the box, and Government's Exhibit 2 is magazine with the six rounds in it?

A.   Yes.

THE COURT:  Can the jury see that?  Can you hold it up?

MS. TAYLOR:  I will, Your Honor.  Your Honor, I would ask for the admission of Government's Exhibits 1 and 2.

THE COURT:  Any objection?

MS. FREESE:  No objection.

THE COURT:  It's admitted.

MS. TAYLOR:  Those are all the questions I have for Corporal Wolfe at this time.

THE COURT:  Cross-examine.

MS. FREESE:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MS. FREESE:

Q.   Corporal Wolfe, good morning.

A.   Good morning.

Q.   As you testified, the target of this investigation was Josh Arvelo; correct?

A.   Yes.

Q.    And from your vantage point at the mall, the first time you saw Mr. Spriggs at all was when you went over to the vehicle to assist other officers?

A.    That's correct.

Q.    Okay.  So at no time did you see Mr. Spriggs get out of that vehicle other than when he was originally taken into custody?

A.    That's correct.

Q.    And at no time on that day did you see Mr. Spriggs provide any marijuana to Mr. Arvelo?

A.    No, I did not.

Q.    After -- now you were -- you're the one who had the initial contact with the confidential informant in Cumberland County; right?

A.    Yes.

Q.    And you have used confidential informants before in your work --

A.    Yes, I have.

Q.    -- in the Drug Task Force.  How long have you been with the Drug Task Force?

A.    Four and a half years.

Q.    And sometimes confidential informants wear body wires, is that true?

A.    Yes, they do.

Q.    And in this instance, was a body wire utilized?

A.    I'm not sure.  I do not believe so.

Q.    Okay.  But certainly none that you placed on the confidential informant?

A.    No.

Q.    So as you said, at some point your view became obstructed, but it's your understanding from radio communications that at some point Mr. Arvelo gets into the confidential informant's vehicle?

A.    Yes.

Q.    And that's where the drug sale goes down?

A.    Yes.

Q.    And because there's no wire, there was no other officers in that car with the CI; right?

A.    I'm not sure -- there was another officer that drove the CI to the location, but I'm not sure if they remained in the vehicle or if they left the CI in the vehicle alone.

Q.    But you have no information or evidence about what was said or, you know, between the confidential informant and Mr. Arvelo?  There's no recordings of that?

A.    No, I have no knowledge of that, no.

Q.    Now you approached -- well, how many officers were part of this investigation?

A.    I'm not sure exactly how many officers were on this detail.

Q.    Okay.  We had members of the Cumberland County Drug Task

Force?

A.    Yes.

Q.    You?

A.    Me, yes.

Q.    No one else from the Cumberland County Drug Task Force?

A.    I believe Detective Eric Dale was also there.  There was two of us there.

Q.    And then we have members from the Dauphin County Drug Task Force and the Pennsylvania State Police?

A.    Yes.

Q.    And when you went to the vehicle where Mr. Spriggs was located, there were already officers in that area?

A.    Yes.

Q.    How many?

A.    I'm not sure.

Q.    Do you recall whether those officers already had their weapons drawn?

A.    I'm not sure.

Q.    But your recollection is that they were commanding Mr. Spriggs to get out of the vehicle?

A.    Yes.

Q.    And this happened -- well, April 18th.  So it happened just over a year ago?

A.    Yes.

Q.    And you didn't prepare a report in this matter?

A. No, I did not.

Q. So you're testifying today off of what you remember from over a year ago?

A. Yes.

Q. How many cases do you handle a year?

A. A lot.

Q. Ballpark? More than a hundred?

A. I would say 75 to a hundred.

Q. Okay. And when you get to the area of the vehicle and there are other officers already there, it's your testimony that Mr. Spriggs did not comply with their commands to get out of the vehicle?

A. There was a struggle. They were saying, keep your hands where we can see them. And he was taking his hands down.

Q. When you say struggle, are you talking about a physical struggle?

A. It was basically, they were trying to control his hands. Like I said, I'm not sure, as I testified to begin with. I'm not sure exactly what all was said. But I know that he wasn't, you know, it wasn't like a calm rationale conversation like we're having now.

Q. And do you recall either yourself or any other officer commanding Mr. Spriggs to put his hands up?

A. Someone was saying, get your hands where we can see them, or something to that effect.

Q.   Do you recall whether he complied with that request?

A.   No.   Like I said, when I came to the driver's side door, they were -- he was pointing towards the passenger side door. I saw the gun.  And I reached in and grabbed the gun, and then we pulled him out through the driver's side of the door.

Q.   Okay.  When you went to the vehicle, Mr. Arvelo's vehicle, but the vehicle that Mr. Spriggs was a passenger, did you walk there or did you drive there?

A.   We drove.

Q.   Okay.  You drove.  So you went back to your vehicle and --

A.   No.

Q.   You never left your vehicle?

A.   No, we never left the vehicle.  We remained inside the vehicle, and we drove over to where they had taken Mr. Arvelo down.  And then after we saw that situation was under control, we drove to where the other vehicle was located.

Q.   Okay.

MS. FREESE:  I have no further questions, Your Honor.

THE COURT:  Redirect.

MS. TAYLOR:  No redirect, Your Honor.

THE COURT:  You may step down.

MS. TAYLOR:  Your Honor, may Corporal Wolfe be excused?

THE COURT:  Any objection?

MS. FREESE:  No objection, Your Honor.

THE COURT: You're excused, sir.

MS. TAYLOR: Your Honor, the next witness will be Joshua Arvelo.

**JOSH ARVELO, GOVERNMENT'S WITNESS, SWORN**

COURTROOM DEPUTY: Would you state your name, please?

THE WITNESS: Josh Arvelo.

Courtroom deputy: And could you spell your last name?

THE WITNESS: A-R-V-E-L-O.

COURTROOM DEPUTY: Thank you.

THE COURT: Is that two L's or one?

THE WITNESS: One L.

THE COURT: You may proceed.

**DIRECT EXAMINATION**

BY MS. TAYLOR:

Q. Mr. Arvelo, how old are you?

A. 21.

Q. And what town do you live in?

A. Harrisburg, Pennsylvania.

Q. Are you currently employed?

A. No.

Q. Are you currently looking for a job?

A. Yes.

Q. In fact, you have an interview for a job this afternoon?

A. Yes. At 1:00.

Q.    How about school?  Are you attending school?

A.    Ever since this incident happened, I couldn't go back to school because I wanted to make sure, you know, what I'm saying everything was going to be okay or whatever.

Q.    Before that, were you attending school somewhere?

A.    Yes.

Q.    Where were you going?

A.    At HACC.

Q.    And what kind of things were you studying?

A.    Electrical technology.

Q.    Do you have any children?

A.    Yeah.

Q.    How many do you have?

A.    Two.

Q.    And how old are they?

A.    I have a two-year-old and a one-year-old.

Q.    Now, Mr. Arvelo, do you know Derek Spriggs?

A.    Yeah.

Q.    How do you know him?

A.    Just somebody off the street, you know what I mean.

        THE COURT:  We're going to have to do something.  I can't hear him.

BY MS. TAYLOR:

Q.    Can you talk a little louder?

A.    I mean, I met him on the street.

Q.    How long have you known him?

A.    For like two months, three months, like not that long.

Q.    You've known him -- you're saying you knew him two or three months?

A.    Prior to the incident, yeah.

Q.    Okay.  The incident that we're here to talk about, you recall that happened on April 18th, 2012?

A.    Yes.

Q.    Back then, how long had you known Mr. Spriggs?

A.    Probably like two months, yeah.

Q.    What kind of contact had you had with Mr. Spriggs?  What was your relationship about?

A.    I mean, I just see him on the street, say, what's up, and grab a little weed, something crazy, something like a dime or something.

Q.    When you say, grab a little weed, are you referring to marijuana?

A.    Yes.

Q.    At that time, were you buying marijuana from Mr. Spriggs?

A.    Yeah.

Q.    How often would you buy marijuana from him?

A.    Probably like once a week, twice a week, probably at the most.

Q.    And how much marijuana would you buy from him on each of those occasions?

A.   I mean, at first, like it was just like little dimes and nicks, little like small stuff.  But by like a prior, probably like a week prior to this incident, I probably grabbed like an ounce and then probably grabbed like another ounce.

Q.   And how long you're talking about that you've been buying from him, for some period of weeks?

A.   Yeah.

Q.   How many weeks or how many months do you think you've been buying from Mr. Spriggs when this happened on April 18th?

A.   Probably for like a month, probably a month and a half.

Q.   When you would buy an ounce of marijuana from Mr. Spriggs, do you recall how much you would pay for it?

A.   I don't want to give no wrong -- probably like 400.  I'm not sure of the right amount.  It's been so long.

Q.   What would you do with the marijuana that you bought from Mr. Spriggs?

A.   I would sell it.

Q.   Did you smoke some of it yourself?

A.   Oh, yeah.

Q.   So you used some of it yourself and you would sell some of it to other people?

A.   Yes.

Q.   And how much were you selling it for?

A.   I probably sell if for like 450, 475.

Q.   If you sold the whole ounce?

A.    Yeah.

Q.    You would sell it for 450 or 475?

A.    Yeah.

Q.    Did you ever take the ounce quantities that you bought from Mr. Spriggs and break those down and sell them in smaller quantities?

A.    No.

Q.    How would you set these transactions up with Mr. Spriggs when you -- when you wanted to buy from him?  How would you contact him?

A.    I mean, like most of the time, I just seen him on the street; like, yo, you know what I mean.  I mean, like other people just see him on the street; yo, I need a dime, a need a nick.  For the ounce, I probably just call him or see him on the street because I was always on the street because I have family that lived on that street.  So I go to my cousin's house, and I probably see him outside or something and be like, yo, my buddy needs this, I need something.  And that's how we go about it.  Probably a few times I called him; probably like once or twice, you know what I mean.

Q.    You would call him on his cell phone?

A.    Yeah, I believe that's his cell phone, yeah.

Q.    You had some phone number for him?

A.    Yeah.

Q.    That you were able to contact him?

A.    Yes.

Q.    Once you had either seen him and set something up or called him and set something up, how would you actually get the marijuana?

A.    I mean, I would just meet him on the street.  I have my scale, weigh it, give him his money, and keep moving.

Q.    And I'm assuming you would pay him in cash?

A.    Yes.

Q.    Now, Mr. Arvelo, before we go into what happened on April 18th, you have been arrested before; right?

A.    Yeah.

Q.    Back in 2010, you were arrested for possession with intent to distribute a controlled substance and carrying a firearm without a license down in Philadelphia; right?

A.    Yeah.

Q.    And you were convicted of that?

A.    Yes.

Q.    And again in 2011, you were convicted of possession with intent to deliver a controlled substance?  Cumberland County?

A.    Yes.

Q.    And in terms of the current case that we're here about with Mr. Spriggs, for your role in that transaction, were you arrested?

A.    Yes.

Q.    And you were charged by the State and pled to those

charges in Dauphin County Court of Common Pleas, right?

A. Yes.

Q. And you were actually charged with felony drug trafficking again, possession with intent to deliver a controlled substance?

A. Yes.

Q. And you pled to that felony?

A. Yes.

Q. Now you received a probationary sentence for that conviction?

A. Yes.

Q. Now this transaction happened on April 18, 2012. But after that, you've been arrested since then; right?

A. That's correct.

Q. You actually have charges that are pending in Cumberland County now?

A. That's correct.

Q. But those are not drug related, right, those are misdemeanors?

A. Yeah.

Q. You're currently charged with simple assault, harassment, and recklessly endangering another person?

A. That's correct.

Q. I want to ask you about what happened back on April 18th, 2012. On that day, were you contacted by someone about buying

some marijuana?

A.   Yes.

Q.   And how much did they want to buy?

A.   I think they wanted a QP.

Q.   What is a QP?

A.   4 ounces.

Q.   Is that a quarter pound?

A.   Yeah, quarter pound.

Q.   Did you have a quarter pound of marijuana?

A.   No.

Q.   How were you going to get it?

A.   Call everybody on my phone to see if I can get it.

Q.   Did you find somebody that you could get it from?

A.   Yeah, yeah, eventually.

Q.   Who was that?

A.   Mr. Derek Spriggs.

Q.   And just for the record, since you were sort of pointing him out, the person that we're talking about is Derek Spriggs. Do you see him in the courtroom today?

A.   Yes, I do.

Q.   Could you just identify him by where he's sitting?

A.   He's in the middle with both the attorneys in the white.

        THE COURT:  So identified.

        MS. TAYLOR:  Thank you, Your Honor.

BY MS. TAYLOR:

Q.   How did you contact Mr. Spriggs on April 18th about buying the quarter pound?

A.   I believe I called him or probably seen him on the street or something.  It's been so long.  Like I said, it's been like 9, 10 months.  I think I just like seen him walking down the block, and I was like, yo, I got some people that want something, could you help me out, you know what I mean.  He was like, well, what you need?  I was like, well, I need this and that.  And I got it, and the guy came down and --

Q.   Before we get to that, on that day, were you actually looking only to buy a quarter pound from him or were you -- did you have another customer interested in another amount?

A.   I mean, at the time, I did have somebody interested like to grab like a higher grade or something, but I wasn't like sure, so I --

Q.   How much was that?

A.   It was an up and down thing at the time.

Q.   What quantity did that person want to buy?

A.   I think it was like an ounce, like an ounce.

Q.   Okay.  Regarding the quarter pound, how much were you going to sell the quarter pound for?

A.   I was going to sell it for, I think, five.

Q.   How much were you buying it from Mr. Spriggs for?

A.   I believe it was 400.

Q.   So you were going to make money off this?

A.    Yeah.  Of course, yeah.

Q.    Is that why you sell drugs, to make money?

A.    Of course, yes.

Q.    At some point, did you actually meet up with Mr. Spriggs that day?

A.    Yeah.  Yes.

Q.    Did you meet him on the street or you were driving or how did you --

A.    I mean, like I said, like I'm always at my cousin's house. So I'm like a hundred percent sure that I like probably seen him just like walking down the street.  I was like, yo, I need something.  I'm trying to call everybody in my phone.  I don't know what's going on.  Nobody is answering.  Could you help me out.  He was like, well, what you need?  I guess we went about -- you know what I mean.

Q.    But eventually, you guys end up at the Harrisburg East Mall parking lot; right?

A.    Yeah.

Q.    Tell me how you get there.

A.    I see him, he hops in the car.

Q.    So are you driving a car?

A.    I'm driving.

Q.    Is it your car?

A.    My car.

Q.    What kind of car was it?

A.    It was a Malibu.  And we -- he hops in.  We go pick it up.
I'm not sure where he went to go get it or none of that.

Q.    So you're driving, and Mr. Spriggs is in the passenger
seat?

A.    Yes.

Q.    Does he have the marijuana with him when you pick him up?

A.    No.

Q.    All right.  Do you take him somewhere to get it?

A.    Yes.

Q.    Can you tell us where it is generally?  Is it somewhere in
the City?

A.    Somewhere in the City, yeah.

Q.    Do you remember where he went?

A.    I know it was like going towards like Derry Street like if
you are going like, I guess, like, I guess, like a certain
school like elementary school.

Q.    You didn't go to an elementary school?

A.    Yeah, yeah, yeah, we didn't go directly to an elementary
school, but it was around an elementary school somewhere.

Q.    Okay.  How does he get the marijuana?  Does someone come
out to the car?  Does he get out of the car?  What happens?

A.    He goes out of the car, he goes, grabs it, comes back.

Q.    Where does he go grab it?

A.    I have no idea.  He's got out the car, walking into some
alleyway.  That's the only thing I remember, that he got out of

the car, walked, come back in like 10 minutes.

Q.   At that point, does he give you the marijuana?

A.   Yes.  As soon as he get in the car, yeah.

Q.   Does he give you the quarter pound and the ounce?

A.   No, just the quarter pound.

Q.   Okay.  Do you pay him for it?

A.   No.

Q.   Why not?

A.   Because I didn't have no money on me.  I was going to go sell it, and when the guy gives me the money, I'll keep my half and then give him his half.

Q.   So your plan was to go sell it to the person at the mall and then pay Mr. Spriggs?

A.   Yes, that's correct.

Q.   Is that why Mr. Spriggs went with you to the mall?

A.   Yes, yeah.

Q.   Okay.  When he gets back in the car and he delivers the marijuana to you, where do you put it?

A.   I probably held it in my hand or probably put it down in my pants or something or put it in the little glove compartment.  And then from there, I drove up to the mall.  I parked in front of the Bass Pro Shop.

Q.   Is Mr. Spriggs still with you?

A.   Yes.

Q.   Is anybody else in the car?

A.   No.

Q.   Okay.  So you guys get to the mall.  And you park where?

A.   We park like in front of the mall like not near like the boats of the Bass Pro Shop, but like directly in front of the mall.  And then like he sits in the car, and I'm like, I'll be right back.  And I go and I get jammed up.  All these people --

Q.   Hang on.  Before that, how do you know where to meet the person that you were going to sell the marijuana to?

A.   I mean, I was talking to him like the whole time on the phone like, where you at, you know what I'm saying.  He was like, well, meet me over here by the boats by the Bass Pro Shop.  And so I did.  I just went over there, parked.  Parked up on the opposite side of the boats, walked over, and --

Q.   So you get out of your car.  Do you have the marijuana with you?

A.   Yes.

Q.   Does Mr. Spriggs come with you?

A.   No.

Q.   Where does he stay?

A.   He stays in the car.

Q.   You go over to sell the marijuana to the person?

A.   (Witness nodded head affirmatively.)

Q.   Do you get in the car?

A.   Yes.

Q.   And what happens when you get in the car?

THE COURT: I'm sorry. What was his response?

THE WITNESS: I said, yes. I hopped in the car. I was talking to him probably for like a minute or two. And I gave him the drugs. And as soon as I got out the car --

BY MS. TAYLOR:

Q. So you give him the drugs?

A. Yeah.

Q. Does he give you the money?

A. Yes.

Q. Then what happens?

A. Then I get out the car, walk probably like 10, 15 feet from the car, and then like 6, 7 SUV's just pull up all around me. And then, you know.

Q. Well --

A. Okay.

Q. Well, you tell us.

A. Okay. They pull up around me, and like all these cop guys get out the car with tasers and stuff; get on the floor, you're under arrest. Basically, you're set up, you know what I'm saying.

Q. Did you comply and get on the ground?

A. Yeah.

Q. And you were arrested at that point?

A. Yes, ma'am.

Q. Were you searched?

A.   No.

Q.   The officers didn't search you for the money that you had on you?

A.   Nope.

Q.   Okay.  Then where were you taken at that point?

A.   I was taken to, I guess, like the police station, like the state trooper, I guess, like the police station.  And they fingerprinted me, and then they took the money out and stuff like that and started asking me all these questions.

Q.   Now at that time when this entire transaction happens, you were on probation still; right?

A.   Yes.

Q.   Was your probation officer present at the scene of this?

A.   Yeah.

Q.   At the time, what was your probation officer's name?

A.   Larry Muza.

Q.   And did you have a chance to talk with Mr. Muza that day?

A.   Yeah.

Q.   Now you weren't actually taken to jail that day, were you?

A.   No.

Q.   What happened?  What did you do that day?

A.   The PO came.  He picked me up.  I was talking to officer, I think, John Marko.

Q.   Trooper Markle?

A.   Yeah, Trooper Markle.  He was like, well, you know what

I'm saying, your buddy, he has a gun.

MS. FREESE:  Objection, hearsay.

MS. TAYLOR:  I'll move on, Your Honor.

THE COURT:  Sustain your objection.

BY MS. TAYLOR:

Q.   Now you weren't put in jail that day?

A.   No, ma'am.

Q.   But you were charged with felony drug trafficking offenses?

A.   Yes.

Q.   Those charges were brought by Dauphin County and you were prosecuted in the State?

A.   Yes.

Q.   And you realize that you could have gone to jail for those offenses?

A.   Oh, yeah.

Q.   But you received a probationary sentence?

A.   Yes.

Q.   You also know that you could have been indicted by --

A.   The Federal Government, yeah.

Q.   -- by my office and charged federally with those?

A.   Yes.

Q.   And you were not in exchange for your cooperation here today?

A.   Yes.

Q.   Now despite all that, and knowing all that, you don't really want to be here today, do you?

A.   Not at all.

THE COURT:   You're starting to lead.

BY MS. TAYLOR:

Q.   Sir, were you subpoenaed by my office to be here?

A.   Yes, I was.

Q.   In fact, were you subpoenaed by the defense attorney also?

A.   Yes, I was.

MS. TAYLOR:   Your Honor, if I could have the Court's indulgence just one moment?

THE COURT:   Yes.

BY MS. TAYLOR:

Q.   Mr. Arvelo, you mentioned that day you had requested -- you had ordered from Mr. Spriggs a quarter pound of marijuana. That's what you sold in the parking lot of the mall?

A.   Yes, ma'am.

Q.   And you had also ordered approximately an ounce quantity?

A.   Yeah.

Q.   Did you ever receive that ounce quantity?

A.   No, ma'am.

MS. TAYLOR:   Those are all the questions I have at this time, Your Honor.

THE COURT:   I'm going to have you do cross, but he has to be in an interview at 1:00.

MS. TAYLOR: Yes, Your Honor.

THE COURT: Give it a go.

MS. FREESE: Your Honor, very briefly may we approach before I start my cross?

THE COURT: Yes.

(Discussion at sidebar:)

MS. FREESE: Your Honor, in my cross examination, I'm obviously going to cross-examine him on his prior convictions. His first felony drug trafficking conviction involved five kilos of marijuana. Initially, I would not get into the facts of that underlying offense or the quantity involved, but by the Government arguing that he's a middleman, I think --

THE COURT: He's what?

MS. FREESE: -- that he's a middleman and that he's not really a supplier of marijuana, I am asking Your Honor for a ruling on whether I am permitted to ask him, isn't it true that that offense involved over five kilos?

MS. TAYLOR: Your Honor, I don't think anything I said about him being a middleman in this transaction would have anything to do with the quantity that was involved in his priors. I mean, certainly our position would be that the underlying facts, his convictions clearly come in, as they already have. But the underlying facts of his conviction should not -- would not be appropriate cross examination.

THE COURT: You want to bring out the fact that

previously he had large quantities he was convicted of?

MS. FREESE:  Um-hum.

THE COURT:  Can't you just do that, instead of using five kilos?

MS. FREESE:  I could just use the words large quantity?

THE COURT:  Yes, I'll permit that.

(Discussion at sidebar concluded.)

THE COURT:  Cross-examine.

MS. FREESE:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MS. FREESE:

Q.   Mr. Arvelo, you testified that you're 21 years old today; right?

A.   Yes, ma'am.

Q.   And you've been dealing drugs, we know, at least since you've been about 18?

A.   Yes.

Q.   Since 2009.  That was when you had your first conviction in Philadelphia County.  And that offense involved a large quantity of marijuana, didn't it?

A.   Yes, ma'am.

Q.   And you were convicted of possession with the intent to distribute that marijuana?

A.   Um-hum.

Q.   And the carrying the firearm without a license?

A.   Yes.

Q.   You went to jail for 11 and a half to 23 months?

A.   Yes.

Q.   And you got a consecutive term of probation of three years?

A.   Yes.

Q.   And while you were on probation in Philadelphia, you continued to sell marijuana.  While you were on probation in Philadelphia, you weren't permitted to use any drugs, were you?

A.   No.

Q.   You're not allowed to use drugs when you are on probation?

A.   Not at all.

Q.   When you are on probation, you're required to tell the truth to your probation officer, aren't you?

A.   Yes, ma'am.

Q.   But while you were on that probation from Philadelphia County, you sold drugs to an undercover agent in 2011?

A.   Yes, ma'am.

Q.   That was in Cumberland County?

A.   Yeah.

          THE COURT:  I can't hear you.

          THE WITNESS:  Yes, ma'am.

BY MS. FREESE:

Q.   And that was then your second conviction for a delivery?

A. Yes.

Q. You got probation, but you went to jail for a short period of time for violating your prior term of probation, didn't you?

A. Yes.

Q. For breaking the rules?

A. Yes.

Q. For getting rearrested. And that same year, you were convicted of a simple assault. Again, you remember that?

A. Yes.

Q. And so you were on probation then in Philadelphia County and Cumberland County?

A. Yes, I was.

Q. And all those same rules applied? You weren't allowed to use drugs?

A. Yes.

Q. Certainly weren't allowed to sell drugs?

A. Yeah.

Q. When you are on probation, you're required to tell the truth to your probation officer?

A. Yes.

Q. You're not allowed to lie?

A. Not at all.

Q. If you lie, can you be violated from your probation?

A. I believe so, yeah.

Q. If you are violated from your probation, you can go to

jail?

A.    Yes.

Q.    In fact, when you violate your probation, you can go to jail in the State of Pennsylvania for up to the maximum term incarceration, can't you?

A.    Yes.

Q.    That first offense in Philadelphia County was punishable by up to five years in prison, right?

A.    Yes.

Q.    And the second one in Cumberland County in 2011 was punishable by up to 10 years in prison?

A.    Yes.

Q.    But you went to jail for a month?

A.    Yes.

Q.    For violating your probation?

A.    (Witness nodded head affirmatively.)

Q.    So Mr. Muza, Larry Muza from the Dauphin County Probation Department, was supervising you at that time?

A.    Yes, ma'am.

Q.    Was your probation from Philadelphia County and Cumberland County transferred to Dauphin County because you were living here?

A.    Yes.

Q.    So he was the guy?  He was your go-to guy who you had to report to?

A.   Yes.

Q.   He was the guy who you had to be honest with?

A.   Yes, ma'am.

Q.   He was the one who was supervising you?

A.   Yes.

Q.   But you violated that probation, didn't you?

A.   Yes.

Q.   By committing this drug sale?

A.   Yes.

Q.   And those charges aren't resolved yet.  But you do have these other pending charges out there of simple assault, reckless endangerment, and harassment; right?

A.   Yes.

Q.   And you don't want to go to jail, do you?

A.   Not at all.

Q.   You want to be out of jail?

A.   Yes.

Q.   With those two young children you testified about?

A.   Yes.

Q.   You want to be able to go to your work interview and to carry on with your life, right?

A.   Yes.

Q.   On April 18, 2012, you drove to the mall and you go and you make the drug sale.  You sell a quarter pound of marijuana?

A.   Yes.

Q. I think we've established that pretty clearly, while you're obviously on probation?

A. (Witness nodded head affirmatively.)

Q. So Mr. Muza --

THE COURT: Wait a minute. Is that a question?

MS. FREESE: It was.

THE WITNESS: Yes. Everything you're saying is correct.

MS. FREESE: Thank you, Your Honor.

BY MS. FREESE:

Q. And so Mr. Muza was actually present at the Harrisburg Mall when you were taken into custody?

A. Yes, ma'am.

Q. And so he was aware clearly that day that you had delivered that marijuana?

A. Yes.

Q. But he didn't violate you, did he?

A. No.

Q. He didn't put you in jail?

A. Huh-uh.

Q. Do you know why that is?

A. A little bit, yeah, I guess. I guess like he was telling me, with the cop, Jon Markle, he was like, well, your buddy, he's like, his rap sheet is pretty long, you know what I'm saying, and, you know what I mean, and he had a gun, scale, he

had more weed on him.

Q.   Did he tell you -- did he ever tell you during the course of that, that if you cooperated, you wouldn't go to jail?

A.   Yeah.

Q.   Yes?

A.   Yes.

        MS. FREESE:  Your Honor, may we briefly approach?

        THE COURT:  Yes.

        (Discussion held at sidebar:)

        MS. FREESE:  Your Honor, I would ask for a curative instruction.  The witness just indicated that my client had a long rap sheet.

        MS. TAYLOR:  She's asking him whether --

        MS. FREESE:  It was --

        MS. TAYLOR:  It was also stipulated.

        THE COURT:  It will only bring more attention to it if I instruct them.

        MS. FREESE:  Okay.

        (Discussion at sidebar concluded.)

BY MS. FREESE:

Q.   So it's your recollection that, or you believe that, you didn't go to jail in part on your probation violations because you were cooperating?

A.   Yeah.

Q.   And on April 18, 2012, were you smoking marijuana?

A.    Yes.

Q.    Did you smoke marijuana on a daily basis back at that time?

A.    Yes, I did.

Q.    Regularly?

A.    Yeah.

Q.    How much marijuana did you smoke that day?  Do you remember?

A.    Probably a lot.  I can't remember.  It's so long ago.  But I know I was smoking a lot at that time.

Q.    Based upon your drug use, how many years have you been using marijuana?

A.    Probably like six, seven.

Q.    As a drug user, how much would you use at any given typical day?  I realize it might vary.

A.    Yeah, yeah.  I mean, if I have it like that, then I'll smoke a whole ounce a day.

Q.    An ounce a day?

A.    Yeah.

Q.    So you could have an ounce for your personal consumption?

A.    Yeah.

Q.    When you buy drugs for your own personal use, do you ever have a scale?  Do you ever weigh it?

A.    Yes.

Q.    Why do you do that?

A.   Make sure I don't get beat.  Make sure, you know what I'm saying, it weighs out correctly.  It's my money.  I want to make sure I'm getting back --

Q.   Make sure you're not getting ripped off?

A.   Yeah.

Q.   So in the past, you've purchased an ounce of marijuana for your own use?

A.   Right, yes.

Q.   On April 18, 2012, you're taken into custody when you are walking across the parking lot; is that true?

A.   No.  When I hopped out the guy's car, and when they all pulled up around me, like I laid on the ground or whatever, and they put the cuffs on me.  And then they took me like directly in some guy's SUV, drove me over to my car.  And, yeah.

         MS. FREESE:  Your Honor, at this point I would ask permission to approach the witness to show him what's been previously marked as Defendant's Exhibit 101?

         THE COURT:  Any objection?

         MS. TAYLOR:  No, Your Honor.

         THE COURT:  Okay.  Is that going to be displayed?

         MS. FREESE:  It is.

BY MS. FREESE:

Q.   Mr. Arvelo, I'm going to ask you to take a look at what's been premarked as Defendant's Exhibit 101.  Do you recognize that?

A.   Yes, I do.

Q.   And what does it appear to be to you?

A.   The parking lot at the mall, at the Bass Pro Shop.

Q.   At the Bass Pro Shop?

A.   Yes.

MS. FREESE:  Your Honor, I have previously provided a copy of this to the Government, and we have stipulated to its admissibility.  I would request permission to present it to the jury?

THE COURT:  It's admitted.

BY MS. FREESE:

Q.   Okay.  I just want to warn you, Mr. Arvelo, if you touch the screen, it will cause a marking to appear on the screen. Okay.  Okay.  So when we're looking at this map, looking at the top of the screen, you see a road on the top of that, on the top of that screen there.  Is that Paxton Street?

A.   Yes, it is.

Q.   Okay.  And the large white building depicted on the lower left-hand side of the screen, is that the Bass Pro Shop which is connected to the Harrisburg East Mall?

A.   Yes, it is.

Q.   Okay.  Now in front of the mall, there's actually a yellow marking on there that says Spriggs.  Do you see that?

A.   Yes.

Q.   Is that an accurate depiction of where you parked your car

on April 18, 2012?

A.    Yes.

Q.    So when you parked your vehicle in that location, your vehicle was facing Macy's; is that true?

A.    Yes.

Q.    And you got out of your vehicle, and you walked to the confidential informant's vehicle?

A.    Yes.

Q.    When you walked your route to the confidential informant's vehicle, could you, by pressing on the screen, start where it says Spriggs and show the route that you took to get to the confidential informant's vehicle?

A.    (Complied.)  Something like that.

Q.    That's actually my next question.  There's another yellow marking or pin there that says drug deal.  Is that an accurate depiction of approximately where the confidential informant's vehicle was?

A.    I'm pretty sure, yes.

Q.    You believe that to be fairly accurate?

A.    Yes.

Q.    And so you walked around -- on the day, on April 18, 2012, were there any boats in a row there?

A.    Yes.

Q.    On that side of the mall?

A.    There was a whole bunch, yeah.

Q. Okay. From the confidential informant's vehicle, could you see your own vehicle?

A. No.

Q. And you got into the confidential informant's vehicle, nobody else was in that vehicle?

A. Nobody else was in the vehicle.

Q. Just you and that other individual?

A. Yes, ma'am.

Q. So after you deliver the quarter pound of marijuana -- that's what I want to be specific about. You get out of the vehicle. And can you mark -- you know what? Maybe I can change the color here if I can figure it out. We'll see how this works.

COURTROOM DEPUTY: He can do it there also.

MS. FREESE: I think I pressed it. It should be green.

THE WITNESS: Yeah.

BY MS. FREESE:

Q. Could you mark approximately where you were taken into custody?

A. Probably about like right here. Somewhere around there. (Complied.)

Q. Okay. So you got in the vehicle almost immediately --

A. Yeah, probably like 10 feet. And then all these cars just came around me circling me, yeah.

Q.   That was my question.  Cars swarmed around you?

A.   Yes.

Q.   There were multiple police officers?

A.   Yes, probably like 10 of them.

Q.   Were their guns drawn?

A.   Yes.

Q.   Were they commanding you to get on the ground?

A.   Yes, ma'am.

Q.   You got on the ground and you were taken into custody?

A.   Yes.

Q.   At that time when they went over, at some point there, you're obviously speaking to officers, and they're taking you into custody.  Did you tell officers on that day that Mr. Spriggs had nothing to do with this?

A.   Yes.  Yeah, I did.

Q.   And after you're taken into custody, you're processed, and you're released; is that true?

A.   Yes.

Q.   All right.  So when you are released, are you released, not to the custody, but are you released with your probation officer when he is there?

A.   Yes.

Q.   And this confidential informant was a regular customer?  You had been serving him for sometime?

A.   Like I knew him for years, like literally knew him for

like eight years.

Q. You had been supplying drugs to him over the years?

A. Yeah. I haven't seen him within like probably like two years or like a year and a half. Like I haven't talked to him. Like I talk to him on Facebook probably once a month but not actual person to person. And I guess, yeah.

Q. And have you been supplying this and other individuals with marijuana for several years?

A. Yes.

Q. For an extended period of time?

A. (Witness nodded head affirmatively.)

Q. Long before you knew Mr. Spriggs?

A. Oh, yeah, yes.

Q. I think your testimony was that you knew him maybe a month or two?

A. Yeah, like two, maybe three months.

Q. But you've been selling drugs for years?

A. Yes, yes.

Q. And you're aware that you could have been prosecuted in federal court for your involvement in this offense?

A. Yes, ma'am.

Q. And you could be charged tomorrow?

A. I guess, yeah. I don't know.

Q. Nobody talked to you about that?

A. Charged in this?

Q.    You could be charged in federal court tomorrow?

A.    Nobody talked to me about that, no.

Q.    So you didn't know that?

A.    No.

Q.    You're aware if you were charged in federal court, you could face up to a life sentence?

A.    Yes.

Q.    It's your understanding you're not going to be charged in federal court?

A.    I hope not.

Q.    Correct?

A.    Correct.

Q.    Did anybody tell you that you're not going to be charged in federal court?

A.    Nobody told me, but I assume no because I already went to court for this.

Q.    And you went to court in Dauphin County?

A.    Yes.

Q.    And you got probation?

A.    Yes.

Q.    Three years probation?

A.    Yes.

Q.    And is it your understanding that you got probation in part because of your testimony, your cooperation?

A.    Yes.

Q.   And it's true that in that Dauphin County case, this happened -- this event happened a year ago, okay, April 18, 2012?

A.   Yes.

Q.   Roughly a year ago?

A.   (Witness nodded head affirmatively.)

Q.   But the charges in that case weren't even filed until September of 2012, several months later?  Does that sound about right?

A.   Yeah, yeah.

Q.   About five months later?

A.   Yes, it does.

Q.   So you just continued on probation, you didn't get violated, you didn't go to jail?

A.   (Witness shook head negatively.)

Q.   And then about five months later, you got charged?

A.   Yes.

Q.   And when you got charged, you haven't served any time in jail for this offense?

A.   No.

Q.   And you haven't served any time in jail for any of your probation violations?

A.   No.

Q.   Not even for using marijuana, like you said that you were, while you were on probation?

A.   Yes.

Q.   While you were on probation, were you using marijuana daily or regularly?

A.   Every day.

Q.   Did you ever tell your probation officer that you were using marijuana?

A.   Yes.

Q.   Okay.  And you were not violated, you were never sent to jail?

A.   Nope.

Q.   And you're aware that the person or the office who decides whether you get charged in federal court is Ms. Taylor, the U.S. Attorney's office?  You're aware of that, right?

A.   Yes, ma'am.

Q.   So the folks over here are the ones who decide whether you get charged in this court?

A.   Yes.

Q.   And as you testify here today, you're certainly hoping that does not happen?

A.   Yes.

Q.   Aren't you?

A.   Yes.

          MS. FREESE:  Mr. Buckwalter, could we save a marked-up copy of this exhibit?

          COURTROOM DEPUTY:  Do you want to give it a number?

MS. FREESE:  Armbruster, sorry.  Yeah, this is Defendant's Exhibit 101, so why don't we call it 101.1.  And may I have one moment, Your Honor?

THE COURT:  Yes.

MS. FREESE:  No further questions.

THE COURT:  Redirect.

MS. TAYLOR:  Just very briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MS. TAYLOR:

Q.   Mr. Arvelo, Ms. Freese asked you some questions about things that you told the officers back on April 18th.  I believe she asked you if you told them on that date that Mr. Spriggs had nothing to do with the drug transaction?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   And when did you tell them that?

A.   I believe when they was putting me in the car.  I was like, look, because I heard them on the phone.  I'm like, yo, we're at his car, there's somebody in his car.  And it was just like talking.

MS. FREESE:  Objection.  Hearsay to any of those initial statements.

THE WITNESS:  They were just talking about a whole bunch of stuff.

THE COURT: I can't even hear.

MS. FREESE: Hearsay objection as to anything he heard other officers discussing in the vehicle.

THE COURT: Sustained.

BY MS. TAYLOR:

Q. You told the officers that Mr. Spriggs had nothing to do with it on the scene at the time they were arresting you?

A. I believe so, yes.

Q. Did you tell them anything else at that time?

A. Like when I got put in the car or like --

Q. Any time while you're at the scene, yes, when they were taking you into arrest before they transport you?

A. (No response.)

Q. Did you tell them anything about what they could expect to find?

A. Oh, yeah, yeah, yeah. I was like, you know what I mean, he got a gun, so be careful, you know what I mean. But I was saying that for the cops' safety and his safety, you know what I mean, because, I mean, I know how cops are. You know. You watch TV. I was like, look, he got a gun, so be careful.

Q. So you told the officers at that time that Mr. Spriggs had a gun?

A. Yes.

Q. Had you seen the gun that day?

A. Yes.

Q.   When did you see it?

A.   I think like when he got in the car.  He was like fidgeting in his pockets or something.  And like he like --

Q.   You saw it at that time?

A.   I looked over, you know what I mean.

Q.   But you wanted to alert the officers that he had a gun for their safety and for Mr. Spriggs' safety?

A.   Yes.

Q.   Now you said that you had known Mr. Spriggs -- again, back in April, you had known him for two or three months; right?

A.   Yes.

Q.   That entire time that you knew him, you had been buying some quantities of marijuana from him?

A.   Yes.

Q.   It started out as smaller quantities?

A.   Yes.

Q.   And progressed up to ounce quantities?

A.   Yes.

Q.   Now you told Ms. Freese that sometimes that you could smoke up to an ounce of marijuana a day?

A.   Yes.

Q.   That's a lot of marijuana for one person to smoke in a day, wouldn't you agree?

A.   Maybe, maybe not.  Like honestly, like I've been smoking marijuana since I was a little kid.  And I know you talk about

my past and this and that. Well, I used to sell drugs. So when you have so much drugs in front of you, you can smoke as much as you want, you know what I'm saying. At the time back in like '09, '10, I was smoking like an ounce, probably like two ounces a day. Not just by myself; me, my girl, probably like two buddies. But that was like a daily use, probably like an ounce, ounce and a half a day.

Q. So you didn't smoke the entire ounce yourself? You would share it with your friends?

A. Share it, yeah.

Q. You also mentioned that you had a scale that you would use to weigh drugs when you would buy them?

A. Yes.

Q. And when you would sell drugs, you had a scale, and you would weigh them when you would sell them as well; right?

A. Yes, ma'am.

MS. TAYLOR: Those are all the questions I have for Mr. Arvelo.

THE COURT: Recross.

**RECROSS EXAMINATION**

BY MS. FREESE:

Q. Mr. Arvelo, you just testified that you saw a firearm on April 18, 2012. You saw Mr. Spriggs with a firearm?

A. Yes.

Q. When he got into your car?

A.    Yes.

Q.    And so what kind of firearm was it?  Was it a revolver?
Semiautomatic?

A.    It looked like a revolver, like a barrel or something.

        MS. FREESE:  Thank you.  Nothing further, Your Honor.

        THE COURT:  You may step down.  We'll be in recess
until 1:30.

        COURTROOM DEPUTY:  Court's in recess.

        MS. TAYLOR:  Your Honor, may Mr. Arvelo be excused?

        THE COURT:  Any objection?

        MS. FREESE:  I just need one brief moment to consult
with my client.  (Complied.)  We have no objection to Mr.
Arvelo being excused.

        THE COURT:  Where is he?

        MS. TAYLOR:  He's waiting outside.

        THE COURT:  Okay.  He's excused then.

        MS. TAYLOR:  Thank you, Your Honor.

        (Proceedings recessed at 12:30 p.m. and reconvened at
        1:30; all parties present.)

        THE COURT:  Afternoon.  Be seated, please.  Ms.
Taylor.

        MS. TAYLOR:  Thank you, Your Honor.  The Government
would call Detective Corey Dickerson.

        **COREY DICKERSON, GOVERNMENT'S WITNESS, SWORN**

        COURTROOM DEPUTY:  Would you state your name, please?

THE WITNESS:  Detective Corey Dickerson. D-I-C-K-E-R-S-O-N.

COURTROOM DEPUTY:  Thank you.

THE COURT:  You may proceed.

MS. TAYLOR:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MS. TAYLOR:

Q.   Detective Dickerson, how are you employed?

A.   I'm employed by the Dauphin County Criminal Investigation Division, assigned to the Dauphin County Drug Task Force.  And I've been assigned as such since December 15th, 2008.

Q.   And how are you employed before you were with Dauphin County?

A.   I was a police officer in Arlington County, Virginia.

Q.   How long were you a police officer in Virginia?

A.   Approximately four years.

Q.   Detective Dickerson, were you involved in a case, a drug transaction that was being monitored by the Dauphin County Drug Task Force back on April 18th, 2012?

A.   Yes, ma'am, I was.

Q.   And what was your role in that case?

A.   My role in that case was part of the surveillance and apprehension team of the suspect who came to deliver us marijuana.

Q.   Were you positioned at the Harrisburg East Mall?

A.    Yes, ma'am, I was, in an undercover vehicle.

Q.    And in relation to the Bass Pro Shop, where was your vehicle located?

A.    Actually in the lot, in the parking lot of the Bass Pro lot where the CI confidential informant vehicle was.  We were probably 10 to 15 spots behind it.

Q.    So you could actually see the vehicle that the CI was in?

A.    Perfect visual of the CI vehicle from the vehicle we were in, yes.

Q.    When you -- at some point, did you see someone approaching the vehicle that the CI was in?

A.    Yes, I did.  Trooper Markle had already gave us a description of the person who was supposed to be bringing the marijuana that we were purchasing, who was indeed the person we were supposed to arrest as well.  So when the person -- I believe his name was Mr. Arvelo -- when he started to approach the vehicle, we obviously knew who he was and that we were going to be arresting him after the transaction.

Q.    So at some point, you positively identified Mr. Arvelo approaching the CI car?

A.    Correct.

Q.    And did you actually see him get in the car?

A.    Yes, ma'am.

Q.    About how long do you think he was in the car?  Short period of time or long?

A.   Approximately a couple of minutes, two to three minutes, which is normal length of a drug transaction.

Q.   And after -- at some point, you see Mr. Arvelo exit the car?

A.   Correct.

Q.   What happens after that?  What do you do?

A.   At that time, again, we were already instructed when he exited the vehicle, when he walks away from the confidential informant, who was now safe, to approach and arrest the target. At that time, that's what myself and Detective Flythe did.  We approached Mr. Arvelo and placed him under arrest.

Q.   And when you arrested Mr. Arvelo, did he resist in any way or was he compliant?

A.   No, ma'am.  He was completely compliant.  He did not resist at all.

Q.   Did he say anything to you either when you were arresting him or putting him into a transport vehicle?

A.   Absolutely.  When we initially placed him on the ground to make sure that, you know, the scene was safe, when we removed him from the ground and placed him in handcuffs, he was already, not yelling stuff to us, but letting us know that he was accompanied by another.

MS. FREESE:  Objection, Your Honor.  Just as to hearsay, anything that Mr. Arvelo told the officer.  He was present in court and testified today.

THE COURT: It was a statement against his own interest. Ms. Taylor.

MS. TAYLOR: Well, Your Honor, could we approach briefly?

THE COURT: Yes. He is an unindicted co-conspirator.

(Discussion at sidebar:)

MS. FREESE: This particular officer did not prepare a report, so I have no idea what this statement is.

THE COURT: Well, a lot of people don't file reports. That doesn't mean he can't testify.

MS. FREESE: I would just ask for an offer of proof as to the fact this was a statement.

MS. TAYLOR: That's one reason why I wanted to approach. What Detective Dickerson will say that Mr. Arvelo said was that he, Mr. Arvelo, informed him that Mr. Spriggs had a gun, and also Mr. Arvelo testified today that he told them on that day that Mr. Spriggs wasn't involved with the drug transaction. And that's not what he told Detective -- that's not what Detective Dickerson would testify to. He would tell them that Mr. Arvelo said that Mr. Spriggs, the guy I got weed from is in the car around the corner and he has a gun.

MS. FREESE: Well, as to the first part, that he had a gun, Josh Arvelo already testified to that, that he told law enforcement he had a gun. And that's not in furtherance of a conspiracy. As to the second part, Josh Arvelo did not

identify to whom he made that statement. Therefore, it may be misleading to the jury. This was not the only officer there present at the scene. Josh Arvelo clearly could have said that to a different officer.

MS. TAYLOR: But this is the officer.

THE COURT: But if he said it to him. Then try to impeach him. He already testified to what an unindicted co-conspirator said.

MS. FREESE: My argument will be that statement is not in furtherance of a conspiracy. An admission by the co-defendant who already testified is not in furtherance of a conspiracy. It doesn't fall within the hearsay exception.

MS. TAYLOR: Your Honor, I think the statement that he makes, that the guy I got the weed from in the car has a gun, that is in furtherance.

THE COURT: The conspiracy probably, but it ends at the point he was arrested, too.

MS. TAYLOR: He is referencing what just occurred though.

MS. FREESE: Which makes it hearsay.

THE COURT: Sustain your objection. Try another way.

(Discussion at sidebar concluded.)

THE COURT: May I see counsel up here again?

(Discussion at sidebar:)

THE COURT: I was going to say, if that would be a

statement against interest, but it wouldn't be his interest though.

MS. FREESE: No.

THE COURT: Okay.

(Discussion at sidebar concluded.)

BY MS. TAYLOR:

Q. Detective Dickerson, based on your interaction with Mr. Arvelo as you were arresting him, did you communicate anything to the other officers that were present?

A. Absolutely. I immediately communicated to the officers who were present at the scene that there was another man in the vehicle parked on the front side of the Bass Pro lot, I guess the Paxton Street side, that had a firearm on him and had came to the scene with Mr. Arvelo.

Q. Now from your vantage point as the -- where you were sitting near the car with the CI, could you see the vehicle that Mr. Arvelo came from and the vehicle that ultimately Mr. Spriggs was arrested in?

A. No, ma'am.

Q. After you placed Mr. Arvelo under arrest, what did you do at that point?

A. After we placed Mr. Arvelo under arrest and I got on my radio and let other officers again know that the other man in the vehicle had a firearm, I proceeded around to that area just in case they needed further assistance.

Q. And once you got over there, did you -- did they need your assistance at that point or did other officers have it under control?

A. Other officers had already converged on the vehicle and they had it under control.

MS. TAYLOR: Thank you. Those are all the questions I have for Detective Dickerson.

THE COURT: Cross.

MS. FREESE: Thank you, Your Honor.

**CROSS EXAMINATION**

BY MS. FREESE:

Q. Detective Dickerson, when you became involved in the investigation, you testified that the target of this drug transaction was Josh Arvelo?

A. At that time, he was one of the targets.

Q. Right. Well, I think you previously testified the confidential informant had arranged for a purchase of marijuana from Josh Arvelo?

A. Well, what the confidential informant had arranged for, Mr. Arvelo was supposed to come meet the informant and then drive --

MS. FREESE: Your Honor, I'm sorry. Can we approach?

THE COURT: Yes.

(Discussion was held at sidebar:)

MS. TAYLOR: Your Honor, he's just trying to answer

the question.

MS. FREESE: Hold on. There's a separate report prepared by another officer.

THE COURT: I'm sorry?

MS. FREESE: Sorry. There's a separate report prepared by another officer that indicates that the confidential informant told officers that Spriggs was going to bring his guy or his supplier.

MS. TAYLOR: Arvelo was going to bring his guy?

MS. FREESE: Right, that Arvelo was going to bring his guy or his supplier.

MS. TAYLOR: It references --

MS. FREESE: Hold on a second. The Government is not calling the confidential informant. Anything the confidential informant told other officers again is hearsay.

MS. TAYLOR: But, Your Honor, the question was whether Mr. Arvelo was the target of this investigation. Detective Dickerson is responding he was one of the targets. But he simply is laying out the plan, as they knew it, was that they were initially -- the CI and the -- that Mr. Arvelo was going to bring -- the CI and Mr. Arvelo were going to travel to a supplier's house. Then that plan changed, and he informed them that Mr. Arvelo was bringing his supplier to the mall, which is ultimately what happened.

Detective Dickerson is just merely trying to be

candid about initially the target was Mr. Arvelo, and then they developed whoever the supplier was. It was clearly going to be a second target.

THE COURT: How does he know that?

MS. TAYLOR: How does --

THE COURT: How does Dickerson know about that?

MS. TAYLOR: I believe he knows it from Trooper Markle, who is testifying next.

MS. FREESE: So it's double hearsay.

THE COURT: Then have him testify to that issue.

MS. FREESE: We'll deal with it there. Withdraw the question.

(Discussion at sidebar concluded.)

MS. FREESE: I'll withdraw the question, Your Honor.

BY MS. FREESE:

Q. On April 18, 2012, you indicated that you were part of the surveillance team, you were part of the multiple teams that were involved in this particular controlled purchase; correct?

A. Yes, ma'am.

Q. Okay.

MS. FREESE: Your Honor, permission to approach the witness?

THE COURT: Yes.

BY MS. FREESE:

Q. Detective Dickerson, I'm going to ask you to take a look

at what's been premarked as Defendant's Exhibit 100.

A.    All right.

Q.    Do you recognize what I just handed you?

A.    This is an aerial shot of the Bass Pro at the mall.

MS. TAYLOR:  Your Honor, again, the parties have previously stipulated this is admissible.

THE COURT:  Place it on the screen.

MS. FREESE:  Thank you, Your Honor.

BY MS. FREESE:

Q.    Just so the jury is clear as to where you were and what your vantage point was, the street at the top of the screen is Paxton Street; correct?

A.    Correct.

Q.    Okay.  And then that large white roof, that large white building in the lower left-hand portion of the screen is the Bass Pro Shop?

A.    Correct.

Q.    Okay.  Over to the right-hand side of the screen, that is the parking lot area where the confidential informant's vehicle was parked?

A.    Correct.

Q.    Okay.  I'm going to ask you, I don't know if you've ever used these screens before, but if you actually press firmly on the screen, it will make a dot, it will make a mark?

A.    Okay.

Q.   Hopefully, that mark comes up in green because we're going to use a couple different colors.  So could you mark, to the best of your recollection, where the confidential informant's vehicle was parked?

A.   Again, to the best of my recollection.

Q.   Absolutely.

A.   (Complied.)

Q.   And in relationship to the confidential informant's vehicle if, of course, it is actually on this map -- well, actually let me change the colors here.  Where was your vehicle?  If you could mark it?

A.   (Complied.)

Q.   Okay.  So you remained in your vehicle, is that true, while Mr. Arvelo walked to the confidential informant's vehicle?

A.   Correct.  I could see him walking from, I guess, the Paxton Street side once he became visible on our side.  He was coming from that direction though.

Q.   That's the next question.  Now I've changed it to a third color, which is red.  Could you mark with your hand sort of by drawing an arrow from what direction Mr. Arvelo traveled?

A.   (Complied.)  Obviously, to the green car.

Q.   Okay.  So he at some point entered your view?

A.   Correct.

Q.   And then remained in your unobstructed view until he

exited the confidential informant's vehicle?

A.   Well, while he's crossing through the parking lot fairly unobstructed, he has to pass cars, but --

Q.   Okay.  And you then participated in taking Mr. Arvelo into custody?

A.   Correct.

Q.   And when you arrived at the vehicle -- well, let me ask you this.  If you could mark just with an X where approximately was Mr. Arvelo taken into custody?

A.   He exited the vehicle and walked, if I remember correctly, like around the front of the vehicle.

Q.   Um-hum.

A.   So about right there.  (Complied.)

Q.   Okay.  So a short distance?

A.   Oh, yes.

Q.   From the vehicle?

A.   Yes.

Q.   And on April 18, 2012, were there a row of boats in the area of the Bass Pro Shop?

A.   Sometimes, there is a lot of boats.  Sometimes, there is only a couple.

THE COURT:  The question was, at that time were there boats?

THE WITNESS:  I don't remember correctly if there were.

BY MS. FREESE:

Q.   And from your vantage point, which would be the magenta or purplish dot there, could you see Mr. Arvelo's vehicle?  Could you see Mr. Spriggs?

A.   No.

Q.   And you didn't see him until you moved or traveled to the area to assist other officers?

A.   Correct, if they needed it.

Q.   Very good.  And when you arrived, they did not?

A.   Correct.

        MS. FREESE:  Mr. Armbruster, could we please print a marked-up image of that and we could mark that Defense Exhibit 100.1.

        THE COURT:  That's what the other one was.

        MS. FREESE:  The other one was 101.  And I have no further questions, Your Honor.

        THE COURT:  Redirect.

        MS. TAYLOR:  Nothing further, Your Honor.

        THE COURT:  You may step down.

        MS. TAYLOR:  Your Honor, may Detective Dickerson be excused?

        THE COURT:  Any objection?

        MS. FREESE:  No objection.

        THE COURT:  You're excused, sir.

        MS. TAYLOR:  Your Honor, the Government's next

witness will be Trooper Markle.

**JON MARKLE, GOVERNMENT'S WITNESS, SWORN**

COURTROOM DEPUTY:  Will you state your name, please?

THE WITNESS:  Trooper Jon, J-O-N; last name is Markle, M-A-R-K-L-E.

COURTROOM DEPUTY:  Thank you.

THE COURT:  Go ahead.

MS. TAYLOR:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MS. TAYLOR:

Q.   Sir, how are you employed?

A.   I'm employed by the Pennsylvania State Police for the previous 13 years.

Q.   And what's your current duty assignment?

A.   Currently, I'm assigned to the State Police K-9 unit out of Carlisle station.

Q.   And prior to that, what was your assignment?

A.   Prior to that, the previous 9 years of the 13, I was assigned to the vice narcotics unit out of the Harrisburg station.

Q.   And while you were with the vice unit, did you have an opportunity to do work with the Dauphin County Drug Task Force?

A.   Yes, I did.

Q.   Were you involved in a drug transaction that occurred on April 18th, 2012, in the Harrisburg East Mall parking lot?

A.    Yes, I was.

Q.    And tell us about how your involvement began?

A.    My involvement began, I was contacted by Detective Wolfe that had a confidential informant that could purchase a sum of marijuana from a Josh Arvelo, which was going to occur in the Harrisburg area.

Q.    And once you had an opportunity to speak with Corporal Wolfe, did you then contact members of the Dauphin County Drug Task Force to arrange for that deal to occur?

A.    Yes, I did.

Q.    Just tell us generally, a confidential informant, what is that?

A.    A confidential informant is just that.  It's an individual that may have charges pending.  In return, they give cooperation with other investigations put on by law enforcement.  And in return, they are given judicial consideration for their actual charges they may have.  That depends on the district attorney's office and the judge that's presiding over that individual case that they have pending charges over.

      Then the second kind is an individual that has no charges pending and may work for the police for money.  Sometimes we pay individuals for cooperation, information, that leads to an arrest and to help further along investigations we may have.

Q.    Now in this particular date that we are discussing, April

18th, 2012, did you have an opportunity to meet with a confidential informant?

A.    I did.

Q.    And was that with Corporal Wolfe?

A.    Yes, it was.

Q.    Now what was the -- when you initially met with the confidential informant, what was the initial plan?

A.    The initial plan with the confidential informant was, they placed a phone call to arrange a drug transaction.  It was for a quarter pound of marijuana for $460.00.

Q.    Was that phone call placed in your presence?

A.    Yes, it was.  And Josh Arvelo was going to be bringing the marijuana.  The original plan was that the confidential informant would meet Mr. Arvelo at the Bass Pro Shop, which was in the -- it's the old Harrisburg East Mall.  Meet him at the Bass Pro at which time the confidential informant would ride with Mr. Arvelo down to the City where Mr. Arvelo would pick up the marijuana from his supplier.

Q.    Is that what happened?

A.    No, it's not.

Q.    How did the plan change?

A.    The plan changed once we placed the confidential informant in the parking lot at Bass Pro.  The confidential informant advised that --

            MS. FREESE:  Objection, Your Honor, hearsay.

THE COURT:  Sustained.

THE WITNESS:  I'll rephrase.  The plan changed.  Mr. Arvelo was bringing the supplier with him --

MS. FREESE:  Objection, Your Honor.

THE WITNESS:  -- to the location.

MS. FREESE:  Permission to approach?

THE COURT:  No.  Overruled.

BY MS. TAYLOR:

Q.   After that plan was put in place, did the plan change again?

A.   No, it did not.  After that, a few minutes went by.  Mr. Arvelo was to be driving a gold-colored sedan whenever he came to the drug transaction.  Surveillance members observed the gold sedan pull into the front part of the Bass Pro parking lot at which time it was occupied by a black male in the passenger seat and the driver was a Hispanic male.

Q.   Now at that point, where was the confidential informant?

A.   The confidential informant was in the parking lot next -- behind the Sheetz basically.  In the Bass Pro parking lot, but on the end by where the boats were that the Sheetz is in the background.  That would be the east side of the mall actually.

Q.   He was in a vehicle or --

A.   Yes, yes, the CI was parked in a vehicle in that parking lot.

Q.   And was anyone else with him in that particular car?

A.   No.   Detective McKahan drove the informant to the location, and then Detective McKahan met up with me and was in my vehicle during the drug transaction.

Q.   So when the transaction occurs, are you part of the surveillance team essentially?

A.   Yes, I am.

Q.   And which -- what could you see from your vantage point?

A.   I actually had visual contact with the CI's vehicle along with Detective Flythe and Detective Dickerson.  At the time, once the gold sedan arrived to the parking lot and parked on the north side next to Paxton Street out of sight of the confidential informant, Detective McKahan and myself repositioned our location and went over to the north side of the mall.

Q.   Now were you surprised that the gold sedan with Mr. Arvelo and Mr. Spriggs in it parked on one side of the mall even though the CI was parked on the other side?

A.   No, not at all.  Usually the supplier does not want to see --

        MS. FREESE:  Your Honor, I am going to object.  This witness --

        THE COURT:  Lay a foundation for his knowledge.

BY MS. TAYLOR:

Q.   Sir, you were with the vice unit for nine years?

A.   That's correct.

Q.   And how many -- while you were with vice, were most of the cases -- what types of cases did you handle usually?

A.   I handled all kinds of cases; narcotics investigations, prostitution, and gambling.  Specifically in the narcotics investigation, most of our investigations are used where we use confidential informants at which time they would use or be a middleman getting the drugs from the main supplier.

In those situations, with me doing undercover purchases of drugs myself, I know from experience that the supplier does not want to meet any new faces that they have not dealt with.  So they typically like to stay out of sight, but not be too far from their money or their product.

THE COURT:  Do you wish to question him on his qualifications?

MS. FREESE:  No, Your Honor.

THE COURT:  You may proceed with questioning.

BY MS. TAYLOR:

Q.   When you were referring to product, are you referring to some kind of controlled substance?

A.   That's correct.

Q.   So I believe you testified that initially you could see the car with the confidential informant in it, but then you later moved over closer to the gold sedan where Mr. Spriggs was located?

A.   That's correct.  Once the gold sedan parked and Mr. Arvelo

got out of the driver's seat and started walking towards the confidential informant, at that time the arrest team/surveillance individuals, we had made it known that Detective Flythe and Detective Dickerson was going to take Mr. Arvelo into custody and the remaining individuals would secure the gold sedan along with the black male that was inside the vehicle.

Q.   So could you actually see Mr. Arvelo get into the car with the confidential informant?

A.   Yes, I did.  As he was opening the driver's door of the confidential informant's vehicle, I was driving through the parking lot over towards the area of the gold sedan.

Q.   Did you see Mr. Arvelo actually being arrested by Detective Dickerson?

A.   No, I did not.

Q.   What happens after Mr. Arvelo is arrested by Detective Dickerson?

A.   They give us the notification that they were moving in to take him into custody.  At the same time, via radio communications, the remaining individuals secured the gold vehicle.

Q.   Now were you part of the officers that dealt with that vehicle?

A.   Yes, I was.  I approached my vehicle to the passenger side of the gold sedan where the black male was seated at which time

it's, I don't want to say common practice, but usually when we secure a vehicle with our vehicles, there's a, they're called takedown cars. Like we use our car, it's called a takedown car, you will block the vehicle in from the front and the rear and usually the door wherever the suspect is at so that it prevents them from being able to flee the scene on foot and causing more hazards to people.

Q. And is that what occurred in this case?

A. Yes. I took the passenger side at which time I got out and approached the passenger door where the black male, which was later identified as Mr. Spriggs, was seated.

Q. Was there anybody else in the car?

A. No, there was not.

Q. And you and other officers are approaching the car?

A. That's correct.

Q. And when you are approaching it, do you have your weapons drawn at that point?

A. We did.

Q. And what do you say, if anything, to Mr. Spriggs?

A. Basically when I approached the vehicle, I kept giving the instructions for Mr. Spriggs to put his hands up to where I could see them. As I was approaching, I could see an overt movement with his right hand down towards his right pocket area as though, I took it that he was trying to get rid of something.

MS. FREESE: Objection, Your Honor.

THE COURT: He is permitted to lay the foundation for what his actions were.

THE WITNESS: Basically his hand movement, the overt movement, I took it that he was trying to hide something or stash something in his pocket at which time I kept directing him to put his hands up at which time he did comply, and Detective McKahan was able to open the driver's door and Mr. Spriggs was extricated through the driver's side of the vehicle.

As he was being taken out of the car, I could hear the arrest officers on the other side identify that they observed a gun in his pocket at which time they were able to secure him, handcuff him, and take the firearm into custody.

Q. There were a number of officers on the driver's side that were attempting to get Mr. Spriggs out?

A. That's correct.

Q. He's sitting in the passenger seat, but they are trying to take him out through the driver's seat, and there are a number of officers over there; right?

A. Yes, that's correct.

Q. Once the gown was removed -- at some point, was it turned over to you.

A. Yes, it was, right there at the scene. Once it was secured, it was turned over to me at which time I took custody

of it and it was placed into evidence.

Q. And did you confirm whether it was loaded or unloaded at that point?

A. Yes, it was loaded. I believe it had six rounds in it. I don't believe there was one in the chamber, but the magazine had rounds in.

MS. TAYLOR: Your Honor, may I approach the witness?

THE COURT: Yes.

BY MS. TAYLOR:

Q. Sir, I'm going to show you what has been previously admitted as Government's Exhibits 1 and 2. Do you recognize that?

A. Yes, I do. That was the 380 that was recovered from Mr. Spriggs on that day.

Q. Just so we're clear, Government's Exhibit 1 is actually the handgun, and Government's Exhibit 2 is the magazine with the rounds in it?

A. Yes, that is correct.

Q. And Trooper Markle, what did you do with the gun once it was given to you and secured on the scene that day?

A. It was taken back to State Police Barracks in Harrisburg where it was placed into evidence into that box and located in our storage facility.

Q. Now once Mr. Spriggs was removed from the car, I believe you already testified to this, other officers -- the gun had

been removed from him and he was handcuffed and placed under arrest at the scene?

A.   Yes.

Q.   At some point, was he searched?

A.   Mr. Spriggs?

Q.   Um-hum.

A.   Yes, he was.

Q.   And what, if anything, was found on him once he was searched incident to arrest?

A.   He had an ounce of marijuana stuffed down in his front of his pants.  And he also had approximately, I believe it was $89.00, a cell phone, and a key, I believe, if I recall correctly.

        MS. TAYLOR:  Your Honor, may I approach?

        THE COURT:  Yes.

BY MS. TAYLOR:

Q.   Trooper, I'm showing you what's been previously marked as Government's Exhibit 4.  Do you recognize that?

A.   Yes, I do.

Q.   And I know it's in a plastic bag inside an evidence bag, but can you tell what it is?

A.   Yes.  It's the plastic bag of marijuana that was recovered from the groin area of Mr. Spriggs on that day.

        MS. TAYLOR:  Your Honor, I would ask for the admission of Government's Exhibit 4.

THE COURT:  Any objection?

MS. FREESE:  No objection.

THE COURT:  It's admitted.

BY MS. TAYLOR:

Q.   And Trooper, I also placed in front of you what's been marked as Government's Exhibits 5 and 6.  Do you recognize those items?

A.   Yes, I do.  It's a digital scale and a cell phone which was also taken from Mr. Spriggs.  I believe, if I recall correctly, the scale was in his left jacket pocket.

MS. TAYLOR:  Your Honor, I would ask for the admission of Government's Exhibit 5, which is the digital scale, and Government's Exhibit 6, which is the cell phone.

THE COURT:  Any objection?

MS. FREESE:  No objection.

THE COURT:  It's admitted.

BY MS. TAYLOR:

Q.   Trooper Markle, can you take the scale out --

A.   Yes.  (Complied.)

Q.   -- which is Government's Exhibit 5.  So the scale was found on Mr. Spriggs in one of his pockets, correct?

A.   That's correct.

Q.   What's the significance of the scale?

A.   To insure that the amount of product, marijuana, coke, whatever the drug is, so that it's weighed out exactly and the

person buying it gets the amount that they purchase.

Q.   Is it considered a tool of the trade in drug purchasing and drug trafficking?

A.   Yes.

Q.   Any other tools of the trade?

A.   Also typically you would see a dealer would carry a scale to insure that they're not giving up too much drugs for a cheaper amount, basically so they can make more money.  Usually your average user --

MS. FREESE:  Your Honor, I'm going to object at this point.  This witness is not --

THE COURT:  I think she asked whether there are any other tools.  I don't think you asked him to explain the scale.

MS. TAYLOR:  That's correct, Your Honor.  I'll rephrase.

BY MS. TAYLOR:

Q.   Trooper Markle, did Mr. Spriggs have anything else on him that you would consider a tool of the drug trade?

A.   No, he did not.

Q.   What is use paraphernalia?

A.   Use paraphernalia would be paraphernalia that a user would use to either ingest, inhale, inject the drug that they were buying such as a hypodermic needle, a marijuana pipe, a pipe, whether it be glass, wooden, whatever type of smoking device, also a straw if you were to inhale cocaine.  Those are your

typical use paraphernalias, they would call it.

Q.   And since this case involves only marijuana, if we could just consider only use paraphernalia for marijuana.  Did Mr. Spriggs have any use paraphernalia on him when he was arrested?

A.   No, he did not.

MS. TAYLOR:  Your Honor, may I approach?

THE COURT:  Yes.

BY MS. TAYLOR:

Q.   Trooper, I'm going to show you what's been marked as Government's Exhibit 3.  Do you recognize the items in that bag?

A.   Yes, I do.

Q.   And what are they?

A.   It was the two bags of marijuana that was purchased that day from Mr. Arvelo for $460.00.

Q.   And those came into your possession through whom?

A.   Through Detective Dickerson.  I believe he recovered them and turned them over to me.

Q.   He took them from the confidential informant?

A.   Confidential informant, yes.

MS. TAYLOR:  Your Honor, I would ask for the admission of Government's Exhibit 3.

THE COURT:  Any objection?

MS. FREESE:  No objection.

THE COURT:  It's admitted.

BY MS. TAYLOR:

Q. Trooper, once you had collected the evidence that we've seen, in particular the drugs, Government's Exhibit 3, the marijuana from the confidential informant, and Government's Exhibit 4, the bag of marijuana taken from Mr. Spriggs' pants, what did you do with those items?

A. Those items, along with the firearms, were transported to the State Police Barracks in Harrisburg where they were secured and placed in these bags and placed into evidence.

Q. Now the quantities of drugs, were they submitted to the Pennsylvania State Police lab for examination?

A. Yes, they were.

MS. TAYLOR: Your Honor, may I approach?

THE COURT: Yes.

BY MS. TAYLOR:

Q. Trooper, I'm going to show you what's been marked as Government's Exhibit 8. Do you recognize that document?

A. Yes, I do. It's the drug identification, the lab report that we get back from the state police laboratory that does the testing of the narcotics.

Q. And there is a stipulation in this case that the lab did confirm that the contents in those bags are marijuana. Can you just give us from the lab report what the quantities were?

A. Yes. The quantities of the items, Exhibit No. 3 was a total weight of 112 grams, which is approximately a quarter

pound.

Q. Okay.

A. Exhibit No. 4 is approximately 27.3 grams, which is approximately an ounce. 28 grams is an ounce.

Q. Now after Mr. Spriggs and Mr. Arvelo were arrested on April 18th, 2012, did you have an opportunity to subpoena phone records for phone numbers that those two individuals were using?

A. Yes, I did.

Q. Now where did you get the phone numbers -- how did you know what phone numbers to subpoena?

A. I subpoenaed the phone number that was associated with the phone that was taken from Mr. Spriggs.

Q. That would be the phone that appears in Government's Exhibit 6?

A. Yes, that's correct. And also the phone number of the phone that Mr. Arvelo had in his possession, and that was the number that was called to arrange the drug transaction.

Q. And you only subpoenaed records for those phones for a very limited period of time?

A. That's correct.

Q. Did you have an opportunity to review those records?

A. Yes, I did, briefly.

Q. And what did you discover? I'm really only asking you about the time around when this deal was initially set up

which, I believe, in your report indicates that you began setting it up around 12:55 p.m. on the 18th of April.

THE COURT: Is that correct? Is that a question or a statement?

BY MS. TAYLOR:

Q. Is that correct?

A. That's correct.

Q. What did the phone records reveal about contact between Mr. -- the phone attributed to Mr. Arvelo and the phone attributed to Mr. Spriggs?

MS. FREESE: Your Honor, I'm going to object. The phone records themselves are hearsay. And I don't believe there's anybody here. I would not have any opportunity to cross-examine anyone regarding the accuracy of the phone records, whether they're text message phone numbers --

MS. TAYLOR: Your Honor, can we approach briefly?

THE COURT: Yes.

(Discussion was held at sidebar:)

MS. TAYLOR: Your Honor, I believe Ms. Freese and I had spoke about the phone records previously. And she indicated that she may be asking Trooper Markle some questions, and I indicated I had no problem stipulating to those. So I didn't realize there was going to be an issue in terms of the authenticity.

MS. FREESE: I have no problems he got the phone

records -- I have no problem he got the phone records and that he reviewed them.

THE COURT: And that he what?

MS. FREESE: Reviewed them. He got the phone records. He reviewed them.

THE COURT: Do you object to him testifying to what he reviewed?

MS. FREESE: Yeah. And it was between those two calls, that, I have no problem with.

MS. TAYLOR: I'm sorry?

MS. FREESE: That there were communications between Mr. Spriggs' number and between Mr. Arvelo's number. As for any of the other information in that, because it's unclear whether they're text messages, some of them are like TracFones --

MS. TAYLOR: I'm sorry. I would just refer to them as communications.

MS. FREESE: Okay. Were there communications between the numbers, I have no objection to that.

(Discussion at sidebar concluded.)

BY MS. TAYLOR:

Q. So Trooper, you had an opportunity to review the records to determine whether or not there were any communications between the phone number from the phone taken from Mr. Spriggs and the phone number taken from Mr. Arvelo?

A.    Yes.

Q.    And were you able to confirm whether there were any communications in and around the time when you and Corporal Wolfe from Cumberland County were setting up this transaction with the confidential informant?

A.    Yes, there were.

Q.    And, in fact, your report does indicate that you began working with the CI and Corporal Wolfe around 12:55 on that day?

A.    That's correct.

Q.    The did the phone records show a phone call from the confidential informant's phone to -- I'm sorry, a communication, there was some kind of communication between the confidential informant and Mr. Arvelo at 12:55?

A.    That's correct.

Q.    And then at 12:58, do the phone records reveal a communication between the phone attributed to Mr. Arvelo?

        MS. FREESE:  Objection, Your Honor.  This is back to my same objection as to the hearsay.

        THE COURT:  Rephrase your question.

BY MS. TAYLOR:

Q.    Can you just tell us what communications that you saw on the phone records?

A.    Yes.  There was communication on and shortly after we began to initiate the drug transaction.  There was

communications between the two phone calls that was taken from Mr. Arvelo and Mr. Spriggs between that 12:55 and the actual 13, I don't know the exact time, 13:30 hours. Between that time, there was communication between the two phones.

Q. There were actually multiple communications between the Arvelo phone and the Spriggs phone?

A. Yes.

MS. TAYLOR: Your Honor, I don't believe I moved for the admission of Government's Exhibit 8.

THE COURT: It was introduced. It was stipulated to. Do you have any objection to it being admitted?

MS. FREESE: No, Your Honor.

THE COURT: It's admitted.

MS. TAYLOR: Your Honor, those are all the questions I have for Trooper Markle at this time.

THE COURT: Cross.

**CROSS EXAMINATION**

BY MS. FREESE:

Q. Trooper Markle, you became involved in this investigation at the request or because you were contacted by Officer Wolfe?

A. That's correct.

Q. And that's when you notified your team or when you notified other law enforcement agencies in Dauphin County of this particular investigation?

A. That's correct.

Q. And at that time, when Officer Wolfe contacted you -- Corporal Wolfe, excuse me, contacted you, this was an investigation into Joshua Arvelo?

A. That's correct.

Q. And Joshua Arvelo, I think, testified to the plan was to make a sale to the confidential informant at the Harrisburg mall?

A. Yes.

Q. Now you've testified as to different placements and surveillance where you were. I believe it's actually up there?

A. It is.

Q. I'm going to ask you to take a look at what has been premarked as Defendant's Exhibit 100. Do you recognize what it appears to be?

A. It appears to be an aerial shot of the parking lot location where the drug transaction took place.

Q. And again, referencing the top of the screen is Paxton Street; correct?

A. That's correct.

Q. And when you are referring to the east side of the Harrisburg mall, you're talking about the area on the right-hand side of your screen?

A. That's correct.

Q. Now could you please mark by tapping on the screen where you were, what vehicle you were in, where your vehicle was

parked?

A.   Originally, my vehicle was back in this location.  Do I have to draw a circle?

Q.   Actually, if you just tap on it firmly, it should make a mark?

A.   It was back in this area.  (Complied.)

Q.   And at the time that the drug transaction took place, where was the confidential informant's vehicle?

A.   Over in this area.

Q.   And as you learned, you know, after the drug deal took place, please mark where Mr. Arvelo's vehicle was located?

A.   Over in that area.  (Complied.)

Q.   Now on April 18th, 2012, you did not see Mr. Spriggs give any drugs to Mr. Arvelo?

A.   No, I did not observe the actual transaction.

Q.   And the surveillance that was set up was surveillance only in the Harrisburg East Mall area?

A.   That's correct.

Q.   Is that true?

A.   Yes.

Q.   So in the surveillance you were involved in, there was no surveillance of Mr. Arvelo prior to pulling into that parking lot?

A.   No, there was not.

Q.   There were no recorded telephone calls involving Mr.

Arvelo, you know, or involving this drug transaction at all?

A. No, there was not.

Q. And in your experience, you've been a state trooper for a number of years, in your experience in drug transactions, are there sometimes body wires used?

A. There are sometimes.

Q. And sometimes conversations are recorded?

A. That's correct.

Q. Between confidential informants and between drug suppliers?

A. That's correct.

Q. But there were none in this case that you are aware of?

A. No, there was not.

Q. And at no time were you in the vehicle with the confidential informant at the time the drugs were delivered?

A. No, I was not.

Q. So as far as any conversation between Mr. Arvelo and the confidential informant, you weren't privy to that, you didn't hear anything that occurred in that vehicle?

A. I did not.

Q. And nor did you hear anything that may or may not have been said between Mr. Arvelo and Mr. Spriggs in Mr. Arvelo's vehicle?

A. No.

Q. And Mr. Arvelo was taken into custody approximately where?

Could you just mark an X -- actually a small A?

A.     I believe in this area.   (Complied.)

Q.     So in close proximity to the confidential informant's vehicle?

A.     Yes.

Q.     And he had $460.00 of buy money on him?

A.     That's correct.

Q.     At the time of -- well, let me actually take a step back. On direct examination, you testified that in your experience as a state trooper, that you have dealt with middlemen; correct?

A.     That's correct.

Q.     You've dealt with suppliers?

A.     Yes.

Q.     You've dealt with users?

A.     Yes.

Q.     And many times, confidential informants are users?

A.     Yes.

Q.     And many times, other people dealing or selling drugs are drug users?

A.     Yes.

Q.     Now in this particular case, Mr. Spriggs was in the vehicle and, according to what you know, remained in that vehicle the entire time until he was placed into custody?

A.     That's correct.

Q.     And in your years of experience, you've been involved -- I

mean, how many drug transactions or drug arrests do you think you've been involved with?

A.   Actually involved with or --

Q.   Yes.

A.   Several hundred, if not a thousand.

Q.   Okay, several hundred.  And some of these investigations, drug investigations, involve marijuana obviously?

A.   Yes.

Q.   It's a controlled substance.  And you've been involved in drug investigations where there are people present in vehicles, probably more than this occasion; right?

A.   Yes.

Q.   Okay.  And somebody sitting in a vehicle, I mean, just so we're clear, somebody sitting in a vehicle not participating in a drug transaction in a drug deal, it's not your testimony that that person's typically or always the supplier?

A.   That's correct.

Q.   So there could be, you know, a girlfriend.  There could be anyone in a car not participating in a drug transaction.  That doesn't make them a supplier?

A.   No, it does not, but it does make them a participant in the drug transaction.

Q.   By sitting in the car and being merely present when somebody else sells drugs, in your view, that makes them part of the drug transaction?

A.    If they are aware of it going on.

Q.    If they are aware of it.  And if they're not, you would agree with me, if doesn't make them a part of the drug transaction?

A.    That's correct, if they're not aware.

Q.    Now I think you said -- do you still have the exhibits up there?

A.    I do.

Q.    I'm referring specifically to the marijuana.

A.    Exhibit 4 and 3.

Q.    I'm going to ask you -- okay.  Just so that we're clear, Government's Exhibit No. 4 would be the bag of marijuana that was retrieved from Mr. Spriggs?

A.    Yes.

Q.    Okay.  And Government's Exhibit 3 are the bags of marijuana that were part of the controlled purchase involving Mr. Arvelo?

A.    That's correct.

Q.    Okay.  And have you had an opportunity to look at those substances carefully?

A.    Yes.

Q.    Okay.  And the reason I'm asking you that is because those bags of marijuana, do they appear to be different in any way, I mean, in your experience in dealing with marijuana?

A.    If you could define different?

Q.   Are they a different color?  Do they appear to be a different texture?  Texture?  Color?

A.   These two bags are sandwich bags.

Q.   Correct.

A.   And this is one of those freezer bags with another plastic bag inside of it.  So the exterior bag of this product is not the same as those, if that's what you are asking.  But there is another plastic bag inside this freezer bag.

Q.   I'm actually not just talking about the packaging.  I'm talking about the substance itself.  Do they appear to be identical substances?  In texture?  In color?  If you can tell?

THE COURT:  If you need to open the outer bag and extract the inside bag, you may do that.

THE WITNESS:  I would prefer not to open this one without gloves as to where it was located.  But they are similar.  Could they be a different?  Basically when it comes down to marijuana, if you'll allow me, there's different grades.  There's ditch weed that comes from Mexico for the most part.  It comes in large bales.  It's basically small, and it's not big buds.

Then there's mid grade, which they call middies, which is buds, which is typically grown, and I'm sure most of you folks have seen the TV show with the marijuana growing and that.  They're actual buds.  These feel as to be both quantities.  Now if it's labeled a different brand because it

comes from different plants, then that's a possibility. But they're both decent quality marijuana. But I cannot tell you by looking at it if this weed is exactly the same weed as in this bag. I cannot tell you that.

BY MS. FREESE:

Q. And you can't tell by looking at it in their current state whether they are the same grade of marijuana?

A. I can tell you that they're both of mid grade. These are buds along with these being buds. This isn't your typical ditch weed, which is a lot cheaper to purchase, versus the mid grade weed that costs more money per ounce.

Q. That was actually my question. Depending upon the grade of marijuana, there can be different prices?

A. Yes, that's correct.

Q. Now on April 18th, when you went and collected the evidence -- I mean, you're the officer that processed, took collection, and kept custody of the evidence; is that correct?

A. That's correct.

Q. And did you participate in searching the vehicle?

A. I did.

Q. Okay, you did. And in addition to those items, there were also some counterfeit bills that were found in the car?

A. That's correct.

Q. And were they retained as evidence?

A. They were.

Q.    And they were found -- I'm sorry, they were found in Josh Arvelo's vehicle, in the vehicle itself, not on any person; correct?

A.    That's correct.

Q.    Now at this time, Josh Arvelo -- well, let me just ask you.  You're the officer that actually filed the charges against Josh Arvelo in state court?

A.    Yes, I am.

Q.    In Dauphin County.  Okay.  At the time of this delivery on April 18th, you were aware that Mr. Arvelo was on probation or being supervised in Dauphin County?

A.    Yes, I was.

Q.    And in your experience as a state trooper, and with your work with drugs, you've had experience in the past arresting folks for felonies while they're on probation; is that true?

A.    That's correct.

Q.    And in many cases, isn't it true, maybe you could say almost all cases, people are many times detained or placed in prison when they make drug deliveries and they're on probation; is that true?  It was kind of a confusing question.  Let me --

A.    Well, I can't say most times.

Q.    In your experience, have you seen that?

A.    Individuals go to jail when they're arrested?  Yes.

Q.    Well, no.  That individuals who are on probation and commit new felony offenses on probation are not let go from the

scene, they're detained?

A.   That's correct.  It depends on the nature of the crime that they are on probation for --

Q.   Right.

A.   -- the past crimes, and what is taking place that day.

Q.   And in this case, Mr. Arvelo's probation officer was actually present at the scene?

A.   That's correct.

Q.   And Mr. Arvelo was actually released to his probation officer, Mr. Muza, on that day?

A.   Once we obtained permission from the director of probation that he was able to be released.

Q.   Right.

A.   Yes.

Q.   And he was released to -- not to his custody, but he was released to Mr. Muza, and he wasn't charged with anything that day?

A.   He was advised that day that charges were pending and he would be arraigned at a later date.

Q.   Okay.  Well, charges would be forthcoming, but they weren't pending because you didn't file these charges until September 22nd of 2012; right?

A.   That's correct.

Q.   Okay.  And that's when you filed the complaint at the district justice office in the state case?

A. Yes.

Q. And you subsequently met with Mr. Arvelo on, I believe it was, November 1st with other officers to interview him. You met with Mr. Arvelo to interview him?

A. I believe so. If you tell me. I don't recall the date.

Q. Okay. And we now know that Mr. Arvelo has pled guilty and been sentenced to probation?

A. Yes.

Q. Now in your dealing as what we'll call the affiant or the charging officer in the state case, you had contact with the District Attorney's office in Dauphin County?

A. That's correct.

Q. And because you're involved in this case, you obviously also had contact with Ms. Taylor in the U.S. Attorney's office in this case?

A. That's correct.

Q. And in your conversations or in your involvement with the state case, did you advise the Dauphin County District Attorney that Mr. Arvelo was cooperating in this matter against Mr. Spriggs?

A. Yes, I did.

Q. And did you advise them of that prior to Mr. Arvelo's guilty plea and sentencing?

A. Yes.

Q. And as -- did you have any further discussions -- well,

I'll withdraw that part of the question. Did Ms. Taylor know that you had conversations with or that you had communicated this fact to the Dauphin County District Attorney's office about Mr. Arvelo cooperating in this investigation?

A. I believe she knows now. I'm not sure when she was advised.

Q. And by telling the District Attorney in Dauphin County, you told the DA that Josh Arvelo was cooperating or, you know, testifying in these matters so that could be taken into account in his plea deal in his sentencing in Dauphin County?

A. Yes.

Q. And although you've worked, you know, for the Pennsylvania State Police, you've also, in your role, been involved in referring cases for federal prosecution in this court, is that true, in federal court?

A. Yes.

Q. And you've done that in the past, true, in some cases?

A. I what?

Q. You referred them for federal prosecution?

A. Yes.

Q. And certainly being in your role, you could have referred Mr. Arvelo's case for a federal prosecution?

A. Basically what happens is, the case is presented to the U.S. Attorney's office to decide whether it's going to go as a federal prosecution or not. It's not that I decide, yes, this

one will go or this won't.  I don't do that.

Q.   No, I understand that.  My question to you was, do you refer them?  Let me clarify.  By referring them, you present the cases to the United States Attorney, and they determine who to indict and whom not to indict?

A.   That's correct.

Q.   And is it your testimony then, am I understanding, that in this case, you presented the entire case to the U.S. Attorney's office and they elected not to indict or prosecute Mr. Arvelo?

A.   Yes.

MS. FREESE:  Mr. Armbruster, I'd ask that this marked-up copy be saved and marked as Defendant's Exhibit 100.2.  I have no further questions, Your Honor.

THE COURT:  Redirect.

MS. TAYLOR:  Judge, just a few questions briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MS. TAYLOR:

Q.   Trooper Markle, Ms. Freese asked you some questions about counterfeit bills that were found in the vehicle that Mr. Arvelo and Mr. Spriggs were in.  Do you recall those questions?

A.   Yes.

MS. TAYLOR:  May I approach, Your Honor?

THE COURT:  Yes.

BY MS. TAYLOR:

Q.   I'm showing you what's been marked as Government's Exhibit 10.  Do you recognize that?

A.   Yes, I do.

Q.   And what are those?

A.   Poor copies of counterfeit money.

Q.   And you did note in your report, but do you recall where those bills were found in the car that Mr. Arvelo and Mr. Spriggs were in?

A.   I believe, if I recall correctly, it was near the console and front passenger seat area.  I can't recall if it was in between the seats or if it was in the console.  But I know it was in the front part of the vehicle between the driver's seat and the passenger seat.

Q.   Now Ms. Spriggs -- I'm sorry.  Ms. Freese asked you some questions about your contact with the DA's office and with Mr. Spriggs being charged in this case.  Now certainly, Mr. Spriggs -- I'm sorry, Mr. Arvelo.  Certainly, Mr. Arvelo has not been federally indicted; right?

A.   That's correct.

Q.   But the charges that he faced at the state level were a felony drug trafficking charge, possession with intent to manufacture or deliver a controlled substance, which is a felony?

A.   That's correct.

Q.   And a second count of conspiracy to distribute or possess

with intent to distribute a controlled substance, a second felony?

A.   That's correct.

Q.   And he did plead guilty to both felonies, is your understanding?

A.   Yes.

Q.   And you're -- are you also aware through your conversations with the DA's office that the range of time that he was facing was probation to 12 months?

A.   Yes.

Q.   And did the DA's office advise you that they weren't giving Mr. Arvelo a negotiated plea agreement; in other words, they weren't agreeing to a specific amount of time?

A.   That's correct.

Q.   But the DA's office was recommending the low end of the guidelines, which was probation?

A.   Correct.

Q.   And that's certainly what Mr. Arvelo got?

A.   Yes.

        MS. TAYLOR:   If I could have the Court's indulgence just a moment?  Your Honor, I have no further questions of Trooper Markle at this point.

        THE COURT:   Recross.

        MS. FREESE:   No recross.

        THE COURT:   You may step down.  Is this gentleman

excused?

MS. FREESE: No objection.

MS. TAYLOR: Yes, Your Honor.

THE COURT: You're excused.

MS. TAYLOR: Your Honor, I would ask for the admission of Government's Exhibit 10, which was the counterfeit bills that Trooper Markle just identified.

MS. FREESE: No objection.

THE COURT: They're admitted.

MS. TAYLOR: Your Honor, with that, I would request permission to read in Government's Exhibit 7, which are the stipulations of the parties.

THE COURT: You may.

MS. TAYLOR: The parties, through their respective counsel, enter the following stipulations in this case: The Jennings model Bryco 38, 380 semiautomatic pistol, bearing serial number 1029007, which appears as Government's Exhibit 1, is operational and considered a firearm as that term is defined by Title 18, United States Code, Section 921(a)(3).

The Jennings model Bryco 38, 380 semiautomatic pistol, bearing serial number 1029007, which appears as Government's Exhibit 1, was manufactured outside of the Commonwealth of Pennsylvania and was, therefore, in or affecting interstate commerce within the meaning of Title 18, United States Code, Sections 922(g)(1) and 924(e).

Stipulation number 3 is that prior to April 18th, 2012, the Defendant, Derek Eugene Spriggs, had been convicted in the Court of the Commonwealth of Pennsylvania of a felony crime punishable by imprisonment for a term exceeding one year within the meaning of Title 18, United States Code, Section 922(g)(1) and 924(e).

And stipulation number 4 reads, that the green vegetable substance that was located in a bag recovered from the pants of Derek Eugene Spriggs, Government's Exhibit 4, was later submitted to the Pennsylvania State Police, Bureau of Forensic Sciences Laboratory, and did contain the schedule I controlled substance, marijuana, as defined within Title 18, United States Code, Section 922(j) and 924(a)(2).

And the final stipulation, which appears as stipulation number 5, is that the green vegetable substance that was located in plastic bags, which appears as Government's Exhibit 3, was later submitted to the Pennsylvania State Police, Bureau of Forensic Sciences Laboratory, and did contain the schedule I controlled substance, marijuana, as defined within Title 18, United States Code, Sections 922(j) and 924(a)(2).

And, Your Honor, with that, the Government rests.

THE COURT: Ms. Freese.

MS. FREESE: Yes, Your Honor. We would call Larry Muza to the stand.

**LAWRENCE MUZA, DEFENDANT'S WITNESS, SWORN**

COURTROOM DEPUTY:  Would you state your name, please?

THE WITNESS:  Lawrence Muza.  M-U-Z-A.

COURTROOM DEPUTY:  Thank you.

THE COURT:  You may proceed.

**DIRECT EXAMINATION**

BY MS. FREESE:

Q.   Mr. Muza, how are you employed?

A.   Dauphin County Adult Parole.

Q.   And is that probation and parole?  Is that one department?

A.   Yes, ma'am.

Q.   And how long have you been so employed?

A.   16 years -- I'm sorry, 17 years and 7 months.

Q.   And during your time with Dauphin County, have you been in any supervision roles?

A.   Yes.

Q.   And what were those roles?

A.   Adult -- drug unit for adult parole.

Q.   Okay.  And as part of being a supervisor there, did you have your own case load where you supervised individuals who were also on probation?

A.   Yes.

Q.   For drug offenses?

A.   Yes.

Q.   Now I have some general questions for you first about

probation and some of the rules that go along in these drug cases. When an individual is on probation for a drug offense, what type of conditions are common standard conditions in place?

A. Just your basics. No drug use. Not to hang with persons of ill repute.

Q. Can you explain that, persons of ill repute?

A. People that have -- ex-cons. People who have been in trouble before and have a tendency to stay in trouble.

Q. Okay.

A. No firearms. You can't have firearms in control or possession. I'm trying to go down our conditions.

Q. How about new crimes?

A. Yeah, no new crimes. I'm drawing a blank.

Q. Are they required to report to a probation officer many times?

A. Yes.

Q. Come to appointments?

A. Yes.

Q. And would they be required to report a violation to you?

A. Yes.

Q. So if an individual used drugs, would they have to report that to you?

A. Yeah, but they don't.

Q. If they don't report it to you, how do you find out?

A.   We pull them random urines, and if we catch then on random urines, they're cited with NOAV's, and then just proper steps we take.  Sometimes we just -- depending on how many times they get caught depends what steps we take.  First time, we send them to drug and alcohol, etc.

Q.   And when you say first time, you're talking about like a dirty urine?

A.   A dirty urine, yeah.

Q.   Okay.  And what if there are repeat violations?

A.   Just taking the next steps.

Q.   What are those next steps?

A.   Could be anything.  It could be house arrest.  It could be put on electronic monitoring.  They could be put in work release.  Trying to keep them out of the system, the jail system, just for dirty urines.  But if they're habitual and other things come up, like missing curfew and stuff, it all depends on what they have done up to that stage.

Q.   Okay.  And those types of violations, some of the ones we were just discussing, dirty urines, missing curfew, are they -- can they be characterized as technical violations of probation?

A.   Yes, they are technicals.

Q.   And then there's other types of violations of probation as well, is that true?

A.   Correct.

Q.   And, for instance, committing a new felony drug delivery

while on probation.  What kind of violation would that be?

A.    It's a new charge.

Q.    Okay.  And what are sort of the procedures in place when someone acquires, particularly a new felony, let's just say a new felony, while they're on probation for a drug trafficking felony?

A.    It's a case-by-case basis.

Q.    Okay.  In some cases, are people, what we call, detained or --

A.    Yes.

Q.    Or does probation file what's called a detainer?

A.    Yes.

Q.    Does that happen in many cases where people commit a new drug trafficking felony when they're on probation for drug trafficking felony?

A.    Many as in like overall or --

Q.    Yes.

A.    -- in the drug unit?

Q.    Overall or -- either or is fine.  Does it not happen in the vast majority of cases?

A.    In other case loads, yes, it does happen.  Again, it's a case-by-case basis because there's a lot of times they commit new crimes and they don't get locked up.  They get served NOAV's.  They get staffed with supervisors and deputy directors.  See if the judge wants them brought in for a revo,

you know, or just assign them NOAV's, and if something should happen again, then you violate them. With the drug unit, depending on what they get, what the new crime is, and what is going to go further from there is how we take steps.

Q. So sometimes when an individual, a probationer is cooperating, is that ever a reason that they might not be detained?

A. Correct.

Q. When they otherwise would be?

A. Correct.

Q. And if someone lied to you, a probationer lied to you when they were under your supervision, that would be a violation; is that true?

A. Yeah, if we catch them.

Q. Right. Now back in April 2012, you were a probation officer with Dauphin County Parole?

A. Yep.

Q. And you were supervising Josh Arvelo?

A. Yes.

Q. You were actually present at the scene at the Harrisburg East Mall?

A. Yes.

Q. And were you involved more after the fact or were you involved, you know, when the drug deal was going down? What was your role? Why were you there?

A.   As a standby and as a protection takedown unit.

Q.   Okay.  So you were actually part of the takedown unit?

A.   Yes.

Q.   And so you knew then that the target was Josh Arvelo and this was one of your probationers?

A.   Yep.  Didn't find out until we staged to set everything up.

Q.   Okay.  Now Mr. Arvelo wasn't actually charged with any crimes that night, is that true?

A.   I don't know.  I don't do that.

Q.   Well, when he was released -- he was released that night, we know that?

A.   Um-hum.

Q.   And he was released, I'm not going to say to your custody, but you were present when he was released?

A.   Um-hum.

        THE COURT:  Is that a yes?

        THE WITNESS:  Yes.  I'm sorry.  Yes.

BY MS. FREESE:

Q.   This was not a case where you filed a detainer, was it?

A.   Correct.

Q.   And this was so Mr. Arvelo did not go to jail for a violation of his probation?

A.   Correct.

Q.   On that evening?

A.   It was staffed with the deputy director of Dauphin County Adult Parole.

Q.   It was staffed with the director.  So the director became aware that Mr. Arvelo was going to cooperate with the investigation?

A.   Correct.

Q.   And the fact that he was cooperating with the investigation, was that something that was taken into account in determining or -- I'm sorry, taken into consideration when determining whether to file a detainer?

A.   Yes.

Q.   Okay.

A.   Go ahead.

Q.   Well, I wanted to clarify.  You were supervising.  I didn't clarify this.  Prior to April 2012, why were you supervising Joshua Arvelo?

A.   I do not recall.  I was supervising for a transfer caseload from Philadelphia and Cumberland County.  I do not recall though what the charges were.

Q.   That's okay.  So you were supervising him not on conduct that had occurred in Dauphin County at that point?

A.   No, he was not a Dauphin County case.

Q.   Okay.  But you were the probation officer assigned to the transfer?

A.   Yes.

Q.   You never -- did you ever file a detainer or move forward with a violation of probation for Mr. Arvelo?

A.   No.  I only had his case for a couple days after that incident.  Then it was transferred to another parole officer.  And I can't testify to what he did or whatever happened.

Q.   And that other probation officer would have been somebody within your office?

A.   He was the one who took my spot in the drug unit.  We actually switched spots.  He was in the electronic monitoring.  And then we swapped spots.

Q.   On that evening, when you said it was staffed with your director or with your boss?

A.   Deputy director.

Q.   Did you call Philadelphia County or Cumberland County?

A.   Yes.

Q.   And why did you call them?

A.   To get their approval.  We had to get their approval before we do anything.

Q.   And in those -- were they aware that under all the circumstances here that Mr. Arvelo was cooperating?

A.   Yes.

MS. FREESE:  I have nothing further, Your Honor.

THE COURT:  Cross.

MS. TAYLOR:  Just very briefly, Your Honor.

**CROSS EXAMINATION**

BY MS. TAYLOR:

Q. So, sir, when the decision was made on April 18th for Mr. Arvelo to be released, that was not something that you alone made?

A. I can't make that decision. It has to come from the top down.

Q. So the deputy director was advised of it?

A. Um-hum.

Q. Cumberland County was advised of it?

A. Philadelphia County was advised of it.

Q. And you actually only supervised Mr. Arvelo, at least from the point that we are interested in, the April 18th day, just for a few days, until May 9th of 2012; is that right?

A. Exact date of turning the case over is on May 9th, 2012, to Kurt Zitch.

MS. TAYLOR: That's all I have, Your Honor.

THE COURT: Redirect.

**REDIRECT EXAMINATION**

BY MS. FREESE:

Q. When you turn cases over to other officers or other officers take over, do you ever have conversations with them or discuss cases with them?

A. Yes, you give a whole briefing on the whole case.

MS. FREESE: Thank you. Nothing further.

MS. TAYLOR: Nothing further.

THE COURT:  You may step down.  You're excused.

MS. FREESE:  Your Honor, the defense does not have any additional witnesses.  However, before resting, we would move for the admission of Defendant's Exhibits 100, 100.1, 101, 101.1, and 100.2.

THE COURT:  Any objection?

MS. TAYLOR:  No, Your Honor.

THE COURT:  Any rebuttal?

MS. TAYLOR:  No, Your Honor.

THE COURT:  May I see counsel?

(Discussion held at sidebar:)

THE COURT:  Do you want a charge conference?

MS. FREESE:  Not necessarily.  But I am requesting a couple minutes to actually look through it because I only gave it a very cursory look.

THE COURT:  Do you want to do that before you give your closings?

MS. TAYLOR:  That would be fine, Your Honor.

MS. FREESE:  Yes, that would be great.

THE COURT:  How much time do you need?  About 15 minutes?

MS. FREESE:  Could we have maybe 20?  I'd like a couple minutes to collect my thoughts for closing as well.

(Discussion at sidebar concluded.)

THE COURT:  We're going to take a break, ladies and

gentlemen, and give counsel an opportunity to get their thoughts together in making their closing address and also look over the charge that the Court will give you at the conclusion of the evidence and the conclusion of the closing arguments. So give us about 20 minutes.

COURTROOM DEPUTY:  Court's in recess.

(Recess taken at 2:50 p.m.)

(Proceedings reconvened at 3:20 p.m. in chambers with counsel and the Court only.)

THE COURT:  First of all, with regard to the felon in possession, I'm going to go through the elements, but I'm not going to explain the elements until you want me to.  I'm going to go through the elements and say these elements have been stipulated to, but then I'm also going to add to that, that paragraph of the convicted felon, they are only to consider that as an element and not for any other purpose.  And I think we have some other addition that we are making.  But go ahead.

MS. TAYLOR:  I didn't have anything, Your Honor.

MS. FREESE:  I would request, and I was trying to make sure I didn't overlook anything, but I am requesting a mere presence instruction.  I didn't see that in here.

THE COURT:  I think it's in there.

MS. FREESE:  Is it?

THE COURT:  It's not a separate one, but in some of the elements, like conspiracy, it's -- it refers to the fact

that mere presence is not --

MS. FREESE: Okay.

THE COURT: It is in there, but it's not set forth in a separate section.

MS. FREESE: Okay.

LAW CLERK: Yeah, we did look at that.

MS. FREESE: I'm sorry. I was trying to like read as fast as I could.

THE COURT: I'm sorry. By the way, I should tell you this. I don't think I'm going to give the charge tonight. My charge, as you can see, is so long. And that may take a minimum of a half an hour. And then the courthouse, we can't pay to keep it open beyond five, as you well know.

MS. FREESE: I do, indeed.

THE COURT: And I don't want to give the charge and send them home because that's bad. So is there a problem? Do you have a problem?

MS. TAYLOR: No, that's fine, Your Honor.

THE COURT: I hate to do that, but I probably have to bring them back. Nine?

MS. FREESE: That's fine.

THE COURT: Go ahead. I'm sorry. What else?

MS. FREESE: I also request a simple possession, the lesser included offense. Mr. Spriggs obviously had marijuana on his person. Mr. Arvelo testified that one ounce of

marijuana is certainly something that he himself as a marijuana user could purchase for his own personal use. And so I would request the lesser included offense of simple possession so the jury can determine whether the drugs in my client's pants were possessed with the intent to distribute.

MS. TAYLOR: That's fine, Your Honor.

THE COURT: I think she's permitted to do that.

MS. FREESE: That's all I have. That was not difficult.

THE COURT: Okay. The simple possession, where do you want that in?

MS. FREESE: I suppose when we're going through the offenses and we cover the possession with the --

THE COURT: At the last count, possession with intent to deliver?

MS. FREESE: Yes.

THE COURT: I'll put it in after that.

MS. FREESE: Yes, I think that would be perfect, yeah. I think that's all. I think those are all the requests I had. I'll try to digest it a little bit more tonight.

THE COURT: You'll have an opportunity. If there is, let us know as soon as possible in the morning.

MS. FREESE: I certainly will.

THE COURT: I'm not pushing you because we're not going to charge tonight. How much time do you need for your

closing?

MS. TAYLOR:  Oh, I think it will be 20 minutes or less.

MS. FREESE:  Yeah, absolutely.  Whatever I can scribble, however many scribbles I can find.

THE COURT:  Well the other alternative is, it's about 20 after 3.  I think even if I let you go until 4, then I charge, it will be 4:30, quarter of 5.  I just don't think we should do it.

MS. FREESE:  I'm fine with that.  I agree.

THE COURT:  All right.

MS. TAYLOR:  But, Your Honor, you still prefer us to close today and not close tomorrow?

THE COURT:  Yeah.  I'd like to, because I've got other things tomorrow.

MS. FREESE:  I understand, yeah.

LAW CLERK:  Judge, did you want to address the aiding and abetting as to the conspiracy?

THE COURT:  Oh, the aiding and abetting.  Do you want that at the end of the conspiracy because it's going to be confusing to the jury?

MS. TAYLOR:  I think it is confusing.

MS. FREESE:  It is confusing.

THE COURT:  I mean, conspiracy itself is going to be confusing.  I think the aiding and abetting is the proper

charge, but do you want it right after I give the conspiracy?

MS. TAYLOR: Not necessarily, Your Honor. If you would prefer to put it after the drug count?

THE COURT: After all the drug counts?

LAW CLERK: Which is where, I think, we have it now.

THE COURT: This is going to confuse them. I'll put it at the end because I think you had it right after that. I wanted to check with you.

MS. TAYLOR: Oh, yeah, there was no significance to that. After the drug count is fine.

LAW CLERK: I think the instruction, as we have it, has aiding and abetting as to the conspiracy and as to the possession count and Count 4, which is consistent with the indictment. I think your proposed instruction is only as to Count 4.

MS. TAYLOR: Oh, it definitely should have been as to 3 and 4.

LAW CLERK: Okay. I just wanted to make sure.

THE COURT: You still want the conspiracy?

MS. TAYLOR: Yes, Your Honor.

THE COURT: Okay. All right.

MS. FREESE: Okay.

THE COURT: We'll go out then.

(Proceedings concluded in chambers and reconvened in open court at 3:25 p.m.; with the jury present.)

THE COURT: Ms. Taylor.

MS. TAYLOR: Thank you, Your Honor.

THE COURT: You do know you have also rebuttal after the defense closing?

MS. TAYLOR: Yes, Your Honor, thank you. Ladies and gentlemen, I know it seemed to be a very short trial, but, of course, I would urge you to realize that that doesn't in any way impact the significance to either of the parties. This case is very significant to both Mr. Spriggs and also to the Government.

I mentioned to you in opening that you would hear a little bit about the fact that drug dealing is a business, although an illegal one, that involves customers, middlemen, and bosses of a sort. I think that's what you've heard through the witnesses that have testified here today.

You've heard -- let me just start with Mr. Arvelo because you've certainly heard a lot about Mr. Arvelo. You've heard from him. And you've heard a lot about him from Ms. Freese. Mr. Arvelo, I believe, came in here and was very candid and up front with you about who he is and what he does and what he is about. He's clearly a drug dealer. He's clearly a drug user. And he came in and explained that to you.

And you heard he has two prior convictions for drug dealing before this event happened and that he was charged in connection with his role in this transaction and he pled to

those felony drug trafficking convictions and he did receive a probationary sentence in exchange for cooperating with the Government and he wasn't prosecuted federally.

And those are all things that you can consider in evaluating Mr. Arvelo's credibility. But I would ask you to also consider his demeanor and the other things that he told you from the stand in evaluating his credibility. And what did he tell you? He told you that besides being a drug dealer and a drug user, that he sells drugs to make money and he gets those drugs from different people and one of the people that he gets those drugs from is Mr. Spriggs.

He told you that he got the drugs that were involved with the transaction on April 18th, 2012, from Mr. Spriggs. And he told you that he had gotten quantities of marijuana from Mr. Spriggs several times a week for a couple of months prior to this transaction. This was not his first dealing with Mr. Spriggs. Again, in assessing Mr. Arvelo's credibility, you should consider that this is not a witness that was hand-picked by the Government.

This is actually someone who was hand-picked as an associate of Mr. Spriggs. Someone that Mr. Spriggs dealt with on April 18th and someone that Mr. Spriggs had dealt with on multiple times prior to that incident. Someone he chose to associate with. Someone Mr. Spriggs chose to sell drugs to.

What else did Mr. Arvelo tell you? He told you that

he called Mr. Spriggs up or met with him on that day and ordered a quarter pound of marijuana and ordered an ounce of marijuana. And he explained how that transaction occurred and how he went and picked Mr. Spriggs up and they went and picked the marijuana up and Mr. Spriggs came back and then delivered the marijuana to him. And then he explained how the transaction occurred in the parking lot that ultimately led to Mr. Arvelo's arrest and Mr. Spriggs' arrest.

Now Ms. Freese indicated to you in her opening that Mr. Arvelo was the most important witness that you were going to hear from in this case. And he certainly is an important witness. I'll tell you why he's an important witness. He's important because he's the only person who spoke with Mr. Spriggs on that day who can tell you how this transaction was set up. And he's the person that was in the car with Mr. Spriggs as they traveled to the mall parking lot. And he's the one that Mr. Spriggs actually delivered the marijuana to.

So he certainly is an important witness because he's an eyewitness; he was there, he was present, and he knows exactly what happened. And that's what he came in and told you and that's what he had told the officers prior to today. But Mr. Arvelo is not the only evidence that you've heard or seen in this case. You've seen several other things that was -- several other items that were placed into evidence, and you heard from several other witnesses. And you should certainly

consider all of this testimony and evidence in making your determination.

The physical evidence in this case. You don't have to only take Mr. Arvelo's word for what happened on that day, because the physical evidence that was presented corroborates what Mr. Arvelo told you here from the witness stand. Most importantly, if you take a look at Government's Exhibit 4, Government's Exhibit 4 was the marijuana that was taken from Mr. Spriggs' pants.

Now what's important about this is that Mr. Arvelo made it clear that he ordered a quarter pound of marijuana for the deal that happened in the parking lot. And then he ordered an ounce of marijuana for a later deal. Clearly, the quarter pound of marijuana is Government's Exhibit 3, and that's what was recovered from the confidential informant. I don't think there's any dispute about that.

But Government's Exhibit 4 is the ounce that -- is an ounce of marijuana that Mr. Spriggs had in his pants. And I would submit to you that there is no way that Mr. Arvelo would know that Mr. Spriggs just happened to have an ounce of marijuana on him unless what he told you was true.

He called Mr. Spriggs. He ordered the quarter pound. He ordered the ounce. Here's the quarter pound. We know that from the confidential informant. And Mr. Spriggs has the other ounce in his pants. He hasn't delivered that to Mr. Arvelo yet

because he doesn't have the money. But Mr. Spriggs has it in his pants. It's not a coincidence. It is a conspiracy.

These two individuals, Mr. Arvelo and Mr. Spriggs, conspired together to deliver the quarter pound to the confidential informant, actually deliver the -- Mr. Arvelo delivered the quarter pound to the confidential informant and conspired to deliver this ounce that Mr. Spriggs still had on his person when he was arrested.

You heard that Mr. Spriggs had no use paraphernalia on him suggesting that he was not intending to use that marijuana that was on his person, instead suggesting that he intended to sell it just as Mr. Arvelo told you. Now I wish that we had other witnesses that we could bring in, maybe a kindergarten teacher, an accountant or a priest, who could tell you what happened in that mall parking lot that day.

But we don't, because it takes a drug dealer to catch a drug dealer sometimes. And that's what you have in this case. The other evidence that you should consider, or I would submit that's certainly significant in this case, is what you heard from Trooper Markle. You heard -- and from Detective Dickerson and from Corporal Wolfe. All the police officers that testified.

You heard from Trooper Markle, who has a lot of experience in narcotics cases, and he explained to you what the original plan in this case was or in this transaction was

supposed to be; that the confidential informant and Mr. Arvelo were going to travel to Mr. Arvelo's supplier. But that plan got changed once the confidential informant made it to the mall.

And Mr. Arvelo let them know that he and the supplier were going to come to them. He shows up at the mall, and he's not alone. He has another person with him; Mr. Spriggs, his supplier. You heard Trooper Markle explain, you've seen the graphs and charts, and I'm sure Ms. Freese will show you again in her closing, where everybody was in the parking lot. And everybody has been very consistent in where the confidential informant car was and where the various detectives doing surveillance were and where Mr. Spriggs was in the car.

And they're fairly far apart. I mean, they're in the same parking lot, so it's not like they're zip codes apart, but they're not parked next to each other in the parking lot. And Trooper Markle made it very clear to you why a supplier is not necessarily going to want to be in close proximity to a customer. That's why they use middlemen.

The supplier is going to want to be out of sight from any possible customer and let the middleman, in this case, Mr. Arvelo, assume the risk. That doesn't mean that Mr. Spriggs didn't know what was going on. He had a loaded gun in his pocket and an ounce of marijuana down his pants. He knew what was going on.

That doesn't mean that he hadn't made this agreement with Mr. Arvelo. He had. And that constitutes a conspiracy. You also heard from Trooper Markle about the phone records; that he took a look at the phone records and saw communications between the phone that was taken off Mr. Spriggs and the phone that was taken off Mr. Arvelo. And that corroborates Mr. Arvelo's testimony.

He told you that when he got the call from the CI ordering up a quarter pound, that he got on his phone and he started calling people. He had to get that quarter pound somewhere. And he got it from Mr. Spriggs. And when Trooper Markle took a look at the phone records, you can see that there are calls, multiple calls from the time this deal starts to when it actually occurs in the parking lot between Mr. Arvelo's phone and Mr. Spriggs' phone. That evidence itself corroborates Mr. Arvelo's testimony.

You also heard from Corporal Wolfe and from Trooper Markle about Mr. Spriggs' actions and demeanor when the police approached the car that he was sitting in. And I think his actions were telling as well as, of course, the items that he had on his person were telling about his involvement in what was actually going on.

He wasn't simply sitting in a car in a parking lot waiting for his buddy to come out of Bass Pro having made a purchase or something. He knew what was going on. When the

police swarmed that car, and they're trying to get him out, he doesn't come out with his hands up saying, I don't know what's going on, nothing happened here. He struggles with them. He won't comply with them initially. He won't even put his hands up.

One of the officers sees him make some kind of movement to his right-hand side, either trying to hide something or reaching for something, we don't know. His right-hand side is the pocket where the loaded gun is found and retrieved later. But his actions alone suggests that he knew exactly what was going on and he knew what was about to happen; that he was going to be arrested, that that loaded gun was going to be found in his pocket, and that the ounce of marijuana was going to be discovered in his pants, which is all what ended upcoming to pass.

In terms of the charges in this case, the judge is going to give you very detailed instruction on the law. But as you've heard, there are a lot of agreements as to certain elements of certain parts of the charges. As Ms. Freese explained to you in her opening, apparently Count 1, which is that Mr. Spriggs possessed a firearm after previously being convicted of a felony, is conceded, so I won't spend any time arguing about that charge. It seems we are in agreement that he possessed this firearm, that he had been convicted of a felony, and that it traveled in interstate commerce.

The other three charges are, of course, somewhat similar. He is charged with possession with intent to deliver a controlled substance, the marijuana, for the marijuana that he had in his pants. He's charged with conspiracy to possess with the intent to deliver the controlled substance, marijuana, for the marijuana that he delivers to Mr. Arvelo and Mr. Arvelo delivers to the CI. That conspiracy requires that he made an agreement, that he knew what the agreement was about, that he knew the intention of it was to deliver drugs. And I believe that's what the testimony has shown in this case.

Then the third and remaining charge is that he possessed a firearm during or in furtherance of a drug trafficking crime. Well, clearly he possessed the firearm. It's in the pocket of his coat. And I believe that's conceded to by the defense. The issue in that case is, did he do it knowing there was a drug trafficking offense going on? And I would submit to you that the evidence has shown overwhelmingly that he knew exactly what was going on and he was just as much a participant in it as Mr. Arvelo. He just didn't get out of the car and actually deliver the drugs, but he delivered them to Mr. Arvelo.

Ladies and gentlemen, we all make choices in life. And those choices have consequences. I chose to get up and come to work this morning. You chose to respond to jury duty. And Mr. Spriggs made choices back on April 18th, 2012. I would

ask you to hold him responsible for the choices he made and find him guilty of all the offenses. Thank you.

THE COURT: Ms. Freese.

MS. FREESE: Thank you, Your Honor. May it please the Court, Mr. Spriggs, Ms. Taylor, ladies and gentlemen of the jury. In the beginning of this trial, just a few hours ago, I told you that the case rises and falls on Josh Arvelo. And hopefully at this point in the proceedings, that makes more sense to you. Josh Arvelo is the Government's evidence as to Counts 2, 3, and 4. So I'm going to spend the majority of my time today talking to you about that.

We told you in the beginning that Count 1, easy. I'm agreeing with Ms. Taylor. He possessed a firearm. He wasn't lawfully able to do that. Keep that in mind as we discuss the rest of the charges.

Counts 2, 3, and 4, there is zero evidence that the Government has presented other than Josh Arvelo that Mr. Spriggs is Arvelo's supplier. That's it. That's the sole piece of evidence. There is no other surveillance. There is no body wires. There is no recorded phone conversations. There is nothing else. No evidence for you to consider other than his testimony and the things that flow from it.

Yes, true, Mr. Arvelo sits up there and today he points the finger at my client, Mr. Spriggs. At the time of the arrest on April 18th, 2012, before he knew things were

going down, as he was being taken into custody, before he knew all the consequences that could flow from his own criminal activity, he told you that he told the police he had nothing to do with this.

But, hum, now a year later, after further consideration, no federal prosecution, and the other long laundry list of benefits that he's received, he's pointing the finger at Mr. Spriggs. We're going to talk specifics. I couldn't agree more with Ms. Taylor that we need to evaluate. You need to evaluate the details of what came from that witness stand.

Mr. Spriggs had a gun. Mr. Spriggs had marijuana. And I want to take a moment before I move on to talk to you about the marijuana that was located, undisputed, in Mr. Spriggs' pants. The judge will charge you on the law that you will need to consider when viewing the facts and reaching a verdict. And one of the things that you will be asked to consider is not whether Mr. Spriggs possessed that marijuana in his pants, but did he possess it for his own personal use or did he possess it with the intent to distribute it?

That is a very important distinction, and you will be given both of those questions to answer. Were the drugs in his pants possessed with the intent to distribute? Is this theory, which we're going to talk about, that the Government wants you to adopt, that, oh, this was the ounce that Arvelo had lined up

for this on-again/off-again sale, is that really what that ounce was or was that ounce for Mr. Spriggs to use to smoke?

It's important to talk about the demeanor of Mr. Spriggs at the time of his arrest in conjunction with all the charges here because the Government just argued to you, let's look at his demeanor, look at what he did when he's approached and surrounded by law enforcement officers with their guns drawn, you know, giving him all kinds of commands to get out of the vehicle.

First of all, the testimony is conflicting. Corporal Wolfe, who arrived at some point after the initial contact having made been with Spriggs, referred to some struggle without any other apparent detail. Trooper Markle told you that he was in the area of the vehicle, he was being given commands to put his hands up in the air, and that he complied and he was removed from the vehicle.

Regardless, and your recollection will govern as to that testimony, regardless of that testimony, Mr. Spriggs was guilty of a crime, Count 1. When police surrounded and blocked that vehicle and drew their guns and ordered him out of that car, he knew that he had a gun on him and that he, by law, by federal law, he wasn't able to possess it.

So if there is any mystery about Mr. Spriggs' demeanor at the time of his arrest, the unlawful possession of the firearm easily explains that. And frankly, the testimony

was conflicting. Reference was made by the Government as to the location. And I did spend some time with the exhibits, which you will have an opportunity to review when you are deliberating, about where these vehicles were positioned.

They did it for that exact reason. What's interesting is when Trooper Markle was testifying, one of the things he was talking about in his experience is, you know, on one hand, how the supplier might want to be out of sight from that bottom line, that bottom line customer. And yet in the same sentence, he referred to because the supplier wants to protect his product. You saw it. You can consider it.

The police officers testified as to what was -- to the vantage points and what one could see from Arvelo's car, to the CI, to the drug deal going down. If Mr. Spriggs is the supplier, he's not possessing that gun to protect his product. He's facing the opposite direction towards Macy's when around the corner behind a row of boats with cars moving about, Arvelo's selling a quarter pound of marijuana.

He's not protecting his product. And the evidence doesn't support that. And make no mistake about it, Arvelo's no rookie, okay. He's been in the game. He told you about it. His testimony made it crystal clear that he's no rookie in this game of drugs or this game of drug dealing. He told you, I'm a drug dealer, I've been doing it for years, I'm a drug user, I smoke a ton of weed, I don't care if I'm on probation.

I mean, he basically told you that. That's the conclusion that can be drawn. Yes, there are rules. Yes, I'm supposed to follow rules and not violate probation. Yes, I'm supposed to be honest with my probation officer and not lie to them. No, I'm not supposed to commit new felonies. But I did and I did and I did and I did. I continue to smoke marijuana. I continue to sell marijuana.

And Ms. Taylor wants to talk to you about consequences. There's consequences for Mr. Arvelo's behavior, for Mr. Arvelo's crimes that he continues to escape. And this time, he's escaping it. Like I said in my closing, the ticket to his freedom is that testimony, his testimony here in court. And when we look at the details, when we look at that testimony, I would submit to you that his testimony today is not credible at all.

Use your common sense, ladies and gentlemen. Wouldn't you remember every detail? Wouldn't you replay it a thousand times in your head, the details; the when, the where, the how, the price. Mr. Arvelo, well, he's vague on almost everything down to, well, you know, I've known him a little while.

Where did you go to get the drugs on April 18th? Somewhere up, I think it was like off of Derry Street, somewhere, yeah, up there. And this is about the details. This is really a minute point, but an incredibly important one.

Consider what he testified to about the price of these drugs. He testified on direct examination that he paid -- he bought approximately an ounce, give or take, regularly, he says, for a period of time from Mr. Spriggs. And he said that he bought an ounce for $400.00, about an ounce for $400.00.

On April 18th, 2012, he sold a quarter pound of marijuana, which is obviously four ounces. Even if he's receiving a bulk discount, according to his own math, this is his testimony, his own mouth, 4 ounces of marijuana is $1600.00. His story doesn't even make sense. He was supposed to charge him $500.00. He was supposed to charge the CI $500.00, or he thought, but it was 460. None of it makes sense. It doesn't make sense because it's not the truth. The details, the story of where he got the marijuana.

And that's what you need to consider. Why would Mr. Arvelo lie to the police? Why would Mr. Arvelo lie to you? That would be the difficult question for you to consider; whether he lied, whether he's being truthful. What is true and what is not is not our job. Of course, we make arguments and advocate our respective positions. But it's ultimately collectively your decision to determine whether Mr. Arvelo is truthful.

Trooper Markle talked briefly on cross examination about the marijuana, about the grades of marijuana, about different types of marijuana and that type of thing. There has

been no evidence. We don't know this marijuana is even from the same source. We don't know where it came from. We don't know the source. I mean, the Government wants you to think the source of this is, of course, Mr. Spriggs and that Mr. Spriggs seemed to have both of these quantities, one tucked away for a little sale for Arvelo that he didn't even commit to.

Arvelo says, oh, it was on-again/off-again. He was very vague, very unclear whether he had even ordered another ounce of marijuana from Mr. Spriggs, whether he even knew Mr. Spriggs had another ounce of marijuana in his pants. We know he didn't buy it or negotiate the deal. Where's all the money? Where is all the money? Drug dealers. Money.

Mr. Spriggs had $89.00 on him. That was returned to him. It wasn't retained as evidence. Where is this money? Mr. Spriggs is this big fish, this big drug supplier. Where is it? Arvelo is a drug dealer. And it is equally as plausible that Mr. Arvelo is a supplier, that Mr. Arvelo or some other source sold Mr. Spriggs the marijuana that was in his pants. The only person telling you it's the other way is Mr. Arvelo, who has everything at stake.

So when we look at in a nutshell what's wrong with this picture, what is wrong with this picture? In 2009, Josh Arvelo gets convicted in Philadelphia County, possession with the intent to distribute marijuana, a large quantity of marijuana, he told you, and carrying a firearm without a

license.  He went to jail.  He got 11 and a half to 23 months, and he got a consecutive term of probation, probation that you heard about that has rules, restrictions, truthfulness, no new crimes associated with it.

So while he's on probation -- he gets out of jail, and while he's on probation, time moves forward to 2011.  And he's relocated his drug trafficking activities to Cumberland County where he, again while he's on probation, gets convicted of delivery of marijuana to an undercover police officer.  And in that same year, in a separate matter, gets convicted of simple assault.  Serves a sentence of probation.  And he's later sentenced, as he told you, to a month of prison based on some new criminal charges, which were actually some of these.

So now he's picked up probation in Philadelphia County, probation in Cumberland County.  He's being supervised in Dauphin County because that's where he's living.  And as he told you, he is smoking marijuana all the time, he's selling marijuana, he's staying in the game.  No regard for the rules.  None.  And then he gets jammed up here in 2012.  He gets convicted in Dauphin County Court of Common Pleas of his involvement in this offense while he's on probation in Philadelphia and Cumberland County.  Third drug trafficking felony in four years.

Mr. Arvelo is motivated.  He gets three years probation.  The fact that Mr. Arvelo did not get charged in

federal court, the fact that, like I told you in my opening, he got to sit there and not there is something that motivates him, that makes him bias. And you will be instructed on the law that is a factor you can take into consideration in determining how truthful he's being.

Three years probation, no prison for the violations of probation for the technicals, or the new charges, smoking marijuana, all those things that we discussed with Mr. Muza. No federal prosecution where he could have faced potentially a life sentence. He has motive. When you add that all up, what's wrong with this equation? He's not credible. He is the Government's evidence.

Yes, they presented law enforcement to tell you about where they were and how this went down and how they were targeting Josh Arvelo for a drug transaction. They told you all those things. Yes, they presented this evidence and these were the exhibits and this is how it went down. I think we all have a clear picture of how that day unfolded. But the only person, other than the prosecutor in the arguments, telling you that Spriggs is the supplier is Arvelo. He's it.

They find counterfeit money in the car which Arvelo drove. There is far more questions than answers. Not proof beyond a reasonable doubt. When this case is surrendered to you, ladies and gentlemen, find my client guilty for what he's guilty of. Convict him of Count 1 for being a felon in

possession of a firearm. Convict him of possessing those drugs, of simple possession.

But find him not guilty of possessing that firearm in furtherance of drug trafficking. Knowing that there was drug trafficking, knowing that there was a drug deal going down is not enough. Knowing is not enough. The judge will instruct you on the law. Possessing a firearm in furtherance of or in relation to a drug trafficking charge. Participating in the trafficking of marijuana with co-conspirator Josh Arvelo. Find him not guilty of Counts 2, 3, and 4, ladies and gentlemen, because those charges are piled on top and he is not guilty of them. Thank you.

THE COURT: Ms. Taylor, rebuttal.

MS. TAYLOR: Thank you, Your Honor. Ladies and gentlemen, you are actually permitted and, in fact, required to bring your common sense and your life experiences with you into the courtroom. We don't ask you to check them at the door and come in and decide these cases in a vacuum. We ask that you actually bring your common sense and your life experiences and apply that to what you hear from the witness stand and what you've seen in the evidence in making a determination about a Defendant's guilt.

Now Ms. Freese indicated that there was zero evidence that Mr. Spriggs is Arvelo's supplier other than Mr. Arvelo's testimony. And I know I mentioned this in my closing, but I

think it's so important that it really does bear a response to her comments because, of course, your recollection of what you've heard in this courtroom here today will control, but I would submit to you that there is evidence that Mr. Spriggs is Mr. Arvelo's supplier other than just Mr. Arvelo's testimony.

Certainly, Mr. Arvelo's testimony is important because he is an eyewitness. He is a critical witness in the case. An associate chosen by Mr. Spriggs. He's important. You needed to hear from him and you needed to hear from him, warts and all, because he is what he is. And he told you that. But he's not the only evidence that Mr. Spriggs was the supplier.

Again, you've heard about the phone records that establish that his phone was in contact with Mr. Arvelo's phone at the critical times around when this transaction was being set up. And importantly, it really is important that you heard from Trooper Markle about what the plan initially was because you have to consider that what the plan initially was. This information was given well before anyone was arrested or anyone knew they were a target or they were about to be arrested.

The information that the officers had at the very beginning of this transaction was that this confidential informant and Mr. Arvelo were going to meet and go to Mr. Arvelo's supplier. And then that changed and Mr. Arvelo was going to bring his supplier to the mall.

That's information that law enforcement had before anyone was arrested, before Mr. Arvelo had to worry about what was going to happen with his charges. There was specific information that Mr. Arvelo and his supplier would be there. And I think that's critical information for you to consider in determining whether the Government has presented to you any other evidence besides Mr. Arvelo as to whether Mr. Spriggs was a supplier.

Ms. Freese also indicated that Mr. Spriggs was not behaving like a supplier who wants to protect his supply because I believe she said he was around the corner. There was a row of boats and there were cars moving all about. Well, I would submit to you that where he was in that parking lot absolutely confirms that he's a supplier. He didn't want to have direct contact with a customer. He sends someone else to do that. That's what bosses do. They don't get their hands dirty. That's what middlemen are for.

He's around the corner, behind the boats. There's cars moving all around. He's pretending he's not paying attention. He certainly can't see what's going on. All in order to shield himself from any liability about what's happening. But he can't shield himself once the police get involved. And the fact that he has a loaded gun in his pocket, which I also think supports the fact that he is a supplier protecting his supply.

And, of course, he has got the additional marijuana in his pants. Now Ms. Freese made an argument to you that perhaps the marijuana in Mr. Spriggs' pants was for his own personal use and not -- and that he did not intend to distribute it. The problem with that argument is really two-fold. One, as you heard from Trooper Markle, when Mr. Spriggs is searched, he has no use paraphernalia on him. He has no pipe to smoke marijuana, he has no rolling papers to smoke it, no way to ingest it.

So that would suggest that he's not a marijuana user, that he actually possessed that quantity with the intent to distribute it. In addition, I just don't believe that it happens to be a coincidence that he has the exact amount in his pants that Mr. Arvelo had ordered for the later transaction. Mr. Arvelo tells you he orders an ounce. Mr. Spriggs has an ounce in his pants. It really isn't a coincidence. It really and truly is a conspiracy. And I think the evidence has shown that to you today.

Ms. Freese also made some comments about the discrepancy in the prices. And while a ton of information was not put forward to you about the different grades of marijuana and the different prices, you did hear from Trooper Markle that there are various different grades of marijuana. There's ditch weed, which is a low grade. There's a mid grade marijuana. And then there's a variety of different higher grade

marijuanas. Can all vary wildly in prices.

So when Mr. Arvelo talked about different prices and buying an ounce versus a quarter pound and the prices being different, I find there's no inconsistency in that whatsoever because no grades were ever assigned to the quantities that he was talking about. I certainly didn't ask him about it, and I don't recall that Ms. Freese did either. But, of course, your recollection will control. So I don't think the fact that there were different prices discussed creates any inconsistency on what Mr. Arvelo told you about buying marijuana and selling it on different occasions.

Ms. Freese also suggested that it was as plausible that perhaps Mr. Arvelo sold the marijuana to Mr. Spriggs, that Mr. Spriggs had in his pants. The problem with that is, I would agree with something Ms. Freese asked you, which is, where is the money then. If Mr. Arvelo sold Mr. Spriggs that marijuana, I'm quite sure he didn't do it for free. So Mr. Spriggs would have had to pay him. But you heard from the officers that the only thing, the only money taken off Mr. Arvelo was the $460.00 of buy money that was provided by the Task Force.

So Mr. Spriggs could not have sold -- he didn't -- Mr. Arvelo didn't sell that marijuana to Mr. Spriggs because he didn't have any money from Mr. Spriggs on him. I would also agree with Ms. Freese on one other thing that she said, which

is that you should find her client guilty of what he is guilty of. And in this case, Mr. Spriggs is guilty of possessing that firearm as a convicted felon. He's guilty of possessing that firearm in furtherance of these drug trafficking offenses. And he's guilty of the drug trafficking offenses themselves, the possession with intent to distribute the marijuana and the conspiracy to possess with the intent to distribute the marijuana. And I would ask that you find him guilty of all of those offenses. Thank you.

THE COURT: Ladies and gentlemen of the jury, at this point in time, I would ordinarily charge you on the law that is applicable to this case. My charge, however, is at least 100 pages and may take a minimum of a half an hour to 45 minutes. That would take you up to quarter of 5. This building shuts down -- whether you understand it or not, the Court does not control the operation of this building. So we would be at least by 5:00 without air conditioning and some other and security officers.

So I know I thought that this might be done today, but I'm going to have to call you back tomorrow. Is it a problem for anyone to get here by 9:00? I think you need to report to Marlene initially. Does Marlene bring them up or --

COURTROOM DEPUTY: She'll bring them all up at one time.

THE COURT: I would report to Marlene by quarter of

nine. Is that a problem for any of you? If so, say so. We can start later, but I have other matters in court tomorrow. So tomorrow, again, do not discuss this case among yourselves or with anyone else. And don't use any social media to check on the case. You're now excused until, let's say, 8:45 down in the jury assembly room.

COURTROOM DEPUTY: Court's adjourned.

(Proceedings concluded for the day at 4:07 p.m.)

**CERTIFICATION**


I, Wendy C. Yinger, Federal Official Realtime Court Reporter, in and for the United States District Court for the Middle District of Pennsylvania, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


/s/ Wendy C. Yinger
Wendy C. Yinger, RMR, CRR
U.S. Official Court Reporter
(717)440-1535

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION


UNITED STATES OF AMERICA             :     CASE NO.
                                     :
        v.                           :
                                     :
DEREK EUGENE SPRIGGS                 :     1:12-CR-00300-1


TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
DAY II OF II


BEFORE:          HON. SYLVIA H. RAMBO

DATE:            April 25, 2013
                 9:13 a.m.

PLACE:           Courtroom No. 3, 8th Floor
                 Federal Building
                 Harrisburg, Pennsylvania


APPEARANCES:

MEREDITH A. TAYLOR, ESQUIRE
Assistant United States Attorney
    For the United States

HEIDI R. FREESE, ESQUIRE
    For the Defendant


_____


WENDY C. YINGER, RMR, CRR
Federal Official Court Reporter
P.O. Box 983
Harrisburg, PA  17108

THE COURT: Good morning, everyone. Members of the jury, I am now going to instruct you on the law that is applicable to this case. Now there are four counts in this case. And as I told you yesterday, the charge is rather lengthy. However, I want you to listen carefully, but you will have a copy of the charge to take out with you during your deliberations should you need to confer with it. But I do ask you to listen carefully because some of the charge is very complicated.

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job and not mine. And nothing that I have said or done during the trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if the Government has proved the Defendant guilty beyond a reasonable doubt. It is my job to instruct you about the law. And you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you even if you personally disagree with them.

This includes the instructions that I gave you before and during the trial as well as these instructions. All of the instructions are important and you should consider them

together as a whole. The lawyers have talked about the law during their arguments.

If what they said is different from what I say, you must follow what I say. What I say about the law controls. Perform your duties fairly. Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way. Now you must make your decision based only on the evidence that you saw and heard here in court.

And I will repeat that as I had given you this instruction previously. Do not let rumors, suspicions, or anything else that you may have seen or heard outside the court influence your decision in any way. The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, and any stipulations the lawyers agreed to.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. And any of my comments and questions are not evidence. Make your decision based only on the evidence as I have defined it here and nothing else.

I'm going to repeat what I told you earlier, that there are two kinds of evidence; direct evidence and circumstantial evidence. Direct evidence is simply evidence

like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is evidence which, if you believed it, indirectly proves a fact. It is evidence that proves one or more facts from which you could find or infer the existence of another fact or facts. An inference is simply a deduction or conclusion that reason, experience, and common sense lead you to make from the evidence.

An inference is not a suspicion or a guess. It is a reasoned logical decision to find that a disputed fact exists on the basis of another fact. To draw an inference, you must find that there exists a logical and convincing connection between the facts established and the conclusion inferred. For example, if someone walked into this courtroom wearing a wet rain coat and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

You would not have to find that it was raining, but you could. Sometimes different inferences may be drawn from the same set of facts. The Government may ask you to draw one inference, and the defense may ask you to draw another. You and you alone must decide what inferences you will draw based on all of the evidence.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one or to say that one is better evidence than the other. You should consider all of the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

You should use your common sense in weighing the evidence. Consider it in the light of your everyday experience with people and events and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

Statements and arguments of counsel are not evidence unless made as an admission or stipulation. The purpose of an argument to a jury is to suggest inferences and deductions which the particular attorney believes can be drawn from the evidence. While you may follow the inferences and deductions that are suggested to you by a particular attorney, if they seem reasonable and logical to you, you are not bound to do so.

During their argument, counsel are permitted to make reference to evidence that they believe supports their position. They are permitted to refer to evidence from which they believe an inference can be drawn that supports their position. And in the course of their reference to the

evidence, they are permitted to characterize the evidence in certain ways. In all cases, however, it is your recollection of the evidence that controls, not counsel's recollection of the evidence.

As to any offer of evidence that has been rejected or ruled out by the Court, you, of course, must not conjecture as to what the answer might have been had I allowed the witness to answer or as to the reason for the objection. Nor are you permitted to draw any inference from the question itself. Nor can you speculate what an excluded exhibit might have shown.

It is indeed the duty of the lawyers for the respective parties to make objections when that particular lawyer believes that certain evidence which is offered would be perhaps inadmissible or in some manner prejudicial to the client. With reference to objections made by the lawyers, keep in mind that it is not a question of someone trying to keep anything away from you that you are supposed to hear.

Rather, it is a matter of whether under the federal rules of evidence the testimony is admissible. If it is not admissible, it must be excluded. The important thing for you to remember is that if I have sustained an objection, you cannot consider the evidence or draw any inference from the fact that it was offered. But if I have admitted the evidence and overruled the objection, you may and can and should fully consider the evidence submitted.

Also, any evidence which may have been ordered to be stricken must be entirely disregarded by you in keeping with these instructions. Now you have observed during the course of the trial that the Court from time to time had a bench conference. You are admonished not to draw any unfavorable inference or inferences from these conferences for or against any of the parties to the case.

If the Court felt that the jury should hear anything that was discussed out of its hearing at the bench, the Court permitted that to be presented to you. You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. Ordinarily, it is assumed that a witness will speak the truth. But this assumption may be dis-spelled by the appearance and conduct of the witness or by the manner in which is the witness testifies or by the character of the testimony given or by evidence to the contrary of the testimony given.

You should carefully scrutinize all of the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether a witness is worthy of belief. You will consider each witness's intelligence, motive and state of mind, demeanor and manner while on the stand. Consider also any relation each witness may bear to either side of the case, the manner in which each witness might be affected by the verdict, and the

extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause a jury to discredit such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently. An innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail and whether the discrepancy results from innocent error or intentional falsehood.

After making your own judgment, you will give the testimony of each witness such credibility, if any, as you think it deserves. You may believe all or part or none of a witness's testimony. The testimony of a single witness which produces in your minds belief in the likelihood of truth is sufficient for the proof of any fact and would justify a verdict in accordance with such testimony even though a number of witnesses may have testified to the contrary.

If after consideration of all the evidence in the case, you hold a greater belief in the accuracy and honesty of that one witness, even with uncontradicted testimony, you may accept or reject the testimony in whole or in part.

Now you have heard the testimony of law enforcement

officers. The testimony of a law enforcement officer should be considered by you just as any other evidence in the case. And in evaluating his or her credibility, you should use the same guidelines which you apply to the testimony of any other witness. You should not give either greater or lesser credence to the testimony of a witness merely because he or she is a law enforcement officer.

In evaluating the credibility of a witness, you should take into account any evidence that the witness who testified may benefit in some way from the outcome of this case. Such an interest in the outcome creates a motive to testify falsely and may sway the witness to testify in a way that advances his or her own interest. Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of the trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care.

Any evidence that a witness is biased, prejudicial, or hostile towards the Defendant requires you to view that witness's testimony with caution, to weigh with care, and subject it to close and searching scrutiny. This is not to suggest that every witness who has an interest in the outcome of the case will testify falsely. It is for you to decide to what extent, if at all, the witness's interest is affected or colored his or her own testimony.

Now you have heard evidence that Joshua Arvelo has received a promise from the Government that he will not be prosecuted federally in exchange for testifying.  This testimony was received in evidence and may be considered by you.  The Government is permitted to present testimony of someone who receives a benefit for providing information to the Government.  But you should consider the testimony of such a witness with great care and caution.

In evaluating his testimony, you should consider this factor along with the others I have called to your attention. You may give the testimony such weight as you think it deserves.  It is for you to determine whether or not Joshua Arvelo's information or testimony had been influenced by his arrangement with the Government.  You must not consider Joshua Arvelo's guilty plea in Dauphin County Court of Common Pleas as any evidence of Derek Spriggs' guilt.  His decision, that is Arvelo's decision, to plead guilty was a personal decision about his own guilt.

Such evidence is offered only to allow you to assess the credibility of the witness, to eliminate any concern that the Defendant has been singled out for prosecution, and to explain how the witness came to possess detailed firsthand knowledge of the events about which he testified.  You may consider Joshua Arvelo's guilty plea only for these purposes.

Now you have heard evidence that Joshua Arvelo was

previously convicted of a crime punishable by more than one year in jail.  You may consider this evidence along with other pertinent evidence in deciding whether or not to believe Joshua Arvelo and how much weight to give his testimony.  You have also heard testimony that Joshua Arvelo at the time of his arrest made statements that may have been different from his testimony in this trial.

It is up to you to determine whether these statements were made and whether they were different from his testimony at trial.  These earlier statements were brought to your attention only to help you to decide whether to believe the witness's testimony at trial.  You cannot use it as proof of the truth of what the witness said in the earlier statements.  You can only use it as one way of evaluating the witness's testimony in this trial.

Now evidence was also introduced during the trial that Joshua Arvelo was using drugs or was addicted to drugs when the events took place.  There is nothing improper about calling such a witness to testify about events within his or her personal knowledge.  On the other hand, his testimony must be considered by you with care and caution.  The testimony of a witness who was using drugs or addicted to drugs may be less believable because the effect the drugs may have on his or her ability to perceive, remember, and relate certain events in question.  After considering Joshua Arvelo's testimony in light

of all the evidence in the case, you may give it whatever weight, if any, you think it deserves.

Now Derek Spriggs did not testify in this case.  A Defendant has an absolute constitutional right not to testify or to present any evidence.  The burden of proof remains with the prosecution throughout the entire trial and does not shift to the Defendant.  The Defendant is never required to prove that he is innocent.  You must not attach any significance to the fact that Derek Spriggs did not testify.

You must not draw any adverse inference against him because he did not take the witness stand.  Do not consider for any reason at all the fact that Derek Spriggs did not testify. And do not discuss this fact during your deliberations or let it influence your decision in any way.

Now the indictment charges the offense was committed on or about certain dates.  The proof need not establish with certainty the exact dates of the alleged offense.  It is sufficient if the evidence in the case established beyond a reasonable doubt that the offenses were committed on the dates reasonably near the dates alleged.

Now the Defendant, Derek Spriggs, has pleaded not guilty to the offenses charged.  Derek Spriggs is presumed to be innocent.  He starts the trial with a clean slate, with no evidence against him.  And the presumption of innocence stays with Derek Spriggs unless and until the Government presents

evidence that overcomes that presumption by convincing you that Derek Spriggs is guilty of the offenses charged beyond a reasonable doubt.

The presumption of innocence requires that you find Derek Spriggs not guilty unless you are satisfied that the Government has proved guilt beyond a reasonable doubt. The presumption of innocence means that Derek Spriggs has no burden or obligation to present any evidence at all or to prove that he is not guilty. The burden and obligation of proof is on the Government to prove that Derek Spriggs is guilty. And this burden stays with the Government throughout the trial.

In order for you to find Derek Spriggs guilty of the offenses charged, the Government must convince you that Derek Spriggs is guilty beyond a reasonable doubt. This means that the Government must prove each and every element of the offense charged beyond a reasonable doubt. A Defendant may not be convicted based on suspicion or conjecture, but only on evidence proving guilt beyond a reasonable doubt.

Proof beyond a reasonable doubt does not mean proof beyond all possible doubt or to a mathematical certainty. Possible doubt or doubts based upon conjecture or speculation are not reasonable doubts. A reasonable doubt is a fair doubt based on reason, logic, common sense, or experience. A reasonable doubt means a doubt that would cause an ordinary reasonable person to hesitate to act in matters of importance

in his or her own life.

It may arise from the evidence or the lack of evidence or from the nature of the evidence. If after hearing all the evidence, you are convinced that the Government has proved Derek Spriggs guilty beyond a reasonable doubt, you should return a verdict of guilty. However, if you have a reasonable doubt as to any element of an offense, then you must return a verdict of not guilty.

Your verdict should be based solely on the evidence or the lack of evidence as to Derek Spriggs in accordance with these instructions and without regard to your feeling towards drugs or drug use.

Now Derek Spriggs has been charged with Count 1, possession of a firearm by a convicted felon, Count 2, possession of a firearm during and in furtherance of a drug trafficking offense, Count 3, criminal conspiracy to distribute or possess with intent to distribute a controlled substance, namely marijuana, and Count 4, possession with intent to deliver a controlled substance, namely marijuana.

Now Derek Spriggs, as to Count 1, is charged with possession of a firearm by a convicted felon. This offense has three essential elements. First, that Derek Spriggs has been convicted of a felony, that is a crime punishable by imprisonment for a term exceeding one year. Second, that after this conviction, Derek Spriggs knowingly possessed a firearm

described in Count 1 of the indictment. And third, that Derek Spriggs' possession was in or affecting interstate or foreign commerce. The parties have stipulated that all of these elements of the offense have been met.

Now the fact that you have heard evidence by way of stipulation that Derek Spriggs was convicted before this incident in a court of the Commonwealth of Pennsylvania of a crime punishable by imprisonment for exceeding one year. This prior conviction has been brought to your attention only because it tends to establish one of the elements of the crime of possession of a firearm by a convicted felon as set forth in the indictment, specifically that the Defendant had a prior felony conviction.

You are not to speculate as to the nature of the conviction. You may not consider the prior conviction in deciding whether Derek Spriggs was in knowing possession of the gun he is charged in this case with possessing, which is a disputed issue in this case.

The fact that the Defendant was found guilty of another crime on another occasion does not mean he committed this crime on April 18, 2012. And you must not use his guilt of the other crime as proof of the crime charged in this case except for the one element of the crime which I have mentioned. You may find Defendant guilty of this crime only if the Government has proved beyond a reasonable doubt all the

elements of this crime and that Defendant committed it.

Now Count 2 of the indictment charges Derek Spriggs with possessing a firearm in furtherance of a drug trafficking crime, which is a violation of federal law. The offenses alleged in Counts 3 and 4 are drug trafficking crimes. In order to find Derek Spriggs guilty of the offense in Count 2, you must find that the Government proved each of the following two elements beyond a reasonable doubt:

First, Derek Spriggs committed the crime of conspiracy to distribute or possess with intent to distribute a controlled substance as charged in Count 3 of the indictment and Count 4 of the indictment. Second, that Derek Spriggs knowingly possessed a firearm in furtherance of this crime. If you find Derek Spriggs possessed the firearm, you must consider whether the possession was in furtherance of the criminal conspiracy to distribute or possess with intent to distribute a controlled substance or mere possession with intent to deliver a controlled substance. In order to find Derek Spriggs guilty of these offenses, you must first find that the Government proved each of these elements beyond a reasonable doubt.

Possession in furtherance of means for the purpose of assisting in, promoting, accomplishing, advancing, or achieving the goal or objective of drug trafficking. Mere presence of a firearm at the scene is not enough to find possession in furtherance of a drug trafficking crime. The firearms presence

may be coincidental or entirely unrelated to the underlying crime.

Some factors that may help you to determine whether possession of a firearm furthers a drug trafficking crime include, but are not limited to: One, the type of criminal activity that is being conducted; two, the accessibility of the firearm; three, the type of firearm; four, whether the firearm is stolen; five, whether the Defendant possesses the firearm legally or illegally; six, whether the firearm is loaded; seven, the time and circumstances under which the firearm is found; and eight, proximity to drugs or drug profits.

Count 3 of the indictment charges that on or about the 18th of April, 2012, in the Middle District of Pennsylvania, Derek Spriggs agreed to conspire with one or more other persons to distribute and possess with intent to distribute a controlled substance. It is a federal crime for two or more persons to agree or conspire to commit any offense against the United States even if they never actually achieve their objective.

A conspiracy is a kind of criminal partnership. In order for you to find Derek Spriggs guilty of conspiracy to distribute and possess with intent to distribute a controlled substance, you must find that the Government proved beyond a reasonable doubt each of the following three elements: First, that two or more persons agreed to distribute and possess with

the intent to distribute a controlled substance.  Second, that Derek Spriggs was a party to or a member of that agreement. Third, that Derek Spriggs joined the agreement or conspiracy knowing of its objectives to distribute and possess with intent to distribute a controlled substance and intended to join together with at least one other alleged conspirator to achieve these objectives; that is, that Derek Spriggs and at least one other alleged conspirator shared a unity of purpose and intent to achieve these objectives.

Now the first element of the crime of conspiracy is the existence of an agreement.  The Government must prove beyond a reasonable doubt that two or more persons knowingly and intelligently arrived at a mutual understanding or agreement, either spoken or unspoken, to work together to achieve the overall objective of the conspiracy; that is, to commit the offenses of distribution or possession with intent to distribute a controlled substance.

The Government does not have to prove the existence of a formal or written agreement or an express oral agreement spelling out the details of the understanding.  The Government also does not have to prove that all the members of the conspiracy directly met and discussed between themselves their unlawful objectives or agreed to all the details or agreed to what the means were by which the objectives would be accomplished.

The Government is not even required to prove that all the people named in the indictment were, in fact, parties to the agreement or that all the members of the alleged conspiracy were named or that all the members of the conspiracy are even known.  What the Government must prove beyond a reasonable doubt is that two or more persons in some way or manner arrived at some type of an agreement, mutual understanding, or meeting of the minds to try to accomplish a common and unlawful objective.

You may consider both direct and circumstantial evidence in deciding whether the Government has proved beyond a reasonable doubt that an agreement or mutual understanding existed.  You may find the existence of a conspiracy based on reasonable inferences drawn from the actions and statements of the alleged members of the conspiracy, from the circumstances surrounding the scheme, and from evidence of related facts and circumstances which prove that the activities of the participants in a criminal venture could not have been carried out except as a result of a preconceived agreement, scheme, or understanding.

Now if you find a criminal agreement or conspiracy existed, then in order to find Derek Spriggs guilty of that conspiracy, you must also find that the Government proved beyond a reasonable doubt that Derek Spriggs knowingly and intentionally joined that agreement or conspiracy during its

existence.

The Government must prove that Derek Spriggs knew the goals and objectives of the agreement for conspiracy and voluntarily joined it during its existence intending to achieve the common goals or objectives and to work together with other alleged conspirators towards these goals and objectives.  The Government need not prove that Derek Spriggs knew everything about the conspiracy or that he knew everyone involved in it or that he was a member from the beginning.

The Government also does not have to prove that Derek Spriggs played a major or substantial role in the conspiracy. You may consider both direct and circumstantial evidence in deciding whether Derek Spriggs joined the conspiracy, knew of its criminal objectives, and intended to further the objections.

Evidence that shows that Derek Spriggs only knew about the conspiracy or only kept bad company by associating with members of the conspiracy or was only present when it was discussed or when a crime was committed is not sufficient to prove that Derek Spriggs was a member of the conspiracy even if Derek Spriggs approved of what was happening and did not object to it.  Likewise, evidence showing that Derek Spriggs may have done something that happened to help a conspiracy does not necessarily prove that he joined the conspiracy.

You may, however, consider this evidence with all

other evidence in deciding whether the Government proved beyond a reasonable doubt that Derek Spriggs joined the conspiracy. In order to find Derek Spriggs guilty of conspiracy, you must find that the Government proved beyond a reasonable doubt that Derek Spriggs joined the conspiracy knowing of its objectives and intending to help further or achieve those objectives; that is, the Government must prove that Derek Spriggs knew of the objectives or goals of the conspiracy, that Derek Spriggs joined the conspiracy intending to further or achieve those goals and objectives, and that Derek Spriggs and at least one other alleged conspirator shared a unity of purpose toward these objectives or goals.

You may consider direct evidence and circumstantial evidence, including Derek Spriggs' words or conduct and other fact and circumstances in deciding whether Derek Spriggs had the required knowledge and intent. Now evidence has been admitted in this case that certain persons who are alleged to be co-conspirators of Derek Spriggs did or said certain things. The acts or statements of any member of a conspiracy are treated as the acts or statements of all the members of the conspiracy if those acts and statements were performed or spoken during the existence of a conspiracy and to further the objectives of the conspiracy.

Therefore, you may consider as evidence against Derek Spriggs any acts done or statements made by any members of the

conspiracy during the existence of and to further the objectives of the conspiracy. You may consider these acts and statements even if they were done and made in Derek Spriggs' absence and without his knowledge. As with all the evidence presented in this case, it is for you to decide whether you believe this evidence and how much weight to give it.

Now Count 4 of the indictment charges Derek Spriggs with possessing a mixture or substance containing a controlled substance, specifically marijuana, with the intent to distribute the controlled substance, which is a violation of federal law. In order to find Derek Spriggs guilty of this offense, you must find that the Government proved each of the following four elements beyond a reasonable doubt:

First, that Derek Spriggs possessed a mixture or substance containing a controlled substance. Second, that Derek Spriggs possessed the controlled substance knowingly or intentionally. Third, that Derek Spriggs intended to distribute the controlled substance. And four, that the controlled substance was marijuana. As to this element, it has been stipulated by the parties that the substance located in the plastic bags was marijuana.

In order to find Derek Spriggs guilty of possession of a controlled substance with intent to distribute, as charged in Count 4 of the indictment, you must find that the Government proved beyond a reasonable doubt that Derek Spriggs intended to

distribute a mixture or substance containing a controlled substance.

To find that Derek Spriggs had the intent to distribute, you must find that Derek Spriggs had planned in some way to deliver or transfer possession or control over a controlled substance to someone else. In determining whether Derek Spriggs had the intent to distribute, you may consider all the facts and circumstances shown by the evidence presented, including Derek Spriggs' actions.

In determining Derek Spriggs' intent to distribute a controlled substance, you may also consider, among other things, the quality and purity of the controlled substance, the manner in which the controlled substance was packaged, the presence or absence of weapons, large amounts of cash, or equipment used in the processing or sale of controlled substances.

To act knowingly, as used in this offense charged, means that the Defendant was conscious and aware that he was engaged in the acts charged and knew the surrounding facts and circumstances that make out the offenses. Knowingly does not require that the Defendant knew that the acts charged in the surrounding facts amounted to a crime.

To act intentionally, as used in this offense charged, means to act deliberately and not by accident. Intentionally does not require that the Defendant intended to

violate the law. The phrase knowingly or intentionally, as used in the offense charged, requires the Government to prove beyond a reasonable doubt that the Defendant knew that what he distributed or possessed with intent to distribute was a controlled substance.

In addition, the Government must also prove beyond a reasonable doubt that the controlled substance was, in fact, marijuana. However, as long as you find that the Government proved beyond a reasonable doubt that the Defendant knew that what he distributed or possessed with intent to distribute was a controlled substance, you need not find that the Defendant knew that the controlled substance was marijuana.

In deciding whether or not the Defendant acted knowingly and intentionally, you may consider evidence about what the Defendant said, what the Defendant did or failed to do, how the Defendant acted, and all the facts and circumstances shown by the evidence that may prove what was in the Defendant's mind at the time.

Now a person may be guilty of an offense because he personally committed the offense himself or because he aided and abetted another person in committing the offense. A person who has aided and abetted another person in committing an offense is often called an accomplice. The person whom the accomplice aids and abets is known as the principal.

In this case, the Government alleges that Derek

Spriggs aided and abetted Joshua Arvelo in committing, one, criminal conspiracy to distribute and possess with intent to distribute marijuana as charged in Count 3, and, two, distribution and possession with intent to distribute a controlled substance as charged in Count 4 of the indictment.

In order to find Derek Spriggs guilty of distribution and possession with intent to distribute a controlled substance because he aided and abetted Joshua Arvelo in committing these offenses, you must find beyond a reasonable doubt that the Government proved the following four requirements:

First, that Joshua Arvelo committed the offense charged by committing each of the elements of the offense charged as I have explained those elements to you. Joshua Arvelo need not have been charged with or found guilty of the offense; however, as long as you find that the Government proved beyond a reasonable doubt that he committed the offenses. Second, that Derek Spriggs knew that the offenses charged were going to be committed or were being committed by Joshua Arvelo. And third, that Derek Spriggs knowingly did some act for the purpose of aiding and assisting Joshua Arvelo in committing the specific offenses charged and with the intent that Joshua Arvelo commit these specific offenses. And four, that Derek Spriggs' acts did in some way aid, assist, or facilitate Joshua Arvelo to commit the offenses.

Derek Spriggs' acts need not themselves be against

the law. In deciding whether Derek Spriggs had required knowledge and intent, you may consider both direct and circumstantial evidence, including Derek Spriggs' words and actions and other facts and circumstances.

However, evidence that Derek Spriggs merely associated with persons involved in a criminal venture or is merely present or was merely a knowing spectator during the commission of the offense is not enough for you to find Derek Spriggs guilty as an aider and abetter. If the evidence shows that Derek Spriggs knew that the offense was being committed or was about to be committed, but does not also prove beyond a reasonable doubt that it was Derek Spriggs' intent and purpose to aid, assist, or facilitate or otherwise associate himself with the offense, you may not find Derek Spriggs guilty of the offense as an aider and abetter.

The Government must prove beyond a reasonable doubt that Derek Spriggs in some way participated in the offense committed by Joshua Arvelo, is something Derek Spriggs wished to bring about and to make succeed. The Government needs to show some affirmative participation by Derek Spriggs which at least encouraged Joshua Arvelo to commit the offense.

Now if you find unanimously that the Government has not proved beyond a reasonable doubt each of the elements of the offense of criminal conspiracy to distribute and possess with intent to distribute a controlled substance as charged in

Count 3 of the indictment, or possession with intent to distribute a controlled substance as charged in Count 4 of the indictment, then you must find Defendant Spriggs not guilty of those offenses, and your foreperson should check not guilty in the space provided for those offenses on the verdict form.

You should then consider whether the Government has proved beyond a reasonable doubt a lesser included offense of simple possession of a controlled substance that are included within the offenses stated in Counts 3 and 4. In order to find Derek Spriggs guilty of simple possession of a controlled substance, the Government must prove the following beyond a reasonable doubt:

First, that Derek Spriggs possessed a controlled substance. Second, that Derek Spriggs possessed the controlled substance knowingly and intelligently. If you find unanimously that the Government has proved beyond a reasonable doubt both of these elements of the lesser included offense, then you should find Derek Spriggs guilty of the lesser included offense, and your foreperson should check guilty in the appropriate space provided in the verdict form.

However, if you find unanimously that the Government has not proved beyond a reasonable doubt each of the elements of the lesser included offense, then you must check not guilty in the appropriate space provided in the verdict form. You should remember that the burden is always on the Government to

prove beyond a reasonable doubt each and every element of the offense charged in the indictment or of any lesser included offense.

Now the Defendant has been charged with four crimes. The number of charges is not evidence of guilt, and this should not influence your decision in any way. It is your duty to separately consider the evidence that relates to each charge and to return a separate verdict for each one. For each charge, you must decide whether the Government has presented proof beyond a reasonable doubt that the Defendant is guilty of that particular charge.

Upon retiring to the jury room, you should first select one of you to act as your foreperson who will preside over your deliberations and will be your spokesperson here in court. A verdict form has been prepared for your convenience. It is in the form of questions, and you must unanimously agree in your verdict as to each of the counts that you address.

You will take the verdict form to the jury room. And when you have reached a unanimous agreement as to your verdict, you will have your foreperson fill it in, date and sign it, and return to the courtroom. If during your deliberations you should desire to communicate with the Court, please reduce your message or question to writing, signed by the foreperson, date it, put the note in an envelope, and pass it to Mark who will bring it to my attention.

I will then respond as promptly as possible either in writing or by having you return to the courtroom so that I can address you orally. And, ladies and gentlemen, it might take several minutes because I must confer with counsel as to any communication that you present to the Court. So I must confer with them before I can respond to you.

I caution you, however, with regard to any message or question that you might send, that you should never state or specify your numerical division at any time. Keep in mind that the dispute between the parties is for them a most serious matter. They and the Court rely upon you to give full and conscientious deliberation and consideration to the issues and evidence before you.

Consider all the surrounding circumstances, the probabilities or improbabilities of the testimony, what counsel and the Court have said. You should try to reach what is a just, true, and correct solution of the controversy submitted to you. Again, in reaching your conclusion, you should be guided solely by the evidence that has been presented to you, the inferences drawn from the evidence, and the instructions of the Court on the law.

You should not be influenced by fear, favor, prejudice, or sympathy. All the parties stand equally before this Court, and each is entitled to the same fair and impartial treatment at your hands.

The Court would ask counsel whether there has been a failure to charge on any substantial matter of law or an incorrect charge?  The Government?

MS. TAYLOR:  No, Your Honor.

MS. FREESE:  No, Your Honor.  Thank you.

THE COURT:  Now at this point, I either have good news or bad news for Ms. Bakner and Mr. Zink.  You have been alternates in this case, and you have performed a very significant duty.  However, the law only requires 12 persons to render a verdict.  Your duty here has saved the Court from a potential retrial of this case.  If I did not have the two of you, and if one or two people became ill or somehow did not appear, I would have had to start the trial all over with a new jury.

So you have truly fulfilled a significant role.  And I thank you, and you are now excused with the thanks of the Court.  Do you have anything in the jury room you need to retrieve?  Mark, would you take them in?  I'll have the jury wait.

(Alternates were excused.)

(Courtroom deputy was sworn.)

THE COURT:  Has counsel checked the verdict slip?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  Any problem?

MS. TAYLOR:  No, Your Honor.

MS. FREESE: No, Your Honor.

THE COURT: The charge and verdict slip will go out with you. Court's in recess.

(Jury deliberations began at 10:03 a.m.)

(Proceedings recessed at 10:03 a.m.)

(Proceedings reconvened at 10:50 a.m.; without the jury.)

THE COURT: This is the question: Need transcript of testimony related to CI and change of plans to deliver the drugs. Instead of bringing buyer to supplier, was there exact statements indicating supplier would come along? Were these statements from the CI or did law enforcement listen in to the conversation? And it's signed by Kurt Scafe.

We're looking at the transcript. And the best that I can say is that the plans were changed, period. And there's no indication who changed them, what the changes were. At one point, I sustained an objection to this, and I think you raised it again, and you wanted a sidebar, I think, to raise the objection again.

MS. FREESE: That's correct, I was objecting to the hearsay testimony of the confidential informant.

THE COURT: Right. Well, there's nothing in here from the confidential informant. I think the only thing we can say is that the plans were changed. There's no indication of who changed the plans.

MS. FREESE:  Well, I think --

MS. TAYLOR:  I believe --

THE COURT:  It says, instead of bringing buyer to supplier, was there exact statements indicating supplier could come along?  There's nothing in the testimony concerning that.

MS. FREESE:  No.  And that was the basis of my hearsay objection.  So, no, there were no statements.

THE COURT:  Do you agree with that?

MS. TAYLOR:  Well, Your Honor, my recollection is, Trooper Markle testified that he was present during -- when these phone calls were made.

THE COURT:  Yeah, but this -- at one point, he was. But I don't know whether he was present after the change of plans.  I think he was present when the initial set-up of the buy.

MS. FREESE:  Correct.

THE COURT:  But we don't know whether he was there when the plans were changed.  There's nothing to indicate he was present -- or even when that change was made.

MS. FREESE:  It's unclear.

THE COURT:  Well, here, I'll have Wendy read from this portion of the transcript from the time that the phone call was made initially, okay.  Here, I'll show you.  Here's what we have.

The question is, Now what was the -- when you

initially met with the confidential informant, what was the initial plan?

The initial plan with the confidential informant was, they placed a phone call to arrange a drug transaction. It was for a quarter pound of marijuana for $460.00.

Was that phone call placed in your presence?

Yes, it was. And Josh Arvelo was going to be bringing the marijuana. The original plan was that the confidential informant would meet Mr. Arvelo at the Bass Pro Shop, which was in the -- it's the old Harrisburg East Mall. Meet him at the Bass Pro at which time the confidential informant would ride with Mr. Arvelo down to the City where Mr. Arvelo would pick up the marijuana from his supplier.

Is that what happened?

No, it's not.

How did the plan change?

The plan changed once we placed the confidential informant in the parking lot at Bass Pro. The confidential informant advised that -- and then there was an objection, and I sustained the objection.

I'll rephrase. The plan changed. Mr. Arvelo was bringing the supplier with him.

Objection.

I should have probably granted that objection because again it was hearsay.

MS. FREESE: Correct. And that was my -- I mean, that was the problem. Now they want the confidential informant's statements, which were hearsay.

MS. TAYLOR: Well, Your Honor, if you could just repeat the question they are asking? They are asking for --

THE COURT: We need the transcript of testimony related to the CI and change of plans to deliver the drugs. Instead of bringing buyer to supplier, was there exact statements indicating supplier would come along? Were these statements from the CI or did law enforcement listen in to that conversation?

MS. TAYLOR: I mean, Your Honor, it may just be simple enough, if the Court is not inclined to send them a portion of the transcript --

THE COURT: No, I'm not.

MS. TAYLOR: -- which I'm sure you're not, it may be simple enough to answer that question by saying, we can't produce a transcript for you and your recollection of the testimony would have to control.

MS. FREESE: I think the answer is, no. I mean, the confidential informant -- there were no -- Trooper Markle did not testify to any specific statements that the confidential informant made.

THE COURT: Okay. I think I can indicate there's no testimony by the confidential informant.

MS. TAYLOR: I would certainly agree with that, Your Honor.

THE COURT: Okay. You agree with that?

MS. FREESE: I agree with that.

THE COURT: And the Court did sustain an objection as hearsay to a portion of the conversation that allegedly took place to which the trooper was not present.

MS. FREESE: That's good.

THE COURT: Any objection to that? I did sustain an objection when the trooper began to indicate what the confidential informant said which he himself did not hear and it was considered hearsay.

MS. TAYLOR: Your Honor, I am just not sure if that's necessary or responsive to their question. If we answer their question by saying, we can't produce a transcript for you and the confidential informant didn't testify.

THE COURT: And anyone testifying to what he said who wasn't present would be hearsay, I think, because they're going to say, well --

MS. FREESE: Right, that's the problem.

THE COURT: They're not going to understand because at one point the trooper started to say, the plans were changed, and that's when there was a hearsay objection because it was by the -- what the trooper was going to say the confidential informant was going to say. I think I can tell

them, first of all, the confidential informant did not testify.

I don't think Arvelo said anything either, did he?

MS. FREESE: No.

THE COURT: As to what he and the confidential informant agreed upon?

MS. FREESE: No.

MS. TAYLOR: He didn't testify about the change of plan.

THE COURT: So there's nothing in here that can help them with their -- first of all, the confidential informant did not testify. Secondly, Mr. Arvelo did not testify as to what he and the informant had changed plans.

MS. FREESE: And I think the question is, does that answer their question with respect to Trooper Markle's testimony about what he said the supplier said or what he said the plan --

THE COURT: Well, it says, need transcript of testimony related to CI and change of plans to deliver the drugs. Instead of bringing buyer to supplier, was there exact statement indicating supplier would come along? There is no admissible testimony concerning bringing the buyer to supplier. And what were the exact statements indicating supplier would come along? There is nothing in the transcript concerning that.

MS. TAYLOR: Well, I would agree with that, Your

Honor, if the Court phrases it as they're asking it, that there are no exact statements in the record.

MS. FREESE: There is no admissible testimony would be my request particularly to protect the record depending upon what their verdict is.

THE COURT: Well, first of all, there are no exact statements from the CI on the record. And there's nothing in the record indicating what the change of plans were that I know of.

MS. TAYLOR: What was the second part, Your Honor?

THE COURT: We need to bring them out. No direct testimony by CI or Arvelo concerning what the change of plans were.

MS. FREESE: And I would specifically request, Your Honor, that you instruct them that there was no admissible testimony as to -- because there were objections at that part of the testimony, that there was no admissible testimony as to --

THE COURT: Well, I could say, there's no direct testimony by the CI or Arvelo concerning the change of plans, what the change of plans were.

MS. TAYLOR: Your Honor, it doesn't appear to me that they're asking about Mr. Arvelo's testimony at this point. I would certainly agree with the statement that there's no --

THE COURT: There's no testimony related to the -- it

doesn't say whether the CI said. It says, any testimony related to the CI and change of plans to deliver the drugs. There is nothing related to -- well, there is something related. It's in the testimony. It was started by the trooper.

MS. FREESE: Correct.

THE COURT: And I sustained the objection the first time around. Remember?

MS. TAYLOR: Yes, Your Honor.

THE COURT: But then you changed it. It was pretty much the same thing. She wanted a sidebar to make an objection to it, which was still hearsay. Now I'm not going to give them something that was improper if I didn't rule properly.

MS. TAYLOR: Of course, Your Honor, I understand that.

THE COURT: There were no exact statements indicating what the change of plans were.

MS. TAYLOR: I think that's certainly an accurate statement of what did not come out.

THE COURT: Do you agree with that?

MS. FREESE: I do agree with that.

THE COURT: There was no statements indicating what the change of plans were.

MS. FREESE: I am still requesting, there was no admissible testimony as to what the change of plans were -- no

admissible testimony or evidence as to what the exact change of plans were, because there were objections around that period of time.

THE COURT: What is your objection to the Court indicating, first of all, there were no exact statements in the record indicating what the change of plans were?

MS. TAYLOR: Mine, Your Honor?

THE COURT: Yeah.

MS. TAYLOR: No, I think that's fine.

THE COURT: Okay. Now why are you also indicating, any testimony along that line was hearsay or would have been hearsay?

MS. TAYLOR: Well, I'm not sure that -- I don't think that everything that Trooper Markle testified to regarding that is necessarily hearsay. I mean --

THE COURT: The first conversation was not hearsay because he was there on the phone when the drug thing was set up. He had no knowledge of the basis for the change of plans.

MS. TAYLOR: But if we say that there's no admissible testimony on that, I think that leaves the impression in the jury's mind that his testifying about what the initial plan was --

THE COURT: That's not what they're saying. It was the change of plans. There was no admissible testimony concerning the change of plans. The trooper was there when the

initial plan was set up. The change of plan, he was not privy to. Correct?

MS. TAYLOR: That's correct, Your Honor.

THE COURT: And there is no testimony, admissible testimony on the record as to --

MS. TAYLOR: The exact change of plans.

THE COURT: -- the exact change of plans.

MS. TAYLOR: I think that would be acceptable.

THE COURT: Hold on now. I forgot what I said. Did Arvelo testify as to what the change of plans were?

MS. TAYLOR: He did not, Your Honor.

MS. FREESE: He did not.

THE COURT: And maybe -- can I indicate that the trooper was not present when the change of plans were made? Because -- were these statements from the CI or did the law enforcement later --

MS. FREESE: Right, change the plan.

THE COURT: -- listen in on that conversation?

MS. TAYLOR: Well, he certainly did not listen in. He did not listen in on that conversation.

THE COURT: Well, then he wasn't present.

MS. FREESE: Correct.

THE COURT: Or was not -- was not present, but was not aware of what the change of plans were. Okay. Well, maybe he was. The CI did not testify. Arvelo did not testify to the

change.  And the trooper was not privy to that conversation.

MS. TAYLOR:  He was not present for that.

THE COURT:  He was not present for that conversation. Is that satisfactory?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  Are you satisfied?

MS. FREESE:  I am.  Are you still going to give the instruction that there was no admissible testimony regarding the change of plans?

THE COURT:  No, because we don't know what the change of plans were anyway.  The trooper wasn't.  I don't know how -- the change of plans were apparently between the CI and Arvelo.

MS. FREESE:  Correct.

THE COURT:  And there's no testimony concerning that change of plans.

MS. FREESE:  There is, I think, Your Honor.  Trooper Markle, over my objection, testified that the confidential informant was going to bring his supplier to the mall.  And that was the basis for my objection for hearsay.  And he testified to that.

THE COURT:  Let me think about that.  Well, the trooper was not present for any of his knowledge concerning the change of plan and could not testify to that because it would be hearsay.  I did at one point sustain the objection and said it was hearsay.

MS. FREESE:  That's correct.

THE COURT:  So that in itself was true.  Well, bring them in and I'll do the best I can.

(The jury was brought in at 11:07 a.m.)

THE COURT:  I was trying to make the most out of your note.  The note says, Need transcript of testimony related to CI and change of plans to deliver the drugs.  Instead of bringing buyer to supplier, was there exact statements indicating supplier would come along?  Were these statements from the CI or did law enforcement listen in to that conversation?

There are no exact statements in the record indicating what the change of plans were.  The CI did not testify to the change of plans.  Arvelo did not specify exactly what the change of plans were.  The trooper only listened in to the conversation when the initial plan was set up.

Are you satisfied with that?

THE FOREPERSON:  I think that was the answer we were looking for, a clarification.

A JUROR:  Actually, may I interject?

THE COURT:  Yes.

A JUROR:  My understanding, was there no mention once the change of plan took place, was there no mention in that, instead of our going there, and that's the first part of it, I'm bringing the supplier with me, by anyone?  Did the trooper

say that is what he was told by the informant, I'm bringing the supplier with me?

THE COURT: Anything that the trooper testified to that he heard from someone else is hearsay and not admissible.

A JUROR: And it's inadmissible, okay.

THE FOREPERSON: Are you satisfied?

THE JURY: Yes.

THE COURT: The Government has an exception.

MS. TAYLOR: Thank you, Your Honor.

(The jury left to resume deliberations at 11:10 a.m.)

COURTROOM DEPUTY: Court's in recess.

(Recess was taken at 11:10 a.m. and proceedings reconvened at 12:06 p.m. with all parties present.)

COURTROOM DEPUTY: Will the foreperson of the jury please rise?

(Complied.)

COURTROOM DEPUTY: Has the jury reached a unanimous verdict?

THE FOREPERSON: Yes, they have.

(Verdict reviewed by the Court.)

COURTROOM DEPUTY: Ladies and gentlemen of the jury will you all please rise?

(Complied.)

COURTROOM DEPUTY: In the case of United States of America versus Derek Eugene Spriggs, case 1:12-CR-300, on Count

1, as to the charge that the Defendant was a felon in possession of a firearm, how do you find the Defendant? Your answer is guilty. Is that your answer?

THE FOREPERSON: Correct.

THE COURT: Is that your answer, so say you all?

THE JURY: Yes.

COURTROOM DEPUTY: On Count 2, as to the charge the Defendant knowingly possessed a firearm in furtherance of drug trafficking, how do you find the Defendant? Your answer is guilty. Is that your answer?

THE FOREPERSON: Correct.

COURTROOM DEPUTY: Is that your answer, so say you all?

THE JURY: Yes.

COURTROOM DEPUTY: Count 3, as to the charge the Defendant knowing and intentionally conspired to distribute and possess with intent to distribute a controlled substance, how do you find the Defendant? Your answer is guilty. Is that your answer?

THE FOREPERSON: Correct.

COURTROOM DEPUTY: Is that your answer, so say you all.

THE JURY: Yes.

COURTROOM DEPUTY: On Count 4, as to the charge the Defendant knowingly possessed with intent to distribute a

controlled substance, how do you find the Defendant? Your answer is not guilty. Is that your answer?

THE FOREPERSON: Correct.

COURTROOM DEPUTY: Is that your answer, so say you all?

THE JURY: Yes.

THE COURT: Please be seated.

(Complied.)

THE COURT: May I see counsel?

(Discussion was held at sidebar:)

THE COURT: That's a strange verdict.

MS. FREESE: It is indeed, Your Honor.

THE COURT: It's not inconsistent.

MS. TAYLOR: Is Your Honor concerned that they did not make -- address the lesser included offense?

THE COURT: No, no. They found him guilty of conspiracy but not the underlying substantive offense.

MS. TAYLOR: I don't think that's necessarily inconsistent.

THE COURT: It's not -- well, they may figure he's guilty of conspiracy, so that covers the substantive offense. But I don't know what to do at this point.

MS. FREESE: I'm not sure what to do. It is bizarre.

THE COURT: Hum.

MS. FREESE: It's bizarre.

THE COURT: Yeah, it is.

LAW CLERK: I don't know how the lesser included offense would make the way that it --

THE COURT: I'm not worried about the lesser included.

MS. FREESE: I'm not worried about that either.

THE COURT: The fact that they didn't find the substantive --

MS. FREESE: Because I think they didn't find the possession.

MS. TAYLOR: Your Honor, I mean, it may be as simple as they didn't feel the quantity on him was that he intended to distribute it, but that he conspired with Mr. Arvelo for the additional amount that was delivered.

THE COURT: I'm going to let it stand for the time being.

(Discussion at sidebar concluded.)

THE COURT: The Court will direct the Clerk of Court to enter a judgment of guilty on Counts 1 and 2 and 3. Now, ladies and gentlemen, I thank you for your service. We could not have these trials without the service of you as citizens performing your duty as jurors, and I thank you. I know some of these issues were difficult to get a handle on, but I thank you for your service. You are now excused with the thanks of the Court.

(Jury was excused at 12:10 p.m.)

THE COURT: Will the Defendant and counsel approach, please?

(Complied.)

THE COURT: Mr. Spriggs, I have the obligation to advise you that you do have 14 days from this date in order to file a motion for judgment notwithstanding the verdict or motion for a new trial. Your counsel will continue to represent you without costs in these matters. You are now excused. Court's adjourned.

COURTROOM DEPUTY: Court's adjourned.

(Proceeding adjourned at 12:15 p.m.)

**CERTIFICATION**

I, Wendy C. Yinger, Federal Official Realtime Court Reporter, in and for the United States District Court for the Middle District of Pennsylvania, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ Wendy C. Yinger
Wendy C. Yinger, RMR, CRR
U.S. Official Court Reporter
(717)440-1535